# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **Female Athletes United,**<br><br>                Plaintiff,<br><br>v.<br><br>**Keith Ellison**, in his official capacity as Attorney General of Minnesota; **Rebecca Lucero**, in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; **Erich Martens**, in his official capacity as Executive Director of the Minnesota State High School League; **Willie Jett**, in his official capacity as the Minnesota Commissioner of Education; **Independent School District No. 11 School Board**; **Independent School District No. 192 School Board**; **Independent School District No. 279 School Board**,<br><br>                Defendants. | Case No.    0:25-cv-2151<br><br>**Verified Complaint** |

## Introduction

1.     Plaintiff Female Athletes United ("FAU") is an organization that advocates for fairness, safety, and equal opportunity for women and girls in sports. FAU has members across the country including female athletes who are playing high-school sports in Minnesota.

2.     Minnesota allows male students to compete in women's and girls' sports if they claim a female gender identity. Minnesota does not place any physical limitations on participation in the female category, such as testosterone levels or other measurements that attempt to mitigate the inherent physiological advantages that male athletes have over females.

3.     Because of this policy, though Minnesota designates some high-school sports for women and girls, these sports are not actually reserved for females. And as a result, boys are displacing and defeating girls in competitive sports. FAU has members who have competed against and lost to male athletes, including when playing on behalf of their Minnesota public school.

4.     Minnesota's policy expands opportunities for male athletes to compete and experience victory at the expense of female athletes. Minnesota's female athletes suffer as a result—experiencing fewer opportunities to play, win, advance, and receive recognition in their own

sports. And these female athletes also suffer the mental burden of knowing that their rights are secondary. Their hard work may never be enough to win.

5.    By sacrificing protection for female athletes, Minnesota fails to treat girls equally or to accommodate them by providing them with competitive opportunities that account for the physiological differences between males and females. This subverts the purpose and requirements of Title IX by subordinating the rights and opportunities of females.

## Jurisdiction and Venue

6.    This action, pursuant to Title IX, 20 U.S.C. § 1681, et seq. and its interpreting regulations, raises federal questions and seeks redress for deprivation of rights protected by federal law.

7.    This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

8.    This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

9. Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the District of Minnesota; the effects of the challenged laws are felt here; Defendants can and do perform official duties here; and Defendants reside here.

**Plaintiff**

10. Plaintiff Female Athletes United ("FAU") is a nonprofit corporation organized under the laws of Texas.

11. FAU is a membership organization formed for the purpose of defending women and girls' sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field. FAU promotes girls' and women's right not to compete against biological males who identify as females on girls' and women's sports teams.

12. FAU is a coalition of current and former female athletes and anyone, whether male or female, who wants to ensure women's sports remain a place for only women and girls.

13. FAU has members in states across the country, including Minnesota.

14. Some FAU members participate on their girls' and women's sports teams at schools governed by Title IX, including public schools in

Minnesota. These members compete on female teams at their schools and seek the benefits of competing against only women and girls in athletic competitions. And some members attend schools with classmates who identify as transgender or non-binary.

*E.G.*

15.    E.G. is a 16-year-old female and resident of Hennepin County, Minnesota.

16.    She is a member of FAU.

17.    E.G. is a junior at Maple Grove Senior High School, where she competes on the varsity basketball and softball teams.

18.    Maple Grove Senior High School is a public school governed by the Independent School District No. 279 School Board and a recipient of federal funding.

19.    E.G. has competed in varsity softball against a male athlete and lost in both games during the regular season and sectionals. Losing at sectionals meant that her team did not have a chance to advance to the state tournament.

20.    E.G.'s team competed against and lost to this male athlete in a regular season game this year. In that game, E.G.'s team did not score at all, and the male athlete pitched seven shutout innings, allowing only one hit and

striking out seven. E.G.'s team will participate in a sectionals tournament this season that includes the male athlete's team—and only the winning team will advance to the state tournament. And her team will participate in a sectional tournament with the male athlete's team again next year, and only the winning team from that tournament will advance to the state tournament.

*M.S.*

21.    M.S. is a seventeen-year-old female who resides in Dakota County, Minnesota.

22.    M.S. is a member of Female Athletes United.

23.    She is in her junior year and plays softball player on the girls' varsity team at Farmington High School in Dakota County, Minnesota.

24.    Farmington High School is a public school governed by the Independent School District No. 192 School Board that receives federal funding.

25.    M.S. was on the male athlete's club team and historically was one of the team's best pitchers. This year, M.S. made the club team but was told she would have to compete against this male player for pitching time.

26.   At the time, M.S. did not realize that this athlete was male. But after her parents told her, she was upset and decided to no longer play for the club team.

27.   M.S. is the top pitcher on her high school varsity softball team.

28.   M.S. has already committed to play collegiate softball at a school in Minnesota when she graduates high school.

29.   M.S. is likely to compete against a male athlete at the state softball tournament this season and will also likely face this male athlete again at state during her senior year.

*E.P.*

30.   E.P. is a 16-year-old female resident of Dakota County, Minnesota.

31.   She is a member of Female Athletes United.

32.   E.P. is a sophomore at Farmington High School, a public high school in Farmington Country, Minnesota. She plays varsity softball and junior varsity and varsity basketball for her high school.

33.   As mentioned above, Farmington High School is a public school governed by the Independent School District No. 192 School Board that receives federal funding.

34.     When playing club softball, E.P. was hit by a pitch thrown by the male athlete competing in girls' softball. E.P. had never experienced pain like this when getting hit by pitches on other occasions. The speed and strength of the pitch made the pain more intense than she has felt when getting hit other times.

35.     E.P. anticipates that she will likely compete against the male athlete at the state softball tournament this year and likely will again next year if Minnesota continues to allow male athletes to compete in women's and girls' sports.

36.     Neither M.S. nor E.P. thinks that it is fair for their team to face a male athlete in the state tournament. The Minnesota high school team with a male softball player recently defeated last year's defending state champion team. M.S. and E.P. are discouraged because they feel like they do not have an equal chance at victory at the state tournament before they even set foot on the field.

37.     E.G., M.S., and E.P. have all participated on teams with this male athlete either as part of the same team or as substitutes for the club team this athlete plays on.

38.     E.G., M.S., and E.P. all believe that it is unsafe and unfair to play against a male athlete, particularly in softball. Males are on average bigger, stronger, and taller than women. In softball, this translates to a significant

8

advantage in pitching, hitting, and running. Female athletes trying to hit a pitch thrown by a male or catch the ball when hit by a male athlete, are at a significant disadvantage. Additionally, they reasonably fear that they could be injured.

39.    None of the FAU members identified above wants to compete against biological males in their school sports, regardless of how those male competitors personally identify themselves. These members think that competing against males in their sports is unfair, discouraging, and limits their ability to enjoy participating in sports. These members identified above also fear being injured if they are forced to compete against males who are typically bigger, faster, and stronger.

## Defendants

40.    Defendant Keith Ellison, sued in his official capacity, is the Attorney General of Minnesota.

41.    General Ellison issued a formal legal opinion stating that the Minnesota Human Rights Act (MHRA) prohibits schools from protecting girls' sports by maintaining a designated female category. Minn. Att'y. Gen. Op.1035 at 2 (Feb. 20, 2025), https://bit.ly/42tcHtL.

42.    The Attorney General serves as the attorney for the Minnesota Department of Human Rights. The Commissioner of the Department refers

matters alleging violations of the MHRA to the Attorney General for enforcement. Minn. Stat. § 363A.32, subd. 1. The Attorney General has authority on behalf of the Department to seek interim relief during the pendency of a charge. Minn. Stat. § 363A.28, subd. 6(e).

43.    Defendant Rebecca Lucero, sued in her official capacity, is the Commissioner of the Minnesota Department of Human Rights.

44.    The Commissioner may initiate charges of discrimination whenever she "has reason to believe that a person is engaging in an unfair discriminatory practice[.]" Minn. Stat. § 363A.28, subd. 2. And any "person who claims to be aggrieved" by an MHRA violation or any person who believes they have witnessed discrimination that violates the MHRA can file a report of discrimination. Minn. R. 5000.0400, subp. 1b; *Report Discrimination*, Minn. Dep't Human Rights, https://tinyurl.com/3ky9tnsx (last visited May 15, 2025).

45.    Minnesota and private organizations have engaged testers to seek out violations of the MHRA. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) ("It has even employed 'testers' to target noncompliant businesses"); Zoë Jackson, *Want to go undercover to test housing discrimination? Legal Aid is seeking Minnesota volunteers*, Star Tribune (April 23, 2023), https://tinyurl.com/2384cnaj.

46.   The Minnesota Department of Human Rights is tasked with determining "whether or not there is probable cause to credit" alleged violations of the Minnesota Human Rights Act. Minn. Stat. § 363A.28, subd. 5. If the Commissioner of the Department of Human Rights reasonably believes that there was a violation, he or she may file a petition in the district court seeking temporary relief pending the Department's final determination. *Id.* at subd. 6(b)-(e).

47.   Erich Martens, sued in his official capacity, is the Executive Director of the Minnesota State High School League (MSHSL).

48.   The MSHSL is a voluntary association of high schools with power and duties created by state statute. Minn. Stat. §§ 128C.01, *et seq.*

49.   The MSHSL provides extracurricular opportunities, including interscholastic athletic competitions, to its over 500 member schools. *About,* MSHSL, https://www.mshsl.org/about.

50.   The MSHSL is considered a state agency under Minnesota law for at least some purposes. *See, e.g.*, Minn. Stat. § 128C.22.

51.   By joining the MSHSL, a high school (via its governing board) delegates control over extra-curricular activities, including athletics, to the MSHSL. Minn. Stat. § 128C.01.

52.   MSHSL's purposes include to "promote, manage and administer a program of activities for the students of member schools on subsection,

11

section, and state levels in athletics and fine arts" and to "establish uniform and equitable rules for students in extra-curricular activities." *About*, MSHSL, https://www.mshsl.org/about.

53.    The MSHSL exercises control over high-school athletics in Minnesota via the delegation from its members schools, the vast majority of which are public schools that receive federal financial assistance and are subject to Title IX.

54.    The MSHSL's official policy is to allow students to compete in the girls' category based on their stated gender identity without regard for sex.

55.    The MSHSL receives funding via dues paid by high schools, including public schools, that themselves receive federal financial assistance.

56.    MSHSL's rules "are promulgated pursuant to a procedure which integrally involves the member school districts[.]" *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973)

57.    Schools are integral to enforcing the MSHSL's rules and their funding and involvement place the MSHSL within Title IX's purview. *See id.* ("[T]he ultimate enforcement of the rules [is] the responsibility of the member school and the public officials of those schools and school districts.… Minnesota State High School League and the defendant school districts are acting under color of state law.")

58.    Willie Jett, sued in his official capacity, is the Minnesota Education Commissioner for the Minnesota Department of Education.

59.    The Minnesota Department of Education is authorized to conduct on-site reviews of school districts to assess Title IX compliance.

60.    Under the MHRA, the Minnesota Human Rights Commissioner can enlist the services of state departments and agencies, including the Department of Education. Minn. Stat. Ann. § 363A.06, Subdiv. 1(6).

61.    Defendant Independent School District No. 11 (ISD 11) School Board is the governing board for public schools located in Anoka and Hennepin counties in Minnesota, including Champlin Park High School.

62.    The ISD 11 School Board and the schools it governs, including Champlin Park High School, receive federal financial assistance.

63.    The ISD 11 School Board and the schools it governs, including Champlin Park High School, are subject to Title IX.

64.    The ISD 11 School Board has delegated control over its high-school athletics to the MSHSL.

65.    High schools governed by the ISD 11 School Board, including Champlin Park High School, are members of the MSHSL.

66.    High schools governed by the ISD 11 School Board, including Champlin Park High School, pay dues to the MSHSL.

67.    Defendant ISD 11 Schools Board provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of the MSHSL.

68.    Defendant Independent School District No. 192 (ISD 192) School Board is the governing board for public schools located in Dakota County in Minnesota, including Farmington High School.

69.    The ISD 192 School Board and the schools it governs, including Farmington High School, receive federal financial assistance.

70.    The ISD 192 School Board and the schools it governs, including Farmington High School, are subject to Title IX.

71.    The ISD 192 School Board has delegated control over its high-school athletics to the MSHSL.

72.    High schools governed by the ISD 192 School Board, including Farmington High School, are members of the MSHSL.

73.    High schools governed by the ISD 192 School Board, including Farmington High School, pay dues to the MSHSL.

74.    Defendant ISD 192 School Board provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of the MSHSL.

75.    Defendant Independent School District No. 279 (ISD 279) School Board is the governing board for Osseo Area Schools, including Maple Grove

14

Senior High School. Maple Grove Senior High School is a public school located in Hennepin County in Minnesota.

76.     The ISD 279 School Board and the schools it governs, including Maple Grove Senior High School, receive federal financial assistance.

77.      The ISD 279 School Board and the schools it governs, including Maple Grove Senior High School, are subject to Title IX.

78.     The ISD 279 School Board has delegated control over its high-school athletics to the MSHSL.

79.     High schools governed by the ISD 279 School Board, including Maple Grove Senior High School, are members of the MSHSL.

80.     High schools governed by the ISD 279 School Board, including Maple Grove Senior High School, pay dues to the MSHSL.

81.     Defendant ISD 279 School Board provides opportunities for interscholastic competition for its students only through events sanctioned by and subject to the discriminatory policies of the MSHSL.

## Factual Background

### A.    Title IX's Goal to Protect Female Athletes

82.     At the time Title IX was passed in 1972, there was a significant gap in athletic participation between men and women.

83.     Female Athletes United's Secretary Sandra Bucha's story epitomizes the discrepancy of athletic opportunities offered to girls and boys in the school context.

84.     Sandra attended public high school in Illinois from 1968−1972. Sandra was an incredibly talented swimmer, but at this time, there were no competitive sports opportunities offered to women at her school. She brought a lawsuit against the state high school association for the inequality of opportunity.

85.     Though she lost this battle, female athletes won this war. Title IX was passed the same year Sandra's case was decided—opening the door for female athletes to enjoy the opportunities and benefits that come from being part of a competitive sports team.

86.     Title IX prohibits sex discrimination in education programs or activities receiving federal financial assistance. Title IX provides that

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

87.     Title IX expressly protects against sex-based discrimination in athletics:

> "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and

no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a).

88.    To ensure effective enforcement of Title IX's guarantees, Congress gave the United States Department of Health, Education, and Welfare (HEW) authority to promulgate regulations implementing Title IX. 20 U.S.C. §1682. HEW published regulations in 1975. 34 C.F.R. Part 106 ("Regulations").

89.    A few years later, in 1979, the Office for Civil Rights (OCR) at the Department of Education Office for Civil Rights published more detailed guidance on Title IX and the Regulations' requirements in the collegiate athletic context through a policy interpretation. This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

90.    The Policy Interpretation was further clarified by OCR through issuance of OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "OCR Clarification"). This interpretation has been applied by Courts in the high school sports context as well.

91.    This year, President Trump issued an executive order, *Keeping Men out of Women's Sports*, Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025), clarifying that Title IX protects girls' sports, including by requiring that competition in the female sports category is reserved for female athletes.

92.    This order reinforces the understanding of what Title IX and its implementing regulations and guidance require: if an entity subject to Title IX offers athletic programs or opportunities separated by sex, it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

93.    For decades, schools and athletes alike recognized that this includes providing a protected female category in competitive sports. The Executive Order underscores this interpretation.

94.    The Trump administration issued another relevant executive order earlier this year, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg 8615 (Jan. 20, 2025). This order confirms that sex "shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" The order also affirmed that federal agencies should interpret and apply "sex" in federal laws and regulations consistent with this definition.

95.    These clarifications of Title IX's requirements merely confirm what was already the practice for decades at schools implementing Title IX across the country.

96.    Title IX's regulations and guidance recognize two aspects of equal opportunity: effective accommodation and "equivalent treatment,

18

opportunities, and benefits." 34 C.F.R. § 106.41(c); Policy Interpretation, 44 Fed. Reg. at 71,415.

97.     The regulations and guidance acknowledge that effective accommodation requires consideration of the physical differences between men and women.

98.     The Regulations and Policy Interpretation both provide that "the athletic interests *and abilities* of male and female students must be equally effectively accommodated." Policy Interpretation, 44 Fed. Reg. at 71,414 (emphasis added); 34 C.F.R. § 106.41(c).

99.     The Policy Interpretation spells this out, stating that effective accommodation requires "equal opportunity in . . . levels of competition," and competitive opportunities for each sex "which equally reflect their abilities."

100.    The guiding principles for "equivalent treatment, benefits and opportunities" are also explained in the Regulations and Policy Interpretation. The Policy Interpretation specifies that equivalent treatment includes equal opportunities to be recognized, 34 C.F.R. § 106.41(c), "to engage in . . . post-season competition," and to be free of any policies which are "discriminatory in . . . effect" or that effectively deny "equality of athletic opportunity." Policy Interpretation, 44 Fed. Reg. at 71,416–17.

101.    In the over 50 years since Title IX's passage, opportunities for female students to participate in school sports has burgeoned. The expansion

19

of girls' participation in high school athletics is especially striking. In the first half century of Title IX, girls' participation in high school sports went from 300,000 to 3.4 million. During the same period, boys' participation in high school sports rose from 3.6 million to 4.5 million. Brenda Alvarez, *Title IX At 50: Where We've Been, Where We're Headed, and Why It Still Matters*, NEA Today (July 7, 2022).

102.   Despite Title IX's progress, the number of girls participating in high school sports today is still lower than the participation of boys in 1972. *Id.*

103.   Work needs to be done to equalize opportunities for female athletes. This necessitates commitment to Title IX's principles and requirements, requirements that recipients of federal funding are tasked with upholding.

**B.    Equal Opportunities in Athletics and the Physiological Differences Between the Sexes.**

104.   Equal opportunity under Title IX cannot countenance prioritizing male athletes' participation at the expense of safety, fairness, and opportunity for women.

105.   Policies that adopt a sex-blind approach to school athletics deprive female athletes of effective accommodation and "equivalent treatment, benefits and opportunities."

20

106.   That's why Title IX is explicit that, as sponsors of the statute made clear during the debates in Congress, "where selection for such teams is based on competitive skill or the activity involved is a contact sport," sex-designated teams are permitted. 34 C.F.R. 106.41(b).

107.   The law has long acknowledged the "enduring" "[p]hysical differences between men and women[.]" *United States v. Virginia*, 518 U.S. 515, 533 (1996). And Title IX recognizes that these enduring differences preclude entirely co-ed athletic programs from offering true equality of opportunity and competition to female athletes. *Hearings Before the Subcommittee on Postsecondary Educ. of the Comm. on Educ. & Labor*, H.R. at 343 (June 1975) (statement of Dr. Bernice Sandler), https://bit.ly/39rvo2H (Entirely co-ed athletic programs will "effectively eliminate opportunities for women to participate in organized competitive athletics.").

108.   Genuine physiological differences are the premise for having sex-designated sports. When males compete in girls' sports, these genuine differences generate real issues of safety and fairness that are substantiated by significant data illustrating that on average male athletes outperform female athletes of comparable talent and training in nearly every sport.[1]

---

[1] Konstantinos D. Tambalis et al., *Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method*, 16 Eur. J. Sports Sci. 736, 738, 744 (2016), DOI:10.1080/17461391.2015.1088577 (2016).

109.   Even before puberty, boys consistently outperform girls on average by a measurable degree. After puberty, male advantage vastly increases due to the wide range of changes that occur during puberty.

110.   Male physiology differs from female in a variety of ways. Male puberty brings with it stronger bones, greater efficiency in blood oxygenation, taller height, broader wingspan, and increased lean body mass. *See* Alison M. McManus & Neil Armstrong, *Physiology of elite young female athletes,* 56 J. Med. & Sport Sci. 23 (2011), DOI:10.1159/000320626; *The Role of Testosterone in Athletic Performance*, Duke Ctr. For Sports L. & Poly's 1 (Jan. 2019), https://bit.ly/3YPTEYe. These attributes translate to an ability to jump higher, throw farther, run faster, and hit harder. *Role of Testosterone*, *supra*, at 1.

111.   Male athletes retain many of these performance advantages, including greater strength and lean body mass, even when engaging in testosterone suppression. Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 200, 211 (2021) ("Hilton & Lundberg").

112.   Puberty blockers likewise do not erase male advantage. For example, males who take puberty blockers have been found to still achieve the height predicted at birth. Lidewij Sophia Boogers et al., *Transgender*

22

*girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment*, 107 J. Clinical Endocrinology Metabolism e3805 (2022). This gives them both the benefits of being taller and also of having longer limbs. Nor is there evidence that puberty blockers eliminate all other aspects of male advantage, including advantages that predate puberty.

113.    These differences are central to softball performance. In pitching, male advantage manifests through throwing faster and farther. Greater wingspan and larger hands provide advantages for grip, potentially giving increased control in putting spin on the ball. Males also have an advantage in hitting and running—they can hit harder and run faster.

114.    Males exhibit great speed, distance, and accuracy in throwing early on. Xiao Liu & Guobing Zhao, *Age and Gender Differences of Motor Skills of the Overarm Throw in Children and Adolescents*, 6 Educ. Rev., U.S.A. 391 (2022) ("Males outperformed females in throwing at all ages on a number of metrics including motion composition, throwing speed, distance, and accuracy.… no historical changes in age or gender differences were observed in developmental level or ball velocity measurements over the past 40 years."). "A pronounced male advantage emerges…around the age of 3 yr, when structural differences across genders are still negligible. The gap is maintained and typically increases throughout development." Antonella Macelli, et al., *A whole body characterization of individual strategies, gender*

*differences, and common styles in overarm throwing*, 122 J. Neurophysiology 2486, 2487 (2019), https://doi.org/10.1152/jn.00011.2019. "[A]t 17 years of age, the average male throws a ball further than 99% of 17-year-old females." Hilton & Lundberg, *supra*, at 204.

115.   Males also outperform females in batting. A 2021 study found trained male batters in cricket "generated greater maximum bat speeds, ball launch speeds, and ball carry distances than their female counterparts." Stuart A. McErlain-Naylor, et al., *Comparing power hitting kinematics between skilled male and female cricket batters*, 39 J. Sports Science 2393, 2398 (2021), https://tinyurl.com/73fmu96c.

116.   From an early age, boys also run faster than girls. A study of 8 and 9-year-old boys and girls found that "data for all ages and distances indicates that the average times for males were 4.8 ± 1.2% faster than the females, and the fastest males were 3.7 ± 2.3% faster than the fastest females" Gregory A. Brown, et al., *Sex-based differences in track running distances of 100, 200, 400, 800, and 1500m in the 8 and under and 9–10-year-old age groups*, 24 European J. Sports Science 217, 220 (Feb. 2024).

117.   Sex-designated categories for female athletes are necessary to provide fair competitive opportunities for women and to avoid eliminating women from the ranks of elite athletes. As a *Washington Post* article explained, "To see that this is true, play with a competition results database

24

and look at what happens to female athletes when rankings are combined: by early-to-mid adolescence, female competitors disappear from the upper echelons." Doriane Lambelet Coleman, *Why elite women's sports need to be based on sex, not gender*, Wash. Post (Aug. 16, 2024), https://tinyurl.com/4rv2h6u8.

118.    Ignoring the physiological differences between men and women, girls and boys, will allow males to "displace females to a substantial extent." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). The biology-based differences between girls and boys are what justify sex-designated categories. Without protected teams on which girls can compete, equal opportunity for them to participate in athletics is illusory. Male advantages are such that even "isolated instances of male participation upon girls' teams creat[es] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979). And this has been documented as male athletes across the country are winning state titles in girls' athletic competitions. *Soule v. Connecticut Ass'n of Sch.*, 755 F. Supp. 3d 172 (D. Conn. 2024); Amanda Sullender, *East Valley teen is the first Washington transgender athlete to win a state high school track championship. But controversy followed*, The Spokesman-Review (June 2, 2024), https://perma.cc/XVG2-75QG.

119.    The basic physiological differences between males and females have long been recognized and respected by the different standards set for boys and girls in a number of athletic events. For example:

a. The net height used for women's volleyball is more than 7 inches lower than that used for men's volleyball.

b. The standard weight used in high school shot put is 4 kilograms for girls, and 5.44 kilograms (36% heavier) for boys.

c. The hurdle height used for the high school girls' 100−meter hurdle event is 33 inches, whereas the standard height used for boys' high school 110−meter hurdle is 39 inches.

d. The standard women's basketball has a circumference of 28 1/2 to 29 inches and a weight of 20 oz, while a standard basketball used in a men's game has a circumference between 29.5−30 inches and a weight of 22 oz.

120.    Minnesota allows athletes to participate in sports solely based on gender identity. There are no limitations based on testosterone level, whether male puberty has been started or completed, or other metrics know to magnify the physiological advantage males have over women, advantages raising safety concerns for female athletes.

121.    As explained in detail above, these marked physiological advantages of males pre-exist puberty and persist despite testosterone suppression.

122.    Plaintiff does not know what medical interventions, if any, the male athlete competing in MSHSL softball events may have received. Nor does this matter. As stated above, state officials allow males to participate in

26

women's sports regardless of any pharmaceutical intervention, and

testosterone suppression and puberty blockers cannot eliminate males'

athletic advantages, which result in an unlevel playing field for female

athletes.

### C.    Increasing Numbers of Girls Are Losing Athletic Victories and Opportunities to Male Competitors Today.

123.    In recent years, the number of people, particularly adolescents,

who identify as transgender has significantly increased. Hilary Cass, *The*

*Independent Review of Gender Identity Services for Children and Young*

*People* at 118 (2024), https://bit.ly/3GuzHQu. And the number of males

competing in the girls' category has likewise grown.

124.    As a result, more female athletes are losing opportunities to

compete and receive recognition for their athletic achievements. Each time a

male competes in the female category, the opportunities for males to compete

and win are expanded at the expense of women and girls.

125.    As more boys begin identifying as girls, the magnitude of impact

on women and girls increases. More girls across different sports and levels of

competition are displaced from competing or losing out on medals, podium

spots, and opportunities to advance.

126.    When girls try to speak up in support of their right to a level

playing field, they are often silenced by the very officials charged with

ensuring that they have equal opportunity to enjoy the benefits of

competitive sports, as required by Title IX.

127.   School sports offer girls the opportunity for development and

growth, but these years are limited. When girls, those with XX chromosomes,

are sidelined in their own sports, instead of receiving lessons of

empowerment and strength, the girls are getting a message of

discouragement: "your voice isn't welcome, your rights don't matter, and you

can never practice hard enough to win."

### D.    Minnesota's discriminatory Policy's impact on female athletes

### 1. Minnesota Allows Boys to Compete in Girls' Sports

128.   MSHSL exists to "promote extra-curricular participation in

amateur athletics and fine arts while establishing consistent and fair

eligibility guidelines for interscholastic contests." *MSHSL History*, MSHSL,

https://www.mshsl.org/about/mshsl-history.

129.   MSHSL states that its purposes include "establish[ing] uniform

and equitable rules" and "elevat[ing] standards of sportsmanship and…

encourag[ing] the growth of responsible citizenship among students, member

schools and their communities." *About*, MSHSL,

https://www.mshsl.org/about.

130.   The MSHSL declares that it seeks to offer athletic experiences that offer students "an equal opportunity to participate in all activities offered by their school." *About*, MSHSL, https://www.mshsl.org/about.

131.   However, since 2015, MSHSL has allowed males who identify as girls to compete on girls' sports teams.

132.   MSHSL's Policy states that "[i]n accordance with applicable state and federal laws, rules and regulations, the Minnesota State High School League allows participation for all students consistent with their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics and fine arts." MSHSL Bylaws 300.00(3)(A), https://bit.ly/4cOMI3o.

133.   Additionally, the Handbook only sets out an appeal process if a student is deemed ineligible to participate on an athletic team designated for the opposite sex. MSHSL Bylaws 300.00(3)(B), https://bit.ly/4cOMI3o.

134.   The policy does not take into account the student's biology or any physiological attributes. It considers only how the student self-identifies and whether that identification is sufficiently consistent.

135.   On information and belief, at no point prior to adoption of the Policy did the MSHSL, or any of the Defendant Schools take into consideration whether the Policy provided equal opportunity or effectively accommodated female athletes, particularly its impact on the quality and

29

quantity of opportunities to advance and achieve victories in competitive athletics. And regardless, the MSHSL adopted a Policy that fails to provide equal opportunity or effective accommodation for female athletes.

### 2. The MSHSL's Policy deprives Minnesota female softball players of equal opportunity

136. Minnesota's Policy has allowed girls to unfairly lose opportunities to play, advance, and receive recognition in girls' softball in Minnesota to a male athlete.

137. Because of the MSHSL's Policy, a male athlete has been permitted to compete on the girls' high school softball team for Champlin Park High School since 2023.

138. Male athletes have physiological advantages that jeopardize the safety and fairness of female softball players in Minnesota.

139. Female Athletes United members attest that this player has greater height, strength, and stamina than female athletes they compete against.

140. The male athlete, E.G., M.S., and E.P. all play for high-school softball teams in the AAAA Class—the class reserved for Minnesota's largest high schools.

141. This means that they all compete against each other for the AAAA state championship, which only one team can win.

142.    Over the course of their high school softball careers, FAU members noticed a dramatic increase in the male athlete's height and physical abilities.

143.    This athlete is the primary pitcher for Champlin Park. The athlete has pitched numerous strikeouts, including pitching 14 strikeouts against last year's state champion team.

144.    M.S. was told she would have to compete with this player for pitching time on her club softball team and so decided to join a less advanced team in the league.

145.    As her team's best pitcher, M.S. also had to sacrifice pitching in a pre-season game against this athlete's team, because the girls on her team objected to hitting against a male pitcher, so the best pitchers from both teams (the male athlete and M.S.) had to step aside.

146.    E.P. was hit by a pitch thrown by this male player and experienced pain unlike that she had ever experienced when getting hit by the ball when a female pitched.

147.    From 2023 to the present, FAU member E.G. has played against and lost to this male athlete on multiple occasions. Her team has lost games to this athlete's team in both the regular season and in sectionals, precluding their team from further competing for an opportunity to go to state.

148.  Earlier this month, E.G.'s team played a high school girls' softball game against this team and lost. The male athlete pitched the entire game and allowed only one hit. E.G.'s team did not score at all in this game.

149.  Later this season, E.G.'s team will participate in a sectionals tournament that includes the mixed-sex team. Only the winner of that tournament advances to the state tournament, and her all-girls team is in the unfair position of competing against a mixed-sex team for an opportunity to go to the girls' state softball championship tournament.

150.  The cycle will repeat itself next season, as the male athlete, E.G., M.S., and E.P., are all sophomores or juniors.

151.  Allowing a male athlete to compete on the girls' team is not only depriving female athletes of opportunities for victory and advancement in sports, but also of awards.

152.  Last year, this athlete was awarded "First–Team All–State Athlete" honors for girls' softball.

153.  By awarding a girls' athletic award to a male athlete, Minnesota is decreasing the opportunities for girls to receive recognition and expanding opportunities for male victory.

154.  Fifty years after Title IX's passage, girls are still participating in sports at a lower rate than boys were at the time Title IX was passed, yet

Minnesota disregards the rights of girls and the mandates of Title IX in favor of a political agenda. *See* Alvarez, *supra*.

155.   This known negative impact on athletic opportunities for Minnesota's female softball players is likely just the tip of the iceberg. Under Minnesota's policy other male students are eligible to join girls' teams even if they have been competing on a boys' team.

156.   And Minnesota allows birth certificates to be amended so schools may not even know a student's sex, let alone whether they have engaged in any hormone interventions or testosterone suppression.

157.   The MSHSL's harmful Policy is not only encouraged but mandated by General Ellison's binding interpretation of state law through a formal opinion declaring that Minnesota's law prohibits protecting female sports. Minn. Att'y. Gen. Op. 1035.

158.   The Commissioner of the Minnesota Department of Human Rights espouses the same position in an amicus brief to the Supreme Court of Minnesota. The brief states that a public accommodation transgresses the MHRA "by prohibiting someone from participating in sports because of their gender identity." Brief for Comm'r of Minn. Dep't Human Rights as Amicus Curiae at 4, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://bit.ly/4iyu5lo. The brief also emphasizes that considerations of fairness to female athletes are misplaced, because the

33

MHRA has no exception for when it causes unfairness to individuals. *Id.* at 12-13.

159.   Minnesota's Policy harms far more than just FAU members; it violates the rights of all female athletes in Minnesota who are forced to play against or compete for playing time with a male athlete.

160.   Beyond that, the policy impacts all female athletes, and even girls who aspire to compete on their schools' sports team in the future, because it denies equal athletic opportunities to girls in the state. Even girls who have not directly faced a male athlete are impacted because the overall program of competitive sports opportunities does not equal that of boys.

161.   By depriving girls of a female-designated category, girls are led to doubt that their efforts to excel in sports will bear fruit, because Minnesota's Policy does not protect athletic spaces that accommodate the reality of girls' physiological traits and capacities.

162.   This adds to the tangible impact of lost victories and opportunities the mental burden of depriving girls of the hope for the victory and advancement that come from a level playing field.

163.   E.G., E.P., and M.S. are discouraged knowing that they do not have a fair chance at victory in their sport.

164.   And they fear that competing against a male player is unsafe. E.P. experienced firsthand the intense pain of being hit by a pitch thrown by

the male players. This is not a concern that female athletes should have when playing in the girls' category.

### 3. Defendants are on notice of their violations of Title IX and have refused to take corrective action.

165.   The Defendants are on notice that their actions violate the rights of female athletes, contravening the requirements of Title IX.

166.   On February 5, 2025, President Trump's executive order, *Keeping Men out of Women's Sports*, 90 Fed. Reg. 9279, confirmed in clear language that Title IX's guarantees require the protection of female-designated athletic categories. The Executive Order incorporated the definition of female from Executive Order 14168, "'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell." 90 Fed. Reg. 8615.

167.   In response, MSHSL stated that it would continue to allow male athletes who self-identify as female to participate on girls' sports teams. The MSHSL further stated that it would "continue to review the existing state laws alongside the new Presidential Executive Order and its timeline, processes for states, and requirements that are included." Madison Hunter, *MSHSL will follow MN law on transgender athletes in sports, not Pres. Trump's order*, Fox 9 (Feb. 6, 2025), https://tinyurl.com/3bjcwbub.

168.   On February 12, the Department of Education initiated a Title IX investigation of the MSHSL. The Department of Education's press release

describing the investigation quoted Executive Order 14201, confirming the Department of Education's intent to "affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972." 90 Fed. Reg. 9279. It also made clear that "State laws do not override federal antidiscrimination laws, and these entities and their member schools remain subject to Title IX and its implementing regulations." *U.S. Department of Education Launches Title IX Investigations into Two Athletic Associations*, Dep't of Educ. (Feb. 12, 2025), https://tinyurl.com/h9b6ymem.

169.   On February 20, the Attorney General of Minnesota issued a formal opinion stating that athletes must be allowed to compete in sports based on gender identity. Minn. Att'y. Gen. Op. 1035. A position consistent with that of the state's Department of Human Rights in an amicus brief submitted to the Supreme Court in November of 2024. *See* Brief for Comm'r of Minn. Dep't Human Rights as Amicus Curiae, *supra*.

170.   On February 19, the Minnesota House Education Committee heard live testimony on HF 12, the "Preserving Girls' Sports Act." Those testifying in support of the bill included Minnesota female athletes, physicians, coaches, and parents of female athletes. The testifiers made clear their concerns that denying female athletes a protected sports category would restrict opportunities for girls to fairly and safely compete and win in sports.

36

*Preserving Girls' Sports Act: Hearing before the Minn. House Educ. Comm.*,
94th Leg (2025), https://tinyurl.com/mr5f3syf. This bill ultimately failed to
pass by a single vote. Brian Basham, *Legislation to bar transgender athletes
from girls sports falls short of passage in House*, Minn. House Rep. (Mar. 3,
2025), https://www.house.mn.gov/sessiondaily/Story/18545.

171.   On February 25, Attorney General Pam Bondi sent a letter to
General Ellison and Executive Director of the MSHSL, Martens. General
Bondi wrote, "Let me be clear. Requiring girls to compete against boys in
sports and athletic events violates Title IX of the Educational Amendments
Act of 1972. … When federal and state law conflict, states and state entities
are required to follow federal law[.]" Letter from Attorney General Pam
Bondi to Minnesota Attorney General Keith Ellison and MSHSL Executive
Director, Erich Marten (Feb. 25, 2025),
https://www.justice.gov/ag/media/1390801/dl.

172.   On April 8, 2025, the United States Attorney General's office sent
a letter to General Ellison notifying him that the United States Department
of Justice had begun a Title IX compliance review of Minnesota and seeking
clarification of his opinion regarding how the MHRA applies to sports. The
letter stated that "allowing men and boys to compete in women and girls
sports[] is contrary to Title IX," and referenced General Bondi's letter on the

subject. Letter from Chad Mizelle and Harmeet K. Dhillon to Keith Ellison (April 8, 2025), https://tinyurl.com/yh2rhxc3.

173.   These numerous instances of clarification from the government and hearing from their citizens put Defendants on notice of the requirements of federal law and the real and detrimental impact of their unlawful policy on the female athletes in their state.

### 4. Plaintiff is Entitled to Injunctive Relief

174.   Both this season and next season, FAU member E.G. will participate in a sectionals tournament that includes the mixed-sex team, only the winner of which will go on to compete in the state tournament.

175.   Competing against a mixed-sex team in the female category will deprive E.G. of a fair and safe opportunity to advance to the state tournament.

176.   FAU members E.P. and M.S. are likely to face a mixed-sex team in the state tournament this year and next year and are being denied a level playing field in this significant competition.

177.   Unless the female category is protected for FAU members including E.G., E.P., and M.S., they will be deprived of their rights to effective accommodation and equal treatment under Title IX.

**Legal Allegations**

COUNT I: TITLE IX

Sex discrimination by failing to provide effective accommodation to the
interests and abilities of female athletes

178.    Plaintiff realleges and incorporates by reference all of the
foregoing paragraphs of this Complaint.

179.    All Defendants are subject to the obligations of Title IX.

180.    Under Title IX, Defendants are required to provide competitive
opportunities for females that accommodate them by "equally reflect[ing]
their abilities" and offer "equal opportunity in . . . levels of competition" as
compared to the competitive opportunities enjoyed by boys.

181.    Because of the measurable physical advantages that male
athletes enjoy both before and after puberty, regardless of whether puberty
blockers or testosterone suppression was administered, the athletic
opportunities of girls are unequal when males are allowed to compete against
them or compete with them for spots or playing time on their team.
By opening up girls' teams to male participation despite males' marked
physiological advantages, all Defendants have refused to fulfil their duty to
effectively accommodate the abilities of girls through offering competitive
opportunities comparable to those offered to boys. This is clear from the fact
that a male athlete has been awarded a prestigious award for the

performance this athlete exhibited on the girls' team, and this athlete's team striking out and defeating numerous female athletes and all-female teams. This includes games in which this athlete's team precluded an all-female team from the opportunity to advance to state. Plaintiff's members are harmed by Defendants' failure to provide competitive opportunities that fairly and effectively accommodate the athletic abilities of girls.

182.   Such harm includes loss of the experience of fair competition; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; emotional distress, pain, and other harms to be proven at trial.

183.   Accordingly, Plaintiff is entitled to the relief requested herein.

## COUNT II: TITLE IX

### Sex discrimination by failing to provide equal treatment, benefits, and opportunities for female athletes.

184.   Plaintiff realleges and incorporates by reference paragraphs 1 through 177 of this Complaint.

185.   All Defendants are subject to the obligations of Title IX.

186.   As a result, all Defendants have a duty to provide equivalent treatment, benefits and opportunities to both sexes.

187.   Providing equivalent treatment and opportunities entails ensuring that both sexes have equal opportunities to participate and compete in competitive athletics, both in-season and post-season. Further, it precludes policies that are "discriminatory in language or effect" or have the effect of denying "equality of athletic opportunity."

188.   Minnesota's Policy has a detrimental effect on girls' opportunities to compete safely and on a level playing field. It has resulted in fewer opportunities for girls to compete, advance, and win awards for their athletic performance. As detailed herein, Minnesota's Policy has resulted in E.G. losing games and opportunities to advance to state and is likely to continue doing so this season and next season. It also will likely deprive E.P. and M.S. of the chance to fairly compete in the state tournament this season and next season. The Policy has deprived these FAU members of equal opportunities to participate and advance in competitive softball, has a discriminatory impact, and prevents girls from experiencing equal athletic opportunity, including the opportunity to achieve and be recognized for winning.

189.   By providing competitive opportunities in baseball and softball and failing to offer female athletes an equal opportunity to participate and advance in their sport based on their abilities, all Defendants have violated their Title IX obligations to extend equal treatment, benefits and opportunities in athletic competition to girls.

41

190.   Plaintiff's members are harmed by Minnesota's Policy, effectuated by the Defendants. The Policy denies female athletes equal and fair competitive opportunities that accommodate their abilities. As a result of this policy, FAU members have been deprived of a level playing field, lost games, failed to advance to post-season competitions, experienced mental burdens resulting from inequitable competition and concerns for their safety, had opportunities to win awards and be noticed by college recruiters diminished, and other harms to be proven at trial.

191.   Accordingly, Plaintiff is entitled to the relief requested herein.

### Prayer for Relief

Plaintiff respectfully asks this Court to enter judgment against Defendants and provide the following relief:

1.   A declaration that Defendants have violated Title IX by failing to provide competitive opportunities that effectively accommodate the abilities of girls;

2.   A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

3.   A declaration that Title IX preempts state law to the extent such law requires allowing male students to access athletics teams and

42

opportunities designated for females in contact sports and sports involving competitive athletic skill;

4.  A preliminary and permanent injunction to:

    a.  Preclude Defendants from allowing male athletes to compete with or against female-athlete members of Female Athletes United in sports designated for women or girls that are contact sports or sports involving competitive athletic skill;

    b.  Require Defendants to declare ineligible any male athletes competing or seeking to compete with or against female-athlete members of Female Athletes United in sports designated for women or girls that are contact sports or sports involving competitive athletic skill;

    c.  Preclude Defendants from applying or enforcing Minnesota law to require allowing male athletes to compete with or against female–athlete members of Female Athletes United in sports designated for women or girls that are contact sports or sports involving competitive athletic skill; and

    d.  Apply the preliminary and permanent injunctions to protect any current or future female–athlete member of Female Athletes United.

5.    A permanent injunction requiring Defendants to correct all records where FAU members (current or future) or their teams have lost to biologically male athletes or teams that included biologically male athletes, with respect to any record or recognition purporting to record game statistics, victories, rankings, or qualifications for competitions designated for girls or women, and conversely to correctly give credit, rankings, and/or titles to FAU members and their teams who would have received such credit, rankings, and/or titles but for the participation of athletes born male and with male bodies in such competitions. This injunction would apply only to contact sports and sports involving competitive athletic skill.

6.    An award of nominal damages;

7.    An award of Plaintiff's reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988;

8.    That this Court retain jurisdiction to enforce its orders;

9.    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiff; and

10.    Such other relief as the Court may deem just and proper.

Respectfully submitted this 19th day of May, 2025.


Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rory T. Gray*
Georgia Bar No. 880715
**Alliance Defending Freedom**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (facsimile)
rgray@ADFlegal.org

By: /s/ Renee K. Carlson

Renee K. Carlson
Minnesota Bar No. 0389675
True North Legal
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789.8811
rcarlson@truenorthlegalmn.org

*Pro Hac Vice Applications Forthcoming*

## DECLARATION UNDER PENALTY OF PERJURY

I, _Kristine Brown_, a citizen of the United States and a resident of the State of _Colorado_, have reviewed the allegations of the foregoing Verified Complaint. As Chair of the Board of directors of Female Athletes United, I have personal knowledge of the allegations that relate to the organization, its membership and its interests. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning Female Athletes United and its membership and interests are true and correct to the best of my knowledge.

Executed this _18th_ day of _May_, 2025, at _Douglas County_ Colorado.

_Kristine G. Brown_

I, _____ E. G. _____, a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this _18_ day of _May_, 2025, at _Plymouth_ Minnesota.

_____ E. G. _____

## DECLARATION UNDER PENALTY OF PERJURY

I, _____M.S._____, a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this _17th_ day of _May_, 2025, at _farmington_ Minnesota.

_____M.S._____

## DECLARATION UNDER PENALTY OF PERJURY

I, _____EP_____, a citizen of the United States and a

resident of the State of Minnesota, have reviewed the allegations of the

foregoing Verified Complaint. I have personal knowledge of the allegations

that relate to me, my activities, and my observations as a participant in softball

at the high-school and club level in Minnesota. I declare under penalty of

perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning

me, my activities, and my observations as a participant in softball at the high-

school and club level in Minnesota are true and correct to the best of my

knowledge.

Executed this __16__ day of __May__, 2025, at __Farmington__,

Minnesota.

_____EP_____