# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

**Female Athletes United,**

  Plaintiff,

**v.**

**Keith Ellison,** in his official capacity as Attorney General of Minnesota; **Rebecca Lucero,** in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; **Erich Martens,** in his official capacity as Executive Director of the Minnesota State High School League; **Willie Jett,** in his official capacity as the Minnesota Commissioner of Education; **Independent School District No. 11 School Board; Independent School District No. 192 School Board; Independent School District No. 279 School Board,**

  Defendants.

Case No.  0:25-cv-02151-DWF/SGE

**Plaintiff's Memorandum in Support of Its Motion for Preliminary Injunction**

# TABLE OF CONTENTS

Table of Authorities ........................................................................... ii

Introduction.......................................................................................... 1

Statement of Facts .............................................................................. 3

I.    Female Athletes United............................................................... 3

II.   The League's Bylaws .................................................................. 3

III.  Males' competitive advantage over females ............................. 4

IV.   Male competition's impact on female athletes in Minnesota. ................ 7

V.    Defendants' responsibility for MSHSL's bylaws and failure to correct
      the denial of equal opportunities for girls. ............................. 10

Argument............................................................................................ 13

I.    The preliminary-injunction standard ..................................... 13

II.   FAU has a fair chance, and is likely to prevail, on the merits of its
      claim that allowing males to play on girls' softball teams abolishes a
      classic female-only sport and violates Title IX...................... 15

      A.    The League's bylaws violate Title IX's text................... 15

      B.    The League's bylaws violate Title IX's implementing
            regulations................................................................ 21

      C.    The League's bylaws violate Title IX precedent. ......... 24

      D.    The League's bylaws subvert Title IX's history. .......... 27

III.  FAU's members face irreparable harm. ................................. 28

IV.   The balance of harms and public interest favor an injunction. ........... 29

Conclusion .......................................................................................... 30

# Table of Authorities

*Adams ex rel. Kasper v. School Board of St. Johns County,*
    57 F.4th 791 (11th Cir. 2022) ...........................................................*passim*

*Alabama v. U.S. Secretary of Education,*
    No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) .. 16, 27

*Arkansas v. U.S. Department of Education,*
    742 F. Supp. 3d 919 (E.D. Mo. 2024) .............................................. 16, 17

*Barrett v. Claycomb,*
    705 F.3d 315 (8th Cir. 2013)............................................................. 14, 15

*Berndsen v. North Dakota University System,*
    7 F.4th 782 (8th Cir. 2021) ...................................................................... 24

*Biediger v. Quinnipiac University,*
    691 F.3d 85 (2d Cir. 2012) ....................................................................... 24

*Brenden v. Independent School District 742,*
    477 F.2d 1292 (8th Cir. 1973)................................................................... 11

*Brentwood Academy v. Tennessee Secondary School Athletic
    Association,* 11
    531 U.S. 288 (2001) .................................................................................. 11

*Cannon v. University of Chicago,*
    441 U.S. 677 (1970) .................................................................................. 27

*Cape v. Tennessee Secondary School Athletic Association,*
    563 F.2d 793 (6th Cir. 1977).................................................................... 25

*CEZ Prior, LLC v. 755 N Prior Ave. LLC,*
    126 F.4th 1353 (8th Cir. 2025) .......................................................... 13, 15

*Chalenor v. University of North Dakota,*
    291 F.3d 1042 (8th Cir. 2002)............................................................ 24, 25

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982)................................................. 6, 11, 25, 26

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) ..................................................... 6, 7, 23, 27

ii

*Cohen v. Brown University,*
    809 F. Supp. 978 (D.R.I. 1992) ............................................................. 29

*Cohen v. Brown University,*
    991 F.2d 888 (1st Cir. 1993) ................................................................. 18

*Cooper v. USA Powerlifting,*
    5 N.W.3d 689 (Minn. Ct. App. 2024) .................................................... 14

*D.M. ex rel. Bao Xiong v. Minn. State High School League,*
    917 F.3d 994 (8th Cir. 2019) ................................................................. 14

*Department of Education v. Louisiana,*
    603 U.S. 866 (2024) ............................................................................... 16

*Eggers v. Evnen,*
    48 F.4th 561 (8th Cir. 2022) ................................................................. 29

*Favia v. Independent University of Pennsylvania,*
    812 F. Supp. 578 (W.D. Pa. 1993) ......................................................... 29

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ............................................................................... 17

*In re Admonition Issued in Panel File No. 99-42,*
    621 N.W.2d 240 (Minn. 2001) ............................................................... 14

*Kansas v. U.S. Department of Education,*
    739 F. Supp. 3d 902 (D. Kan. 2024) ................................................. 16, 17

*Louisiana v. U.S. Department of Education,*
    737 F. Supp. 3d 377 (W.D. La. 2024) .......................................... 16, 17, 27

*Mansourian v. Regents of University of California,*
    602 F.3d 957 (9th Cir. 2010) ............................................................ 24, 25

*Mattson v. Flynn,*
    13 N.W.2d 11 (Minn. 1944) ................................................................... 14

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) ......................................................... 24, 26, 27

*Neese v. Becerra*,
No. 2:21-CV-163-Z, 2022 WL 1265925, at *12 (N.D. Tex.
Apr. 26, 2022) ............................................................................ 16, 17, 24

*North Haven Board of Education v. Bell*,
456 U.S. 512 (1982) .................................................................... 21

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) .................................................................... 17

*Ng v. Board of Regents of University of Minnesota*,
64 F.4th 992 (8th Cir. 2023) ...................................................... 28

*O'Connor v. Board of Education of School District 23*,
449 U.S. 1301 (1980) .................................................................. 25

*Ohlensehlen v. University of Iowa*,
509 F. Supp. 3d 1085 (S.D. Iowa 2020) ..................................... 29

*Petrie v. Illinois High School Association*,
394 N.E.2d 855 (Ill. App. Ct. 1979) ...........................................6

*Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*,
530 F.3d 724 (8th Cir. 2008) ...................................................... 13, 14

*Portz v. St. Cloud State University*,
16 F.4th 577 (8th Cir. 2021) ...................................................... 24, 25

*Portz v. St. Cloud State University*,
196 F. Supp. 3d 963 (D. Minn. 2016) ......................................... 28, 29

*Richland/Wilkin Joint Powers Authority v. U.S. Army Corps of Engineers*,
826 F.3d 1030 (8th Cir. 2016) .................................................... 14

*Soule v. Connecticut Association of Schools, Inc.*,
90 F.4th 34 (2d Cir. 2023) .......................................................... 26

*Tennessee v. Cardona*,
__ F. Supp. 3d __, No. 2:24-072-DCR, 2025 WL 63795, at *3 (E.D. Ky. Jan. 10, 2025) ..................................................................... 16, 27

*Tennessee v. Cardona,*
    737 F. Supp. 3d 510 (E.D. Ky. 2024) ....................................................... 29

*Texas v. Cardona,*
    743 F. Supp. 3d 824 (N.D. Tex. 2024) ............................................. 17, 27

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985 ............................................................................... 21

*United States v. Virginia,*
    518 U.S. 515 (1996) ........................................................................ 4, 25

*Williams v. School District of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993) ..................................................... 23, 24, 27

## Constitutional Provisions

MSHSL Constitution § 204.00 ........................................................................ 11

MSHSL Constitution § 208.00–211.00 .......................................................... 11

## Statutes

20 U.S.C. § 1681 ...............................................................................*passim*

20 U.S.C. § 1686 ............................................................................................ 16

20 U.S.C.A. § 1687 ......................................................................................... 

34 CFR § 106.6(b) ........................................................................................... 14

34 C.F.R. § 106.41(c) .................................................................................*passim*

45 C.F.R. § 86.41(c) ................................................................................... 1, 2

Minn. Stat. § 8.07 ............................................................................ 12, 13, 14

Minn. Stat. § 128C.01 ............................................................................. 10, 11

Minn. Stat. § 128C.02 .................................................................................... 10

Minn. Stat. § 128C.10 ............................................................................. 10, 11

Minn. Stat. § 128C.22 .................................................................................... 11

Minn. Stat. § 128C.122 ................................................................ 10, 11

Minn. Stat. § 363A.03, subd. 34 ................................................... 12, 13

Minn. Stat. § 363A.06, subd. 1 ..................................................... 12

Minn. Stat. § 363A.28, subd. 6 ..................................................... 11, 13

Minn. Stat. § 363A.29, subd. 4, 11 ...............................................13

Minn. Stat. § 363A.32, subd. 1 ..................................................... 11

Minn. Stat. § 363A.33, subd. 7, 8 ................................................. 13

## **Other Authorities**

Anthony Castrovince, *Inside the Draft Combine strength and
    conditioning segment*, MLB News (June 22, 2023),
    https://bit.ly/4jKTv0U ................................................... 18

*Board of Directors*, MSHSL, https://bit.ly/42Y3poD ....................... 10

*Civil Rights Compliance*, Minn. Department of Education,
    https://bit.ly/4mji5HB.................................................12

Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports
    Exception to Title IX's General Non-Discrimination Rule*,
    27 Duke J. Gender L. & Pol'y 69 (2020) ............................. 4, 28

Education Amendments of 1974, Pub. L. No. 93-380, § 844,
    88 Stat. 484 (1974)....................................................... 17, 18

Ellie Roth and Dana Ferguson, *A year after Minnesota became a trans
    refuge, 'transplants' make themselves at home*, MPR News (May 7,
    2024), https://bit.ly/42MkQZ3 ......................................... 9, 10

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The
    Female Category of Sport: Perspectives on Testosterone
    Suppression and Performance Advantage*,
    51 Sports Medicine 200 (2021) .........................................5

Executive Order No. 14201, *Keeping Men Out of Women's Sports*,
    90 Fed. Reg. 9279 (Feb. 5, 2025) ...................................... 2, 3

*Hearings Before the Subcommittee on Postsecondary Education of the Commission on Education & Labor*, H.R. at 343 (June 1975) (statement of Dr. Bernice Sandler), https://bit.ly/39rvo2H. .....................6

Hilary Cass, *The Independent Review of Gender Identity Services for Children and Young People* at 118 (2024), https://bit.ly/3GuzHQu.........9

*Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Department of Education (Nov. 11, 1975), https://bit.ly/3EEBke1 ................................................................ 21, 22, 23

MDHR Commissioner Amicus Brief at 4, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://bit.ly/4iyu5lo. ........................................................... 2, 12

Minnesota Attorney General Opinion 1035 at 2 (Feb. 20, 2025), https://bit.ly/42tcHtL ...................................................... 2, 12

*More Hurdles to Clear: Women & Girls in Competitive Athletics*, U.S. Commission on Civil Rights at 1 (July 1980), https://perma.cc/X3W3-T2YF ...................................................... 26

MSHSL Bylaws 300.00(3)(A), https://bit.ly/4cOMI3o .........................................3

MSHSL Bylaws 300.00(3)(B)(1), https://bit.ly/4cOMI3o.....................................3

MSHSL Bylaws 300.00(B)(1) & (2)(c), https://bit.ly/4cOMI3o.................. 3, 4, 5

*MSHSL History*, MSHSL, https://bit.ly/3EFyWUe.........................................10

*Schools*, MSHSL, https://bit.ly/3Gy3WpG ......................................................10

*The Role of Testosterone in Athletic Performance*, Duke Center For Sports L. & Poly's 1 (Jan. 2019), https://bit.ly/3YPTEYe) .......................4

*Title IX at 45*, National Coalition For Women & Girls in Education at 2 (2017), https://perma.cc/V7KM-PJ97 ...................................................... 26

## Introduction

Girls in Minnesota deserve the chance to fairly compete and win in sports. For decades, they had that opportunity. Acting through the Minnesota State High School League ("MSHSL" or the "League"), Minnesota schools provided female-only sports, with female only post-season competitions, rankings, awards, and championships. But in 2015, the League jettisoned this commonsense practice with new bylaws that allowed some males to play on girls' teams. This put female teams at a competitive disadvantage.

That disadvantage is playing out in real-time as a male athlete on the Champlin Park High School girls softball team wins statewide accolades, takes playing time from girls, and contributes to often lopsided victories against all-female teams. Female Athletes United, a nonprofit membership organization dedicated to the integrity of women's sports, has at least three members affected by this unfairness. All of them play AAAA softball for schools subject to Title IX; all of them have competed against the male athlete; and all of them are likely to do so again—this season and next.

The League's bylaws harm girls, creating an uneven playing field and giving them inferior athletic opportunities to those given to boys. That violates Title IX, which bars discrimination, exclusions, or denials of benefits in educational programs based on sex. 20 U.S.C. § 1681(a). The bylaws also violate longstanding Title IX regulations that require funding

1

recipients to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); 45 C.F.R. § 86.41(c).

President Trump issued an executive order to clarify "that women's sports are reserved for women." Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ("Executive Order"). Yet, at the League's request, the Minnesota Attorney General issued a legal opinion rejecting the Trump order because limiting girls sports to girls "would violate the MHRA." Minn.Att'y.Gen.Op.1035 at 2 (Feb. 20, 2025), https://bit.ly/42tcHtL. Likewise, the Commissioner of the Minnesota Department of Human Rights ("MDHR") argued in court that the MHRA bars public accommodations from "prohibiting someone from participating in [women's or girls'] sports because of their gender identity" and that it makes no difference if athletic competition "is 'fair.'" MDHR.Comm'r.Amicus.Br. at 4, 13, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://bit.ly/4iyu5lo.

So Minnesota schools continue to violate Title IX. State and school officials have simply put their ideological agendas above the need for girls to access equal athletic opportunities. Because Title IX's text, regulations, judicial construction, and history prohibit this sex-based discrimination, the Court should immediately enjoin the League's eligibility bylaws and restore fairness in women's sports in Minnesota.

## Statement of Facts

### I.    Female Athletes United

Female Athletes United ("FAU") is a nonprofit membership organization that defends women's sports and advocates for women to have equal opportunities on a fair and safe playing field. Decl. of Kristine Brown ¶ 3, attached as <u>Exhibit A</u>. FAU's members include current, prospective, and former female athletes—many of whom play for public schools that receive Title IX funding. Kristine Brown Decl. ¶ 5. FAU promotes keeping girls' sports female-only because males have inherent physical advantages that make it unfair and unsafe for girls to compete against them. K. Brown Decl. ¶ 28. With members in about 39 states, including Minnesota, FAU has a strong interest in defending the proper and original understanding of Title IX: "specifying and clarifying that women's sports are reserved for women." Exec. Order No. 1420190 Fed. Reg. 9279.

### II.    The League's Bylaws

The League's bylaws "allow[ ] participation for all students consistent with their gender identity or expression," regardless of natal sex, hormone drugs, or testosterone suppression, effectively abolishing female sports in Minnesota. MSHSL Bylaws 300.00(3)(A), https://bit.ly/4cOMI3o. Only "determination[s] of *ineligibility* based on the student's gender identity" are subject to appeal. *Id.* 300.00(3)(B)(1) (emphasis added). And the League's appeal process considers merely subjective factors, such as whether a student's gender identity is sufficiently "consistent" or "sincerely held as part of the student's core identity" and whether a student's "actions, attitudes,

dress and manner" line up. *Id.* 300.00(B)(1) & (2)(c). Biology plays no role in the decision.

## III.   Males' competitive advantage over females

"Physical differences between men and women … are enduring," *United States v. Virginia*, 518 U.S. 515, 533 (1996), including "the main physical attributes that contribute to athletic performance," Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 92 (2020) (cleaned up). Female sports exist because of this "'performance gap,'" which "'is by design and for good reasons, a reproductive sex classification.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819–20 (11th Cir. 2022) (en banc) (Lagoa, J., specially concurring) (quoting *Re-Affirming the Value, supra*, at 133).

Males have "'more skeletal muscle and less fat,'" "'higher cardiac outputs,'" "'larger maximal oxygen consumption,'" "'higher anaerobic capacity,'" and "'different economy of motion.'" *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring) (quoting *The Role of Testosterone in Athletic Performance*, Duke Ctr. For Sports L. & Poly's 1 (Jan. 2019), https://bit.ly/3YPTEYe); *accord* Expert Declaration of Gregory A. Brown ¶¶ 8, 58, 94–98, 100, 108, attached as <u>Exhibit B</u>. So post-pubescent males, on average, "jump (25%) higher than females, throw (25%) further than females, run (11%) faster than females, and accelerate (20%) faster than females." *Id.* at 820 (quoting *Role of Testosterone, supra*, at 1); *accord* G. Brown Decl. ¶¶ 39–47, 48–54, 59–61.

While puberty accelerates male performance advantage, there are meaningful differences between male and female children. Prepubertal boys run faster, jump farther, and display much more upper-body strength than similar-aged girls. G. Brown Decl. ¶¶ 122–28. These differences are stark in areas relevant to softball. For example, boys have substantial advantages in throwing velocity and distance—even as young as four years old—which is critical to pitching and fielding. G. Brown Decl. ¶¶ 142–43. Likewise in acceleration and change-of-direction, which are critical to baserunning, and upper-body strength, which is critical to batting. G. Brown Decl. ¶¶ 126–31.

Even when males undergo testosterone suppression to reach female levels, they "retain most of the puberty-related advantages of muscle mass and strength seen in … males." *Id.* (citing Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 200 (2021)); *accord* G. Brown Decl. ¶¶ 234–66. Males who identify as females "'remain fully male-bodied in the respects that matter for sport,'" so "'their inclusion effectively de-segregates the [girls'] teams and events they join.'" *Id.* (quoting *Reaffirming the Value*, *supra*, at 108). That "significantly undermine[s] the benefits afforded to female student athletes." *Id.* 819.

Nor is there evidence that puberty blockers eliminate the pre-existing prepubertal male advantage. To the contrary, puberty-blocked males still achieve the same or nearly the same *male* height predicted at birth. G. Brown Decl. ¶¶ 211. This means they are taller and have longer limbs than

typical females, which provides an advantage in most sports, including softball. G. Brown Decl. ¶ 71–74, 214. And they retain advantages in lean body mass, body fat, and handgrip strength, the latter of which is a well-accepted proxy for overall strength. G. Brown Decl. ¶ 213.

As Dr. Bernice Sandler, the "Godmother of Title IX" and the engine behind the statute's passage, explained in 1975 when testifying in favor of Title IX's implementing regulations, ignoring the differences in male and female "physiology … effectively eliminate[s] opportunities for women to participate in organized competitive athletics," which clashes with "equal [educational] opportunity." *Hearings Before the Subcommittee on Postsecondary Educ. of the Comm. on Educ. & Labor*, H.R. at 343 (June 1975) (statement of Dr. Bernice Sandler), https://bit.ly/39rvo2H.

Without all-female sports, courts have long recognized that males' "average physiological differences" would allow them to "displace females to a substantial extent." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("*Clark I*"). Girls softball and boys baseball are separate sports because girls are at a "substantial physical disad-vantage" and even "isolated instances of male participation upon girls' teams creat[es] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979). So "athletics programs *necessarily* allocate [such] opportunities separately for male and female students." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) ("*Cohen II*").

## IV.   Male competition's impact on female athletes in Minnesota.

The League's eligibility rules harm female softball athletes. FAU's Minnesota female-athlete members have played against—and lost to—a mixed-sexed team whose lead pitcher is a male athlete. Decl. of E.G. ¶¶ 29, 32, attached as Exhibit C. E.G., E.P., M.S., and the male athlete all play for some of Minnesota's best softball teams. *See* AAAA Softball Rankings as of May 15, 2025, https://perma.cc/ZYN7-H3M4. All are contenders for the state championship.

FAU's members have witnessed the male athlete's rapid physical growth. Over a summer in high school, the male athlete grew much taller and developed much longer arms. Decl. of M.S. ¶ 20, attached as Exhibit D. This growth coincided with a surge in the male athlete's pitching and hitting ability. M.S. Decl. ¶¶ 21−22. Though FAU's members are elite players used to challenging softball competition, the male athlete is in a different category. E.G. Decl. ¶¶ 30−31; M.S. Decl. ¶¶ 18, 23; Decl. of E.P. ¶ 20, attached as Exhibit E. That's why the male athlete achieved First-Team All-State honors *as a sophomore*—an honor often given to juniors and seniors—and one that otherwise would have gone to a female athlete. M.S. Decl. ¶ 30.

The force, speed, and spin of the male athlete's pitches are remarkable, sometimes leading to 10–14 strikeouts of female athletes in a single game. *See* E.G. Decl. ¶¶ 31, 35, 40; M.S. Decl. ¶ 45. In fact, last year's state champions recently lost to the mixed-sex team after the male athlete's pitching led to 14 strikeouts. E.G. Decl. ¶ 40; M.S. Decl. ¶ 45. This male athlete's participation deprives females of a level playing field and fair

opportunity to win, strips away females' participation opportunities in state-level events, and degrades females' sports records (*e.g.*, statistics, rankings, and titles).

E.G.'s all-female softball team is a great example of this. Her team plays in the same section and conference as the male athlete's team. E.G. Decl. ¶ 27. In 2024, E.G.'s team lost regular season and sectional games to the male athlete's team, ending the season and denying E.G.'s team potential advancement to the state tournament. E.G. Decl. ¶ 29. E.G.'s all-female team recently played the mixed-sex team again in the regular season, losing to the mixed-sex team 0-2 after the male athlete pitched the entire game, struck out seven, and allowed only one hit—all against a team that hits well. E.G. Decl. ¶¶ 32–36. E.G.'s team is likely to compete against the mixed-sex team again at sectionals for a place in the state championship, but E.G. already feels defeated because her all-female team doesn't have a fair chance to win. E.G. Decl. ¶¶ 41–43.

E.P.'s and M.S.'s all-female softball team is likely to compete against this mixed-sex team at the state tournament. E.P. Decl. ¶¶ 27–28; M.S. Decl. ¶¶ 42–43. Their team lost to the mixed-sex team in a pre-season game. Critical to the mixed-sex team's win was the male athlete hitting a two-run homerun—so hard that it struck the far side of the dome in which they were playing. E.P. Decl. ¶¶ 24–26. And their team—currently ranked second in the state—is likely to again face the mixed-sex team at the state tournament in June. *See* E.P. Decl. ¶¶ 27–28; M.S. Decl. ¶¶ 42–43; Softball Rankings, *supra* p. 6. What's more, since the male athlete, E.G., E.P., and M.S. are all

sophomores or juniors, this scenario will play out again next year. E.G. Decl. ¶¶ 2, 26; E.P. Decl. ¶ 2; M.S. Decl. ¶ 2.

The League's bylaws cost FAU's members other opportunities as well. During the school pre-season, M.S. was denied the chance to pitch when the females on her team were afraid to play against the male athlete. M.S. Decl. ¶¶ 36−37. So M.S.'s team and the mixed-sex team agreed not to use their best pitchers (*i.e.*, M.S. and the male athlete) and a freshman took M.S.'s spot in the circle. M.S. Decl. ¶ 37. The mixed-sex team won anyway with the male athlete hitting a two-run homerun. M.S. Decl. ¶ 39.

These experiences have left FAU's members demoralized and afraid. E.G. Decl. ¶¶ 51−52, 54−55; E.P. Decl. ¶¶ 36, 39−40; M.S. Decl. ¶¶ 44, 50. Given the increased force and speed of the male athlete's pitches, the risk of injury is much greater. One of these pitches hit E.P., causing much greater pain than is typical for pitches thrown by female athletes. E.P. Decl. ¶¶ 29−31. FAU members' years of hard work and sacrifice run up against the unfairness of the male athlete's physiological advantage. So their all-female teams lack a fair chance to win sectionals or advance through the state championship. They continue to lose opportunities and recognition to a male athlete who, but for the League's bylaws, would be ineligible to play girls softball.

There's been an "exponential increase" in the number of children and young people asserting a transgender identity. Hilary Cass, *The Independent Review of Gender Identity Services for Children and Young People* at 118 (2024), https://bit.ly/3GuzHQu. And Minnesota is now "a destination state

for gender-affirming care." Ellie Roth and Dana Ferguson, *A year after Minnesota became a trans refuge, 'transplants' make themselves at home*, MPR News (May 7, 2024), https://bit.ly/42MkQZ3. So male participation in female sports is only likely to increase. This current and ongoing threat to female athletics strikes at the heart of Title IX.

## V.    Defendants' responsibility for MSHSL's bylaws and failure to correct the denial of equal opportunities for girls.

Title IX applies to the Defendant School Districts because they operate "education program[s] or activit[ies]" that "receiv[e]" federal funds. 20 U.S.C. § 1681(a). Title IX also applies to Defendant MSHSL, which "control[s] … extracurricular activities" in Minnesota—including sports—under "voluntary" delegations by public schools. Minn. Stat. § 128C.01. The League's members are overwhelmingly federally funded public schools (including Defendant School Districts), its dues come mainly from public schools (including Defendant School Districts), and public schools' paid representatives dominate its Board of Directors. *MSHSL History*, MSHSL, https://bit.ly/3EFyWUe (MSHSL has been "a nonprofit, voluntary association of the Minnesota public schools since its founding"); *Schools*, MSHSL, https://bit.ly/3Gy3WpG (most members are public schools); *Board of Directors*, MSHSL, https://bit.ly/42Y3poD (most board members are public-school employees).

Because the state controls the League, it qualifies as a government actor. *E.g.*, Minn. Stat. § 128C.01 (creating MSHSL, allowing public schools to join and pay dues, setting board membership and giving the Governor the right to select four members, and regulating board members' compensation

and removal); Minn. Stat. § 128C.02 (requiring annual reports to the Legislature); Minn. Stat. § 128C.10 (setting expense limits); Minn. Stat. § 128C.122 (mandating annual audits reviewed by the State Auditor); Minn. Stat. § 128C.22 (compelling open meetings); *accord Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303–305 (2001); *Clark I*, 695 F.2d at 1128. So when the League creates and enforces eligibility rules, it is "acting under color of state law." *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973) (cleaned up).

The School Districts are responsible for these eligibility rules because they continue to delegate control over high school sports to the League and actively participate in its elections and governance. *E.g.*, Minn. Stat. § 128C.01 (mandating "16 [MSHSL board members … be selected according to the league's constitution"); MSHSL Const. §§ 204.00, 208.00–211.00 (establishing voluntary membership and setting rules for designated school representatives to MSHSL, as well as elected members of MSHSL's region committees, representative assembly, and board of directors).

The Attorney General and the Commissioner of the Department of Human Rights are also responsible for the League's decision to ignore Title IX and abide by its eligibility rules. Under Minnesota law, they jointly enforce the MHRA: the Attorney General by serving as "the attorney for the" MDHR who prosecutes matters referred "by the [C]ommissioner after a finding of probable cause," Minn. Stat. § 363A.32, subd. 1, and the Commissioner who decides when "no probable cause" of a MHRA violation exists, sets "policies to determine which [MHRA] charges are processed," and "file[s]

… petition[s]" in state court to punish alleged MHRA violations. Minn. Stat. §§ 363A.28, subd. 6(c), 6(e), 6(h).

The League asked the Attorney General for a written opinion on its eligibility bylaws, the Executive Order's interpretation of Title IX, and the MHRA that is ostensibly "decisive" until a court "decide[s] otherwise" because it relates to "question[s] arising under the laws relating to public schools." Minn. Stat. § 8.07; *accord* Att'y.Gen.Op.1035 at 1–2. The Attorney General obliged, stating, "[t]he Executive Order does not have the force of law," ignoring Title IX's sex-discrimination ban, and concluding that "prohibiting students from participation in extracurricular activities consistent with their gender identity would violate the MHRA." Att'y.Gen.Op.1035 at 2–3. The Commissioner adopted the same view of the MHRA in an amicus brief, written by the Attorney General's office, which states that "prohibiting [males] from participating in [female] sports because of their gender identity" violates the public-accommodation provision, and that considerations of "'fairness' or [males'] 'competitive advantage'" are irrelevant. MDHR.Comm'r.Amicus.Br. at 4, 14.

Though the Minnesota Education Commissioner's department can review school districts to ensure Title-IX compliance, *Civil Rights Compliance*, Minn. Dep't of Educ., https://bit.ly/4mji5HB, Minnesota law puts the department at the Human Rights Commissioner's service, Minn. Stat. § 363A.06, subd. 1(6). So the Human Rights Commissioner's (and Attorney General's) position on the MHRA effectively prevents the Education Commissioner from accurately enforcing Title IX.

The School Districts and the League fall under the MHRA's sweeping definition of a place of public accommodation. Minn. Stat. § 363A.03, subd. 34. Under state law, the Attorney General's interpretation of the MHRA is ostensibly binding on the School Districts and the League. Minn. Stat. § 8.07. The Human Rights Commissioner shares the Attorney General's interpretation of the MHRA and has the power to enforce it in court. *Supra* pp 11–12. So the Attorney General's and the Commissioner's MHRA views effectively force the School Districts and the League to ignore Title IX and the Executive Order—and abide by the eligibility bylaws—on pain of judicial restraining orders, injunctions, and contempt orders, as well as awards of civil penalties, punitive damages, and attorney's fees and costs. Minn. Stat. § 363A.28, subd. 6(e); *id.* § 363A.29, subd. 4, 11; *id.* § 363A.33, subd. 7, 8.

## Argument

### I.    The preliminary-injunction standard

This Court considers four preliminary-injunction factors: "(1) the threat of irreparable harm to the movant; (2) … the balance between this harm and the injury that granting the injunction will inflict on other … litigant[s]; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *CEZ Prior, LLC v. 755 N Prior Ave. LLC*, 126 F.4th 1353, 1358 (8th Cir. 2025) (quotation omitted). A plaintiff's probability of success on the merits is "the most significant factor." *Id.* (cleaned up). Generally, a plaintiff must show "a reasonable probability of success" or "fair chance of prevailing on the merits." *Id.* (quotations omitted). But the Eighth Circuit applies a higher likely-to-prevail-on-the-merits test "where a party

seeks to enjoin the enforcement of a state statute" resulting from "presumptively reasonable democratic processes." *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc).

Disputes over the League's bylaws don't trigger the higher preliminary-injunction standard. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1001 (8th Cir. 2019). Nor do "administrative actions by … state … agencies" unless they "represent[] the full play of the democratic process." *Rounds*, 530 F.3d at 732 n.6 (quotation omitted); *accord Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016). The Attorney General's opinion doesn't qualify because it is merely an "advisory opinion[ ]," *In re Admonition issued in Panel File No. 99-42*, 621 N.W.2d 240, 244 (Minn. 2001) (citing Minn. Stat. § 8.07), that isn't "conclusive or binding upon the courts," especially as it "extends or modifies the [MHRA's] provisions," *Mattson v. Flynn*, 13 N.W.2d 11, 16 (Minn. 1944). *Accord Cooper v. USA Powerlifting*, 5 N.W.3d 689, 702–03 (Minn. Ct. App. 2024), *review granted by* Minn. S. Ct. (July 9, 2024). Plus, the Attorney General formulated this opinion without "lengthy public debate" or other aspects "of the democratic process." *D.M.*, 917 F.3d at 1000 (quotation omitted). The Commissioner's amicus brief fails to qualify for the higher preliminary-injunction standard for the same reasons.

FAU seeks to *enforce* Title IX, a federal statute that resulted from the full democratic process, not *enjoin* state law. Minnesota's legal requirements are irrelevant because States that accept federal funds agree to Title IX's preemptive effect. 34 CFR § 106.6(b). So the fair-chance standard for success

on the merits applies. But this Court needn't resolve the issue if it concludes that FAU also meets the likely-to-prevail standard. *Cf. Barrett v. Claycomb*, 705 F.3d 315, 321 n.4 (8th Cir. 2013) ("not resolv[ing] which standard applies").

## II. FAU has a fair chance, and is likely to prevail, on the merits of its claim that allowing males to play on girls' softball teams abolishes a classic female-only sport and violates Title IX.

Because the probability of success on the merits is "the most significant" preliminary-injunction factor, FAU begins there. *CEZ Prior*, 126 F.4th at 1358 (cleaned up). Title IX's text, regulations, judicial interpretation, and history all point the same way: allowing males to play on girls' softball teams abolishes a classic female-only sport, discriminates against females, and violates Title IX. So FAU has a fair chance, and is likely to prevail, on the merits.

### A. The League's bylaws violate Title IX's text.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" federally funded "education program[s] or activit[ies]." 20 U.S.C. § 1681(a). The law doesn't define "sex." But its text clarifies that "sex" means biologically male or female.

For instance, Title IX doesn't apply to certain institutions transitioning from admitting "only students of one sex" to admitting "students of both sexes." *Id.* § 1681(a)(2). And the statute makes special provisions for male-dominated military academies and female-dominated beauty pageants. *Id.* §§ 1681(a)(4), (a)(9). Title IX also exempts male "social fraternit[ies]" and

female "social sororit[ies]," and youth organizations like the "Young Men's Christian Association" and "Young Women's Christian Association." *Id.* § 1681(a)(6). And the law carves out "Boys State conference" and "Girls State conference" programs, *id.* § 1681(a)(7) and allows for "father-son or mother-daughter activities," so long as those given "one sex" are "reasonably comparable" to those given "the other sex," *id.* § 1681(a)(8). *Accord* 20 U.S.C. § 1686 (allowing "separate [sex-based] living facilities").

Title IX's language shows that "'sex' refers to the traditional binary concept of biological sex," not gender identity. *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *accord Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 942 (E.D. Mo. 2024). Indeed, the Supreme Court unanimously agreed that "sex discrimination" under Title IX doesn't "include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024). That conclusion flows from the law's text, which "presumes sexual dimorphism in section after section." *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022). Concluding otherwise would "render Title IX's many sex-based exceptions meaningless and 'would provide more protection against discrimination on the basis of transgender status … than it would against discrimination on the basis of sex.'" *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) (quoting *Adams*, 57 F.4th at 813–14); *accord Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399 (W.D. La. 2024). And that "turns Title IX on its head." *Tennessee v.*

16

*Cardona*, __ F. Supp. 3d __, No. 2:24-072-DCR, 2025 WL 63795, at *3 (E.D. Ky. Jan. 10, 2025).

Biological sex also reflects the "ordinary meaning" of "sex" in 1972 when "Congress enacted" Title IX. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up). Examples are legion, but two stand out. Dictionaries of the period define "sex" as "biological sex," *Adams*, 57 F.4th at 812 (citing examples), or the "physiological differences between men and women— particularly with respect to reproductive functions," *Neese*, 2022 WL 1265925, at *12 (citing examples). *Accord Texas v. Cardona*, 743 F. Supp. 3d 824, 871–72 (N.D. Tex. 2024) (citing examples); *Kansas*, 739 F. Supp. 3d at 919–20 (citing examples); *Louisiana*, 737 F. Supp. 3d at 398 & n.50 (citing examples). And immediately following Title IX's passage, the Supreme Court characterized "sex" as "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

So Title IX's language prohibits "discrimination" between males and females but "expressly permits separating the sexes." *Adams*, 57 F.4th at 815. What matters is "comparative equality." *Texas*, 743 F. Supp. 3d at 835; *cf.* 20 U.S.C. § 1681(a)(8) (requiring "reasonably comparable" activities). In other words, Title IX supports—and even "encourage[s]"—the "[r]ecognition of innate biological differences." *Texas*, 743 F. Supp. 3d at 873. But the law prohibits "differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other." *Id.*; *accord Arkansas*, 742 F. Supp. 3d at 943; *Kansas*, 739 F. Supp. 3d at 921.

What's more, Congress applied these Title IX principles to athletics. In 1974, Congress passed the Javits Amendment, which ordered the Department of Education's predecessor agency to promulgate Title IX regulations that "include with respect to intercollegiate athletic activities reasonable provisions considering *the nature of particular sports*." Educ. Amends. of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974) (emphasis added). Then roughly a dozen years later, Congress passed the Restoration Act to ensure Title IX regulated athletics. *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993) (discussing 20 U.S.C.A. § 1687).

The result is clear: Title IX's text demands equal athletic opportunities for biological males and females, accounting for individual sports' nature or practical realities. Softball and baseball are competitive sports in which teams select players based on their strength, speed, endurance, and skill. *E.g.*, Anthony Castrovince, *Inside the Draft Combine strength and conditioning segment*, MLB News (June 22, 2023), https://bit.ly/4jKTv0U. Female athletes may match male athletes' skill, but because of physiological difference they can't match male athletes' strength, speed, or endurance. *Supra* pp. 4–6. Plus, selection and playing time are zero-sum games: League rules limit softball rosters to 18 players per team; only 9 can play on the field at a time; and only one can pitch at a time. MSHSL Girls Softball Rules at 6, https://perma.cc/5M2Y-URUJ. So any male who makes the official roster or plays on the field is by definition taking an opportunity that would otherwise go to a female.

The League's eligibility bylaws do not affect boys' baseball, preserving a level playing field and those athletic opportunities and benefits for males. But the League's bylaws have a devastating effect on girls' softball, abolishing its all-female nature, allowing males to take opportunities from females, and creating an imbalanced and unfair playing field for the remaining females.

In practical terms, females (softball) have fewer athletic opportunities than males (baseball and softball), and suffer physical disadvantages with reduced opportunity to excel or win. That means females receive fewer sports awards or titles and their athletic records (*e.g.*, statistics and rankings) suffer, while males receive more sports awards or titles, and their records excel. So the League's bylaws exclude females from equal "participation," deny females equal "benefits," and discriminate against females "on the basis of sex." 20 U.S.C. § 1681(a).

FAU's female Minnesota members have experienced this discrimination firsthand. They have seen the League award a male player First-Team All-State honors, taking that award from a female athlete. M.S. Decl. ¶ 30. At a school scrimmage, officials didn't allow M.S. to pitch because her team had to sacrifice its best pitcher to avoid facing the opposing team's best pitcher—the male athlete who still played a central role in the mixed-sex team's victory. M.S. Decl. ¶¶ 36−39. And E.G. has watched her team lose multiple times to a male pitcher who dominates a group of talented female hitters. E.G. Decl. ¶¶ 29, 31−32.

FAU's female members don't want to play against male athletes; which is demoralizing, emotionally damaging, and physically unsafe; because they don't have a fair chance to excel or win. E.G. Decl. ¶¶ 51−52; E.P. Decl. ¶¶ 39−41; M.S. Decl. ¶¶ 50, 53. At a school scrimmage, E.P. witnessed the male athlete hit a home run that knocked the other side of the indoor stadium, a feat she has never witnessed a female athlete accomplish. E.P. Decl. ¶¶ 25−26. The male athlete has hit E.P. with a pitch, which hurt much worse than other pitches because of the male athlete's increased strength. E.P. Decl. ¶¶ 29−31. E.G. also felt overwhelmed facing the male athlete's pitches because "the speed … was so much faster than the other [female] pitchers [she] faced." E.G. Decl. ¶ 21. FAU's female members are now "afraid to try to hit in a competitive game when a male is pitching." E.G. Decl. ¶ 44.

In other words, FAU's female members feel physically unsafe when they play against the male athlete, a deterrent to athletic participation that male athletes don't face. E.G. Decl. ¶¶ 44, 54; E.P. Decl. ¶¶ 32, 46; M.S. Decl. ¶¶ 44, 53. Yet M.S. and E.P. are likely to play against the male athlete again, as their team and the male's team are likely to meet at Minnesota's high school girls' state tournament. M.S. Decl. ¶¶ 42−44, 46; E.P. Decl. ¶ 27. E.G. is also likely to play against the male athlete, as her team is in the same conference and section as the mixed-sex team, meaning E.G.'s team must play the male athlete during the regular season and in sectionals that determine who makes the state tournament. E.G. Decl. ¶¶ 32−33, 41. And

unless the Court steps in, the cycle will only repeat itself next year. E.G. Decl. ¶¶ 2, 26; E.P. Decl. ¶ 2; M.S. Decl. ¶ 2.

**B.    The League's bylaws violate Title IX's implementing regulations.**

Responding to the Javits Amendment, the Department of Education's predecessor issued Title IX regulations that have three key components. First, the regulations establish a general rule that bars sex discrimination in "interscholastic, intercollegiate, club or intramural athletics," including providing "athletics separately." 34 C.F.R. § 106.41(a). Second, "[n]otwithstanding" this general rule, the regulations typically allow "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). Last, the regulations establish an overriding principle that Title IX requires "equal athletic opportunity for members of both sexes." *Id.* § 106.41(c). One key measure of equal athletic opportunity is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1).

Congress could review these Title IX implementing regulations and reject them in whole or in part. But Congress scrutinized the regulations closely and chose to leave them intact. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–32 (1982). That is compelling evidence that Title IX's enduring regulations "correctly discerned" Congress' intent. *Id.* at 535 (quotation omitted); *accord United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) (Congress's refusal "to overrule an agency's construction" shows "the reasonableness of that construction").

21

Early on, the Department of Education's predecessor clarified Title IX's implementing regulations in a guidance document. Where contact or competitive sports are concerned, the decision of "whether to have single sex teams or teams composed of both sexes" depends on "the interests of both sexes" and "the relative abilities of members of each sex." *Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Dep't of Educ. (Nov. 11, 1975), https://bit.ly/3EEBke1. So "separate teams in [a] sport will be required if both men and women express interest in the sport and the interest of both sexes are not otherwise accommodated." *Id.* Similarly, if funding recipients base scholarships on athletic "'ability'" and "the range of ability in a particular sport … differs widely between the sexes, separate norms must be developed for each sex." *Id.*

The Department of Education's implementing regulations and guidance show that the League's eligibility bylaws violate Title IX. In girls' softball and boys' baseball, teams use "competitive skill" to select players. 34 C.F.R. § 106.41(b). So Title IX allows the League's initial decision to create different sports for females and males and "operate … separate teams for members of each sex." *Id.* The problem is that the League's eligibility bylaws don't provide sex-designated teams; they provide teams designated by gender identity, not sex. This opens softball to males who have physiological advantages over females without providing a comparable girls-only opportunity for females, depriving females of "equal athletic opportunity" and "the selection of sports and levels of competition [that] effectively accommodate [females'] interests and abilities." *Id.* § 106.41(c) & (c)(1).

Nor is it any answer to say that girls can try out for baseball. Women's interests and abilities aren't "effectively accommodat[ed]" if a funding recipient simply "open[s] up its men's teams to women, but only a few women were able to quali[f]y for the men's teams." *Id.* Because of male athletic advantage, that's the case here.

FAU's Minnesota female-athlete members attest to this physiological disparity. They have played against—and lost to—a male athlete whose physiological advantages or "relative abilities" outstrip equally skilled female peers. *Letter to Chief State School Officers*, *supra*; *accord* E.G. Decl. ¶¶ 29, 32; E.P. Decl. ¶ 24; M.S. Decl. ¶ 39. Though FAU's members have faced some of the State's top girls' softball teams, the "male athlete's force, speed, and spin" are unlike anything they have "faced with [female] pitchers." E.P. Decl. ¶ 20. These physical advantages lead to the male athlete striking out 10 to 14 hitters a game. *See* E.G. Decl. ¶ 40, 32; M.S. Decl. ¶ 45. In fact, last year's state champion team recently lost decisively to the male athlete's team, with the male athlete pitching 14 strikeouts. *Id.*

In sum, the League's eligibility bylaws fail to "effectively accommodate" female athlete's "interests and abilities." 34 C.F.R. § 106.41 (c)(1). Nor do they treat female athletes equally because they give male athletes more opportunity to play, excel, and achieve success. Female athletes' years of hard work, sacrifice, and practice cannot change male athletes' physiological advantages. So girls in Minnesota lose the chance to make the team, play in a starting position, and win honors like First-Team All-State to a male. This lack of a fair shot at competition and victory

deprives female athletes in Minnesota of equal athletic opportunity. *Accord Cohen II*, 101 F.3d at 179 ("[i]nterest and ability … evolve as a function of opportunity and experience").

### C.    The League's bylaws violate Title IX precedent.

Judicial precedent recognizes that funding recipients have "flexibility" under Title IX "so long as the goal of equal athletic opportunity is met." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993). But Title IX's equality mandate is substantive, not hollow: "'[a]thletic opportunities' means real opportunities, not illusory ones." *Id.* at 175; *accord Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 101 (2d Cir. 2012) (Title IX requires "*genuine* athletic participation opportunities") (emphasis added). The basic test is whether funding recipients, in practice, "treat[ ] men better than women (or vice versa)." *Neese*, 2022 WL 1265925, at *12.

So when funding recipients purport to separate sports based on sex— as the League does—they must provide equal athletic opportunities to males and females. *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 784 (8th Cir. 2021); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 296 (2d Cir. 2004). "[D]isparities in individual segments of [the recipients' sports] program" may be "substantial enough in and of themselves to deny equality of athletic opportunities" and violate Title IX. *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 581 (8th Cir. 2021) (cleaned up). And recipients may violate the statute "by failing to accommodate effectively the interests and abilities of student athletes of both sexes, even if the benefits provided

athletes of both sexes are equivalent." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010) (quotation omitted).

The League's eligibility bylaws keep baseball an effectively all-boys sport but erase softball as an all-girls sport. They provide baseball opportunities that will go exclusively, or nearly so, to males because of their athletic advantages, yet open softball participation opportunities to males as well. *Supra* pp. 7–10. The result is "more than substantially proportionate athletic opportunity to one" sex — males — "in violation of Title IX," *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1048 (8th Cir. 2002) (cleaned up), which requires that "participation opportunities be offered to both sexes in an equal manner," *Portz*, 16 F.4th at 581.

Even when all-female softball teams compete, they face an uphill climb against teams that include a male athlete. *Supra* pp. 7–10.  Courts have long recognized that accommodating female athletes' interests and abilities typically requires sex separation because "[p]hysical differences between men and women" are significant and "enduring." *Virginia*, 518 U.S. at 533. Otherwise, males' physiological advantages will allow them to "displace females to a substantial extent." *Clark I*, 695 F.2d at 1131.

Indeed, the "substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events" is presumably why the League created a separate girls' softball program to begin with. *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers); *accord Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("[W]ere play and

competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.").

Now the League's bylaws force females "to prevail against" males, changing "the conditions under which [females may] participate in varsity [softball] in a manner that foreseeably preclude[s] their future participation." *Mansourian*, 602 F.3d at 970 n.18. Allowing even "one [male] player" to compete in a sport reserved for females "set[s] back" Title IX's "goal of equal participation by females." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989). Here, the League's approval of mixed-sex teams "place[d] a ceiling on the possible achievement of [all-female softball teams] that they cannot break through no matter how hard they strive." *McCormick*, 370 F.3d at 295. But males "are subject to no such ceiling." *Id.* "[T]reating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes." *Id.*

In sum, precedent confirms that "commingling of the biological sexes in the female [softball] arena … significantly undermine[s] the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams," as male athlete's "inclusion effectively de-segregates the [girls'] teams and events they join." *Adams*, 57 F.4th at 819–20 (Lagoa, J., specially concurring); *accord Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 63 (2d Cir. 2023) (en banc) (Menashi, J., concurring) (Title IX "effectively requires a recipient to maintain separate sports teams").

**D.    The League's bylaws subvert Title IX's history.**

For most of American history, social forces actively opposed equal athletic opportunity for women and girls. Schools channeled female students into home economics classes and spurned their direct athletic participation as dangerous, unfeminine, or not worth the cost. *More Hurdles to Clear: Women & Girls in Competitive Athletics*, U.S. Comm'n on Civ. Rts. at 1 (July 1980), https://perma.cc/X3W3-T2YF; *Title IX at 45*, Nat'l Coal. For Women & Girls in Educ. at 2 (2017), https://perma.cc/V7KM-PJ97.

Congress passed Title IX to end such "discrimination against women with respect to educational opportunities." *McCormick*, 370 F.3d at 286; *accord Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1970); *Texas*, 743 F. Supp. 3d at 835. Of course, Title IX applies "equally to boys as well as girls," but the genesis of the law's equal-opportunity mandate "was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams*, 998 F.2d at 175. So Title IX's "remedial focus is, quite properly, … on … women." *Cohen II*, 101 F.3d at 175.

Over the last 50 years, Title IX has been markedly successful, sparking female athletic participation nationwide. *E.g.*, *id.* at 188; *Adams*, 57 F.4th at 818–19 (Lagoa, J., specially concurring). But allowing male athletes to compete on girls' teams based solely on gender identity—with no reference to testosterone or hormone therapy—subverts Title IX's equal-opportunity objectives. *Alabama*, 2024 WL 3981994, at *4 (citing *Adams*, 57

F.4th at 814); *accord Adams*, 57 F.4th at 819–20 (Lagoa, specially concurring) (examining testosterone's effect).

The League's bylaws "essentially reverse the entire premise of Title IX," which is protecting females' ability "to participate in sports [like softball] that they were unable to participate in prior to 1975." *Louisiana*, 737 F. Supp. 3d at 399. By "throwing gender identity into the mix," the League's bylaws "eviscerate[ ] the statute and render[ ] it largely meaningless," *Tennessee*, 2025 WL 63795, at *3, flushing "decades of triumphs for women … down the drain," *Louisiana*, 737 F. Supp. 3d at 399. In sum, defining female to "include[ ] individuals of both sexes, and then" barring schools from making "any distinctions among them on the basis of sex, is by definition and in effect a rejection of Title IX's equality goals." *Adams*, 57 F.4th at 820 (Lagoa, J., specially concurring) (quoting *Re-Affirming the Value*, *supra*, at 133).

## III.  FAU's members face irreparable harm.

The Eighth Circuit has said that "being denied the opportunity to compete in … athletics" is "irreparable harm." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023). FAU's Minnesota female-athlete members have already missed out on athletic opportunities because of the League's eligibility bylaws. *Supra* pp. 7–10. The athletic opportunities FAU's members do have are unfair, deny females equal benefits, and fail to consider female athletes' interests and abilities. *Id*. So FAU's members also suffer "irreparable harm" from being "treated unequally in violation of Title

IX[ ]," "given the fleeting nature of [high school] athletics." *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016).

That is doubly true because allowing mixed-sex softball teams "deprive[ ]" FAU members' all-female teams of "the chance" to reach or win "[r]egional and [s]tate [c]hampionship competition." *McCormick*, 370 F.3d at 302 n.25. And that irreparable harm is ongoing, as FAU members' all-female teams are likely to keep competing against the male athlete—at sectionals, the state tournament, and again next season. *Supra* pp. 7–10.

## IV. The balance of harms and public interest favor an injunction.

When the government, or a state official in his official capacity, is the non-moving party, "[t]he balance-of-harms and public-interest factors merge." *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (cleaned up). The public interest favors FAU, which merely seek[ ] what the law requires, equal athletic opportunities," *Favia v. Ind. Univ. of Pa.*, 812 F. Supp. 578, 585 (W.D. Pa. 1993), "a legal interest that Congress" deemed "important," *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992). Indeed, "the public interest lies in a correction application of" Title IX, *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 569 (E.D. Ky. 2024) (cleaned up), "because the eradication of impermissible sex discrimination is so compelling," *Portz*, 196 F. Supp. 3d at 978. *Accord Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1105 (S.D. Iowa 2020) (public interest demands Title-IX compliance).

FAU merely seeks equal opportunity for girls under Title IX's text and regulations, which "have been unchanged for approximately 50 years." *Tennessee*, 737 F. Supp. 3d at 569. In contrast, Defendants' efforts to "mov[e]

beyond a biological understanding of 'sex,' … provide[s] more protection against discrimination on the basis of transgender status … than … discrimination on the basis of sex." *Adams*, 57 F.4th at 814. And that incongruous result conflicts with Title IX. *Id.*

## Conclusion

For the reasons set forth above and in the accompanying Declarations and Verified Complaint, FAU respectfully requests that the Court enter a preliminary injunction protecting FAU female-athlete members from having to compete with or against males in women's sports.

Respectfully submitted this 20th day of May, 2025.

By: /s/ Renee K. Carlson

<table>
<tr><td>

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rory T. Gray*
Georgia Bar No. 880715
**Alliance Defending Freedom**
1000 Hurricane Shoals Road NE
Suite D-1100

</td><td>

Renee K. Carlson
Minnesota Bar No. 0389675
True North Legal
525 Park Street, Suite 460
St. Paul, Minneapolis, MN 55418
(612) 789-8811
rcarlson@truenorthlegalmn.org

*Pro Hac Vice Applications
Forthcoming*

</td></tr>
</table>

Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (facsimile)
rgray@ADFlegal.org

Suzanne E. Beecher*
California Bar No. 329586
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, D.C.
(202) 393-8690
(202) 347-3622
sbeecher@ADFlegal.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of May, 2025, a copy of the foregoing Plaintiff's Memorandum in Support of Its Motion for Preliminary Injunction was filed with the Clerk of the Court using the ECF system. I also certify that the foregoing will be served, along with a copy of the Summons and Complaint, via a private process server upon the following defendants:

**KEITH ELLISON**
Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2131

**REBECCA LUCERO**,
Commissioner
of the Minnesota Department of Human Rights
540 Fairview Avenue North
Suite 201
Saint Paul, MN 55104

**ERICK MARTENS**,
Executive Director of the Minnesota State High School League
2100 Freeway Blvd.
Brooklyn Center, MN 55430-1735

**WILLIE JETT**, Minnesota Education Commissioner
Minnesota Dept. of Education
400 NE Stinson Blvd
Minneapolis, MN 55413

**Independent School District No. 192 School Board**
Farmington Area Public Schools Board of Education
20655 Flagstaff Avenue
Farmington, MN 55024

**Independent School District No. 279 School Board**
Osseo Area Schools Board of Education
11200 93rd Avenue North
Maple Grove, MN 55369

**Independent School District No. 11 School Board**
Anoka-Hennepin Schools Board of Education
2727 N Ferry Street
Anoka, MN 55303

/s/Renee K. Carlson
Renee K. Carlson
*Attorney for Plaintiffs*