## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Female Athletes United,<br><br>Plaintiff,<br><br>v.<br><br>Keith Ellison, et al.,<br><br>Defendants. | Case No.: 25-cv-02151 (ECT/DLM)<br><br>**DEFENDANT MARTENS' MEMORANDUM OF LAW OPPOSING PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff seeks a Preliminary Injunction to require Defendant Erich Martens[1] and the Minnesota State High School League (the "MSHSL" or "League") to prohibit transgender females from participating in girls' sports. In so doing, Plaintiff asks this Court to change the status quo pending trial, and in essence, seeks the relief ultimately requested by bypassing a trial on the merits of the case. Because the League's eligibility rules and policies relating to transgender students are required by the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* and Title IX does not preempt the MHRA, Plaintiffs cannot establish a likelihood of success at trial and their motion for a preliminary injunction should be denied.

---

[1] The Complaint names Erich Martens, in his official capacity as Executive Director of the Minnesota State High School League. Because an official-capacity claim is a suit against the entity, Defendant Martens will be referred to as the "League" or "MSHSL".

Plaintiff's Complaint is principally directed toward Defendant Keith Ellison, in his official capacity as Attorney General of Minnesota, Defendant Rebecca Lucero, in her official capacity of Commissioner of the Minnesota Commission on Civil Rights, and Defendant Willie Jett, in his official capacity as the Minnesota Commissioner of Education (collectively, the "State Defendants"). State Defendants have submitted a memorandum and supporting documentation opposing Plaintiff's Motion. Defendants Independent School District No. 11, Independent School District No. 192 (ECF 62), and Independent School District No. 279 (ECF 61) have submitted memoranda opposing Plaintiff's Motion. In the interests of judicial efficiency, the MSHSL does not repeat the factual summaries or arguments made by the other Defendants in this memorandum but instead adopts and incorporates them into this memorandum by reference.

## BACKGROUND

The MHRA prohibits a school from discriminating against transgender student-athletes. Minn. Stat. § 363A.13 ("It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . gender identity"). This prohibition dates back to legislative amendments in 1993. *See* Minn. Sess. Law 1993 Ch. 277, § 12 ("It is an unfair discriminatory practice: (1) To discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of <u>sexual orientation</u>") (emphasis in original) *and* Minn. Sess. Law 1993 Ch. 277, §§ 1-4 (defining sexual orientation to include "<u>a self-image or identity not</u>

traditionally associated with one's biological maleness or femaleness.") (emphasis in original).

In 2014, the MSHSL adopted a formal policy in compliance with the Minnesota Human Rights Act ("MHRA") to "allow[] participation for all students consistent with their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics and fine arts."[2] The policy has remained unchanged since being amended on February 4, 2016, as recommended by the Minnesota Department of Education. *Id.*

Per the policy, a member school makes the initial determination of eligibility and, if a member school determines that a student is ineligible for a sport because their gender identity differs from their sex assigned at birth, the student may appeal to the League's Executive Director. *Id.* The Executive Director must then designate an independent hearing officer to determine whether the student "has a consistent gender identity or that the gender identity is sincerely held as part of the student's core identity." If the Independent Hearing Officer affirms the eligibility of the student, the student is eligible to participate in MSHSL activities consistent with the student's gender identification for the balance of the student's high school eligibility. *Id.*

During the decade the policy has been in effect, the MHRA has remained unchanged in its prohibition on gender identity discrimination. However, guidance from the federal

---

[2] See Bylaw 300.03, 2024-2025 MSHSL Official Handbook, https://perma.cc/PH5N-GWK7.

executive branch on transgender student athletes under Title IX has varied dramatically seemingly dependent upon the outcome of presidential elections. Nevertheless, since 2014 the MSHSL policy has operated without challenge until now.

## ARGUMENT

I. **APPLICATION OF THE *DATAPHASE* FACTORS DOES NOT SUPPORT THE ISSUANCE OF A TEMPORARY INJUNCTION**.

A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).

When determining whether to issue a preliminary injunction, the court considers: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. Plaintiffs' motion, which seeks to change the status quo prior to a trial on the merits, contravenes an injunction's primary purpose to preserve the status quo until adjudication of the case.

Generally, no one of these factors is determinative, *Id.* at 113; rather, the court must balance all factors in considering whether to issue an injunction. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023). However, "the absence of a likelihood

4

of success on the merits strongly suggests that preliminary injunctive relief should be denied." *Barrett*, 705 F.3d at 320 (quoting *CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009)). Stated differently, a plaintiff must show a likelihood of succeeding on the merits that is so high to necessitate a review of the other factors. *See CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398 (8th Cir. 2009); *S & M Constructors, Inc. v. Foley Co., 959 F.2d 97* (8th Cir. 1992).

A weighing of the *Dataphase* factors demonstrates that Plaintiff's request for a preliminary injunction should be denied.

### A.   HEIGHTENED STANDARD OF REVIEW.

Because Plaintiffs challenge a state statute, the heightened standard should apply. There are two standards a court may apply when assessing a movant's probability of success on the merits. The first, which applies in most instances, asks whether the party requesting a preliminary injunction has a "fair chance of prevailing." *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). This fair-chance standard does not require the party seeking relief to "show 'a greater than fifty per cent likelihood that he will prevail on the merits.'" *Id.* at 731 (citation omitted). The second, "more rigorous standard," calls on the court to determine, as a threshold matter, whether the movant is "likely to prevail" on his or her claims. *Id.* at 733. The likely-to-prevail standard applies when "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." *Id.* at 732. A heightened standard is applied in such instances because the duly enacted state statute constitutes "government

action based on presumptively reasoned democratic processes," and such action is "entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 732 (quoting *Able v. United States*, 44 F.3d 128,131 (2d Cir. 1995)).

The likely-to-prevail test may also be appropriate when a movant seeks to preliminarily enjoin other forms of government action such as "administrative actions by federal, state or local government agencies." *Id.* at 732 n.6. However, in those cases, the suggested course of action is to first "evaluate whether 'the full play of the democratic process[]' was involved" in the actions and "then determine which standard would be more appropriate." *Richland/Wilkin*, 826 F.3d at 1040 (quoting *Rounds*, 530 F.3d at 732 n.6).

The MSHSL transgender policy is rightly considered government action. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019) (citing *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973) (determining that the League "act[ed] under color of state law" for purposes of 42 U.S.C. § 1983 in promulgating rules governing high school athletics). Plaintiff incorrectly relies upon *D.M.* for its argument that the lower standard applies because this is a dispute over MSHSL bylaws.

*D.M.* involved a challenge to an MSHSL bylaw that limited participation on a school's competitive dance team to females. In that case, the League pointed to Minn. Stat. § 121A.04, subd. 3, which authorized gender-based, athletic limitations in certain circumstances. ("[I]n athletic programs operated by educational institutions or public services and designed for participants 12 years old or older or in the 7th grade or above, it is not an unfair discriminatory practice to restrict membership on an athletic team to

participants of one sex whose overall athletic opportunities have previously been limited."). The 8th Circuit applied the lower standard because (i) the creation of the bylaw at issue in that case "did not involve the full play of the democratic process" and (ii) Minn. Stat. § 121A.04 did not direct the League to do anything but rather permitted the League to discriminate on the basis of sex in limited circumstances. *D.M.*, 917 F.3d at 1000.

In contrast to *D.M.*, eligibility for transgender students to participate in high school athletics consistent with their gender identity is required by a state law enacted under the presumptively reasoned democratic processes contemplated by *Rounds*. *See* Minn. Stat. § 363A.13. *D.M.* is thus distinguishable because Minn. Stat. § 363A.13 explicitly prohibits the League (and its member schools) from discriminating on the basis of gender identity. In other words, Minn. Stat. § 363A.13 ***directs*** the League to do something (not discriminate). There is no question that § 363A.13 was subject to "lengthy public debate involving both the legislative and executive branches" before it was passed by the legislature and signed by the governor (all of which are "democratically elected officials who must answer to their constituents or face the possibility of not being reelected"). *Id.*

In short, Plaintiffs complaint, while couched in terms of a challenge to an MSHSL bylaw or policy, is a direct challenge to the Minnesota Human Rights Act (namely, that the MHRA is preempted by Title IX), and the heightened likely-to-prevail standard should apply.

**B.    Plaintiffs have no likelihood of success.**

Title IX prohibits educational institutions from discriminating on the basis of sex with respect to opportunities to participate in sports and requires that the sexes receive equal benefits. *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580-81 (8th Cir. 2021). Title IX provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.41(a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.").

Plaintiffs lack standing because they have no concrete injury-in-fact. To have standing, there must be "(1) an injury in fact, (2) a causal connection between the injury and the challenged conduct, and (3) a likelihood that a favorable decision will redress the injury." *Becker v. North Dakota University Sys.*, 112 F.4th 592 (8th Cir. 2024). At the preliminary injunction stage, a plaintiff "must make a 'clear showing' that [they] [are] 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22). An "injury in fact" is a harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990). Plaintiffs alleged injuries here are conjectural and hypothetical dependent upon a

large number of variables. The salient fact is that Plaintiffs are afforded equal opportunity to participate. Without standing, the Court lacks subject matter jurisdiction and Plaintiffs have no likelihood of success. The injunction should be denied.

1. **Title IX does not preempt the MHRA with respect to gender identity discrimination.**

Assuming arguendo Plaintiffs have standing to bring a Title IX claim, they cannot meet their likely-to-prevail burden. There is no dispute that Plaintiffs have the opportunity to participate in interscholastic athletics. *See* Complaint ¶ 17 (Plaintiff "competes on the varsity basketball and softball teams"); ¶ 23 (Plaintiff "plays softball . . . on the girls' varsity team"); ¶ 27 (Plaintiff "is . . . on her high school varsity softball team"); ¶ 32 (Plaintiff "plays varsity softball and junior varsity and varsity basketball").

Instead, Plaintiffs allege, in sum, that they have been subjected to discriminatory impact and deprived of equal treatment, benefits, and opportunities to participate in competitive softball. Title IX does not, however, establish a right to succeed or win a state championship or individual awards; it requires the *opportunity* to participate on equal footing. *See Clausen v. National Geographic Soc.*, 664 F. Supp. 2d 1038, 1048-49 (D.N.D. 2009) (sex discrimination does not exist based on wins as "merely because one gender wins more frequently than the other when both have an equal opportunity to participate in the same event."). Neither the MHRA nor the MSHSL's transgender eligibility policy precludes Plaintiffs from participating in softball or any other MSHSL-sponsored activity. The injunction should be denied.

### 2.    Title IX and the MHRA are not in conflict.

Title IX is silent with respect to transgender participation in high school athletics. The parties agree that Title IX uses the term "sex" without definition. Accordingly, on its face, Title IX does not prohibit transgender students from participating in an activity based upon their gender identity; rather, Title IX succinctly provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" subject to certain exceptions. 20 U.S.C. § 1681(a).

Plaintiffs argue that "sex", as used in Title IX, is limited to biologically male or female and does not include "gender identity." To support its argument, Plaintiffs cite a few recent cases from different circuits and "dictionaries of the period" to arrive at the legal conclusion that Title IX "presumes sexual dimorphism." ECF 7, at 16 (citation omitted). These cases notwithstanding, the ambiguity in Title IX on this specific issue is clearly illustrated by the plethora of other cases finding that "Title IX does not define sex. . . . There is insufficient evidence to support the assumption that sex can mean only biological sex" or that Title IX applies to transgender athletes. *A.C. by M.C. v. Metro Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *see also B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 565 (4th Cir. 2024), *cert. granted* (July 3, 2025) (No. 24-44) (holding that state law precluding a transgender student from participating on a sports team consistent with her gender identity "deprive[d] her of any meaningful athletic opportunities . . . on the basis of sex" in violation of Title IX);

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) (holding that discrimination based on gender identity is discrimination "on the basis of sex" under Title IX); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19 (D.N.H. 2024) (granting preliminary injunction after finding, *inter alia*, a likelihood of success on Title IX claims challenging state law that prohibited transgender girls from participating in girls sports); *Doe v. Hanover Cnty. Sch. Bd.*, Civil Action No. 3:24cv493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024) (granting preliminary injunction after finding, *inter alia*, that plaintiff "has made a clear showing that she is likely to succeed on the merits of her Title IX claim . . . [because the school] excluded her, on the basis of sex, from participating in an education program when it denied her application to try out for (and if selected, to participate on) her school's girls' tennis team based on her gender identity."). The caselaw, coupled with the shifting executive branch interpretations over the past fifteen years, demonstrates that compliance with the MHRA and Title IX is possible.

The federal regulatory guidance from the executive branch on this issue has been inconsistent. From 2014 through 2016, at least three guidance letters were issued, each of which opined that Title IX applied to transgender students.[3] In 2017, the letters were

---

[3] In 2014, the United States Department of Education, Office for Civil Rights issued a "significant guidance document" titled "Questions and Answers on Title IX and Sexual Violence" which stated that "Title IX protects [transgender students] at recipient institutions from sex discrimination." Beck Declaration, Ex. A. On January 7, 2015, the United States Department of Education Office for Civil Rights issued a letter that "Title IX . . . prohibits recipients of Federal financial assistance from discriminating on the basis of sex, including gender identity." Beck Declaration, Ex. B. On May 13, 2016, the United States Departments of Justice and Education jointly issued additional "significant

rescinded but not replaced by a new interpretation. Beck Declaration, Ex. D. Instead, the February 22, 2017 dear colleague rescinding letter stated that "the Departments believe that, in this context, **there must be due regard for the primary role of the States and local school districts in establishing educational policy**." *Id.* (emphasis added). Four years later, on January 20, 2021, an executive order was issued (following *Bostock*) that "Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 *et seq.*). . . along with [its] respective implementing regulations—prohibit[s] discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Four years later, Executive Order 14201 was issued on February 5, 2025. Exec. Order No. 1420190 Fed. Reg. 9279.

The League, concerned with the interplay between its obligations under the MHRA and the most recently issued Executive Order, promptly requested, on February 14, 2025, a formal advisory opinion from the Minnesota Attorney General's Office ("AGO"). The AGO opinion speaks for itself—notably stating that the "Executive Order does not have the force of law and cannot supersede Minnesota state law" and that "the MSHSL would

---

guidance" regarding school's Title IX obligations regarding transgender students with the following:

> The Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations. This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity. The Departments' interpretation is consistent with courts' and other agencies' interpretations of Federal laws prohibiting sex discrimination

Beck Declaration, Ex. C.

violate the MHRA by prohibiting transgender athletes from participating in extracurricular activities according to their gender identity." MN AG Op. 1035 at 2 (Feb. 20, 2025), https://www.ag.state.mn.us/Office/Opinions/1035-20250220.pdf.

Plaintiff's argument that the AGO advisory opinion is not conclusive or binding upon the courts because it "extends or modifies the MHRA's provisions" is misplaced. The AGO opinion does not extend or modify the MHRA—the MHRA is unambiguous in its prohibition on gender identity discrimination: "It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . gender identity." Minn. Stat. § 363A.13, subd. 1. Try as they may to portray this as a challenge to an MSHSL policy, Plaintiff's claim is undeniably that Title IX preempts the MHRA. *See* ECF 7, at 14 ("Minnesota's legal requirements are irrelevant because States that accept federal funds agree to Title IX's preemptive effect. 34 CFR § 106.6(b).").

### 3.     <u>Preemption</u>

The crux of this case is whether Title IX preempts the MHRA. The Supremacy Clause provides that "the Laws of the United States" (as well as treaties and the Constitution itself) "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2.

Congress may consequently preempt a state law through federal legislation through express language in a statute. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). But even where, as here, Title IX does not refer expressly to preemption, Congress may

implicitly preempt a state law, rule, or other state action. *Id.* at 376-77 (citing *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64 (2002)). Congress may implicitly preempt a state law through "field" pre-emption or "conflict" pre-emption.

It is worth noting that, notwithstanding the supremacy of federal law, "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Consequently, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985). This presumption is important because the dear colleague letter issued on February 22, 2017, plainly acknowledged that educational policy is traditionally a state or local regulation: "**there must be due regard for the primary role of the States and local school districts in establishing educational policy**." Beck Declaration, Ex. D (emphasis added).

A.    Field Preemption

In cases where, as here, a statute does not expressly preempt state law, it may nonetheless do so through field preemption. When a federal regulatory scheme occupies the field because of its pervasive nature, leaving no room for state action, field preemption applies. *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608. Congress's intent to preempt a field

"can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it'" or a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Because neither inference is present here, field preemption is not applicable.

However, "[t]he case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 940 (8th Cir. 2011) (citation omitted).

There can be no question that Congress is aware of the operation of state law as it applies to transgender student athletes. During the 119th Congress (2025-26), the United States House of Representatives passed H.R.28, which specifically sought to amend Title IX to prohibit school athletic programs from allowing individuals whose biological sex at birth was male to participate in programs that are for women or girls. *H.R.28 - Protection of Women and Girls in Sports Act of 2025*, *119th Congress (2025-2026)*, https://www.congress.gov/bill/119th-congress/house-bill/28 ("This bill generally prohibits school athletic programs from allowing individuals whose biological sex at birth was male to participate in programs that are for women or girls."). A companion bill, S.9, failed to advance in the Senate. *S.9 - Protection of Women and Girls in Sports Act of 2025, 119th*

*Congress (2025-2026)*, https://www.congress.gov/bill/119th-congress/senate-bill/9A ("This bill generally prohibits school athletic programs from allowing individuals whose biological sex at birth was male to participate in programs that are for women or girls."). A similar bill, H.R. 734, was passed by the House of Representatives during the previous legislative session in 2023; the Senate did not take it up at that time. *H.R.734 - Protection of Women and Girls in Sports Act of 2023118th Congress (2023-2024)*, https://www.congress.gov/bill/118th-congress/house-bill/734 ("This bill generally prohibits school athletic programs from allowing individuals whose biological sex at birth was male to participate in programs that are for women or girls.").

Congress has thus indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension exists between them. Title IX does not preempt the MHRA under the doctrine of field preemption.

<u>Conflict Preemption</u>

Conflict preemption exists where "compliance with both state and federal law is impossible" or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (citation omitted). Conflict preemption is not present here because the MHRA does not stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress under Title IX. There is no clearer illustration of this than the fact that the MHRA and MSHSL policy have operated alongside Title IX for over a decade without

issue and with changing interpretations of Title IX from the federal executive branch. The decision of Congress to stand by during this timeframe denigrates a preemption argument. *Lefaivre*, 636 F.3d at 940("[t]he case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them").

The MSHSL is attempting to comply with its obligations under both the MHRA and Title IX in an uncertain and seemingly ever-changing landscape. Plaintiff recognizes the difficult position the MSHSL and its member schools are in: "the School Districts and the League [are effectively forced] to ignore Title IX and the Executive Order—and abide by the eligibility bylaws—on pain of judicial restraining orders, injunctions, and contempt orders, as well as awards of civil penalties, punitive damages, and attorney's fees and costs." Ironically, Plaintiff has brought suit against the MSHSL asking for an injunction as well as civil penalties, damages, and attorneys fees and costs. This underscores the quandary faced by the MSHSL and its member schools—whether it continued the status quo or rescinded its policy, a lawsuit was likely forthcoming. Given the AGO advisory opinion and the shifting guidance from the federal executive branch, the MSHSL has chosen to maintain the status quo until Congressional action or a court resolves the issue.

Despite the whiplash inducing changes to federal guidance from the executive branch since 2014, Congress has not acted to change the statutory language of Title IX. In other words, the multitude of dear colleague letters and executive orders have had no

impact on the text of Title IX. Consequently, Title IX remains today as it was in 2014 when the MSHSL adopted its transgender eligibility review policy and as it has been in the subsequent decade. The language of the MHRA protecting gender identity has been in place for even longer.

The MHRA and the MSHSL policy regarding transgender athlete participation has been consistently applied for a decade. During that decade, the MHRA has remained unchanged (as it relates to gender identity discrimination) but the federal guidance on transgender athletes under Title IX has varied dramatically, seemingly dependent upon the outcome of presidential elections. The MSHSL policy has remained in effect when the federal executive branch guidance was that Title IX applied to transgender athletes; it remained in effect when that guidance was rescinded; it continued in effect when the rescinded guidance was effectively reinstated; and remained in effect when that reinstated guidance was then rescinded again. Put simply, regardless of the inconstant executive branch guidance, the MSHSL has consistently applied its transgender policy in conformance with what it believes to be its obligations under both the MHRA and Title IX.

**B.    BALANCE OF HARMS/IRREPARABLE HARM**

Plaintiff seeks a preliminary injunction to change the status quo pending trial. In the absence of a preliminary injunction, the status quo will remain in place, as it has for over a decade—to allow transgender students meeting certain requirements to participate on the basis of their gender identity rather than biological sex—and, most importantly, Plaintiffs

remain able to attend class, engage in school activities, and have the opportunity to participate in interscholastic athletics. *See Stevenson v. Blytheville Sch. Dist. # 5*, 800 F.3d 955, 9668 (8th Cir. 2015) ("under Goss, the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process."). Plaintiffs' alleged harm is neither permanent nor irreparable. Stated differently, even if the injunction is denied, Plaintiff's will continue to have the opportunity to participate in interscholastic athletics.

Granting an injunction, on the other hand, would permanently and irreparably harm those student athletes who would be prohibited from participation. Stated differently, student athletes falling under auspices of the MHRA and MSHSL policy would have no opportunity to participate consistent with their gender identity. *See D.M.*, 917 F.3d 1003 ("Students who are denied the opportunity to join their schools' sports teams because of their sex may suffer irreparable harm."). If transgender athletes are subsequently determined eligible after a trial on the merits, it is not possible to remedy that harm.

Moreover, the injunction would fundamentally alter the requirements for League-sponsored activities and would disregard the unambiguous language of Minn. Stat. Ch. § 363A.01 *et seq.* Plaintiffs seek an order to "Preclude Defendants from allowing male athletes to compete with or against female-athlete members of Female Athletes United in sports designated for women or girls . . . [and] declare ineligible any male athletes competing or seeking to compete with or against female-athlete members of Female Athletes United in sports designated for women or girls" and to apply that order to current

"or future female-athlete member." ECF 6, at 2. Consequently, a preliminary injunction would create administrative burdens upon the MSHSL in that it would require an individualized inquiry into whether any student athletes in a given sport are members of FAU and, if so, whether there are any student athletes in that sport are participating based upon their gender identity under the MHRA. Given that the injunction seeks to apply to "future" members of FAU dramatically increases the scope of the injunction and the administrative burden.

There is no allegation that the individual plaintiffs were denied the opportunity to join their schools' sports teams. Whether a preliminary injunction is issued will not harm the individual plaintiffs' ability to tryout and participate in interscholastic activities at their school, including softball. To the contrary, the evidence before this Court is that the individual plaintiffs participate in multiple sports at their respective high schools. In contrast, Plaintiffs injunctions seeks to exclude from participation student athletes who are currently eligible to participate in interscholastic activities. Plaintiffs have not met their burden that they will be irreparably harmed in the absence of a preliminary injunction and the injunction should be denied.

### C.    PUBLIC INTEREST

Public policy weighs in favor of the League and the Minnesota legislature. The MSHSL is responsible for regulating and supervising interscholastic activities and contests between its over 500 member schools throughout the State of Minnesota. Accordingly, it is tasked with enforcing its bylaws consistently and uniformly throughout the state. The

Plaintiff's interests in the injunction, in contrast, are purely private. The public purpose is further served by maintaining the status quo and public policy of the MHRA pending a trial on the merits.

The MHRA is a broad anti-discriminatory statute enacted and reaffirmed by the Minnesota legislature. It states that "[n]othing in this chapter shall be interpreted as restricting the implementation of positive action programs to combat discrimination." Minn. Stat. § 363A.02, subd. 1(a). Federal courts have also recognized protections for transgender persons from discrimination. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011). Accordingly, an individual cannot be punished because of his or her perceived gender-nonconformity. *Id.* at 1319. According to *Glenn*:

> Because these protections are afforded to everyone, they cannot be denied to a transgender individual. The nature of the discrimination is the same; it may differ in degree but not in kind, and discrimination on this basis is a form of sex-based discrimination . . . .

*Id.*

Federal courts have recognized with "near-total uniformity" that the "narrow view" of the term "sex" used by the court in *Sommers* "has been eviscerated." *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Courts have found that an individual's sex includes many components, including chromosomal, anatomical, hormonal, and reproductive elements, some of which could be ambiguous or in conflict within an individual. *See Radtke v. Misc. Drivers & Helpers Union Local #638 Health, Welfare, Eye & Dental Fund*, 867 F.Supp.2d 1023, 1032 (D. Minn. 2012) (citing *In re Lovo-Lara*, 23 I. & N. Dec. 746, 752 (BIA 2005)). As

21

a result, the assigned sex of an individual at birth is based only on observation of anatomy at birth, which itself may change when the individual reaches puberty. *Lovo-Lara*, at 753.

Minnesota federal district court determined that "[i]t would be wholly inappropriate . . . to invent a narrow federal definition of 'sex' based on the sex assigned at birth and impose that construction on a Minnesota statute." *Radtke*, 867 F.Supp.2d at 1032. Consequently, the court held that the capacity requirements for marriage are determined, not at the time of birth, but at the time of marriage. *Id.* To analogize to the League's transgender policy, the gender-identity requirements for participation in extracurricular activities are determined, not at the time of birth, but at the time of participation. The policy requires that certain criteria be provided to verify that the student identifies as a gender different from the biological gender assigned at birth.

The legislative intent to prohibit discrimination on the basis of gender identity has been repeatedly affirmed by the legislative and executive branches since 2015. In 2023, the legislature amended Minn. Stat. § 363A.03, subd. 44 to remove the verbiage pertaining to gender identity from the definition of "sexual orientation" and create a standalone definition for "gender identity" as "a person's inherent sense of being a man, woman, both, or neither. A person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics. A person's gender identity is not necessarily visible to others." 2023 Session Law Ch. 52 §§ 47-48. In that same session, the legislature reaffirmed that it is an "unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services

rendered thereby to any person because of . . . gender identity . . . ." Public policy favors denying the preliminary injunction.

## CONCLUSION

The League has taken no action to limit the individual Plaintiffs' eligibility or opportunity to participate in interscholastic activities. Their alleged limitation and harm is derived entirely from the impact of the MSHSL policy implementing the MHRA's prohibition on gender identity discrimination on the participation of others. Regardless of whether an injunction issues, Plaintiffs will have the opportunity to participate in softball (assuming all other eligibility rules are met) and other MSHSL-sponsored activities. If issued, however, the injunction would remove the opportunity to participate from student athletes who are not parties to this litigation. In this case, the status quo is maintained by *not* issuing a temporary injunction.

Plaintiff's motion for a preliminary injunction seeks to reverse the status quo, bypass a determination of necessary issues on the merits, and effectively seeks the ultimate relief sought. Plaintiff has not met its burden to prove the need for a preliminary injunction. The *Dataphase* factors and equities favor Defendants and thus no injunction should issue.

Respectfully submitted,

**LAW OFFICE OF KEVIN M. BECK**

Dated: July 23, 2025

/s/ Kevin M. Beck
Kevin M. Beck (#389072)
kbeck@kmbecklaw.com
Kristina J. Borgen (#392096)
kristina@kmbecklaw.com
2038 Ford Parkway #432
Saint Paul, MN 55116
(p) 612.743.2618

*Attorneys for Defendant Martens*