# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **Female Athletes United**, | |
| Plaintiff, | |
| v. | |
| **Keith Ellison,** in his official capacity as Attorney General of Minnesota; **Rebecca Lucero,** in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; **Erich Martens,** in his official capacity as Executive Director of the Minnesota State High School League; **Willie Jett,** in his official capacity as the Minnesota Commissioner of Education; **Independent School District No. 11 School Board; Independent School District No. 192 School Board; Independent School District No. 279 School Board,** | Case No. 0:25-cv-02151-ECT-DLM<br><br>**Plaintiff's Combined Reply in Support of the Motion for Preliminary Injunction** |
| Defendants. | |

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Background ................................................................................................ 2

Scientific Background ............................................................................... 2

The League's Bylaws ................................................................................. 5

Argument .................................................................................................... 5

I.    The State's threat of sanctions against FAU's attorneys is meritless and out of bounds. .................................................................. 6

II.    FAU has standing to challenge the League's bylaws. ........................... 7

    A.    FAU's members have suffered past injuries, including losing to a mixed-sex team. ..................................................... 8

    B.    FAU's members face a substantial risk of losing to the mixed-sex team next season. .......................................... 12

    C.    Awarding FAU its requested relief redresses the harms Defendants have caused FAU members. .................................. 15

III.    FAU's suit to protect equal opportunities for women in athletics falls within the heartland Title IX's zone of interest. .................................. 17

IV.    The heightened preliminary injunction standard doesn't apply, and FAU meets the higher standard anyway. ............................................. 19

V.    FAU has a fair chance, and is likely to prevail, on the merits. ............ 21

    A.    The League's bylaws violate Title IX's text. ............................... 21

    B.    The League's bylaws violate Title IX's implementing regulations. ........................................................................... 24

        1.    The bylaws violate the regulations. .................................... 24

        2.    The bylaws violate the 1979 policy statement. .................. 26

i

C.    The League's bylaws violate Title IX precedent. ......................... 28

D.    Title IX preempts any contrary state law. .................................. 32

E.    Defendants had notice of their obligations................................. 32

VI.    FAU deserves an injunction. .................................................... 33

VII.    The Court should waive any bond requirement.................................. 35

Conclusion ................................................................................ 35

ii

# Table of Authorities

<u>**Cases**</u>

*Adams ex rel. Kasper v. School Board of St. Johns County,*
    57 F.4th 791 (11th Cir. 2022) ................................................................. 23

*Alabama v. U.S. Secretary of Education,*
    No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ................. 23

*Arkansas v. U.S. Department of Education,*
    742 F. Supp. 3d 919 (E.D. Mo. 2024) .................................................... 23

*Becker v. N. Dakota University System,*
    112 F.4th 592 (8th Cir. 2024) ............................................................ 8, 12

*Berndsen v. North Dakota University System,*
    7 F.4th 782 (8th Cir. 2021) .................................................. 24, 26, 28, 29

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ................................................................................ 23

*Brenden v. Independent School District 742,*
    477 F.2d 1292 (8th Cir. 1973) ................................................................ 16

*Brooks v. Francis Howell School District,*
    599 F. Supp. 3d 795 (E.D. Mo. 2022) .................................................... 35

*Bucklew v. Precythe,*
    587 U.S. 119 (2019) ................................................................................ 30

*Cannon v. University of Chicago,*
    441 U.S. 677 (1979) ................................................................................ 18

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013) ................................................................................ 15

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ................................................................ 22

*Cody v. Hillard,*
    304 F.3d 767 (8th Cir. 2002) .................................................................. 22

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) .......................................................... 23, 29

*Cooper v. USA Powerlifting,*
    5 N.W.3d 689 (Minn. Ct. App. 2024)...................................................... 19

*Council on American-Islamic Relations-Minnesota v. Atlas Aegis LLC,*
    497 F. Supp. 3d 371 (D. Minn. 2020) ...................................................... 35

*CSL Plasma Inc. v. U.S. Customs & Border Protection,*
    33 F.4th 584 (D.C. Cir. 2022) ................................................................. 18

*D.M. ex rel. Bao Xiong v. Minnesota State High School League,*
    917 F.3d 994 (8th Cir. 2019)................................................................... 20

*D.N. ex rel. Jessica N. v. DeSantis,*
    701 F. Supp. 3d 1244 (S.D. Fla. 2023) ...........................................*passim*

*Daniels v. School Board of Brevard County,*
    985 F. Supp. 1458 (M.D. Fla. 1997) ................................................. 30, 33

*Department of Education v. Louisiana,*
    603 U.S. 866 (2024)................................................................................ 23

*Diamond Alternative Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025)........................................................................ 8, 15

*Food & Drug Administration v. R. J. Reynolds Vapor Company,*
    145 S. Ct. 1984 (2025)............................................................................ 17

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274 (1998)............................................................................... 20

*Grandson v. University of Minnesota,*
    272 F.3d 568 (8th Cir. 2001)................................................................... 32

*Hecox v. Little,*
    479 F. Supp. 3d 930 (D. Idaho 2020)...................................................... 14

*Horner v. Kentucky High School Athletics Association,*
    43 F.3d at 265 (6th Cir. 1994) ................................................................ 31

*Hillsborough County v. Automated Medical Laboratories, Inc.,*
    471 U.S. 707 (1985)............................................................................... 32

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) ................................................................. 7

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) ............................................................... 26

*Labrador v. Poe ex rel. Poe,*
    144 S. Ct. 921 (2024) ............................................................ 33

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................... 21

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) .................................................. 30

*McCoy v. Court of Appeals of Wisconsin,*
    486 U.S. 429 (1988) ................................................................. 7

*Medina v. Planned Parenthood South Atlantic,*
    145 S. Ct. 2219 (2025) ......................................................... 18

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................. 7

*Murthy v. Missouri,*
    603 U.S. 43 (2024) .......................................................... 12, 14

*Mutual Pharmaceutical Company v. Bartlett,*
    570 U.S. 472 (2013) ............................................................... 32

*Neal v. Board of Trustees of California State Universities,*
    198 F.3d 763 (9th Cir. 1999) ........................................... 29, 30

*New York v. U.S. Department of Education,*
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) .................................. 32

*Parker v. Franklin County Community School Corporation,*
    667 F.3d 910 (7th Cir. 2012) ................................................. 30

*Pederson v. Louisiana State University,*
    213 F.3d 858 (5th Cir. 2000) ................................... 11, 30, 33

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ................................................................... 20

*Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*,
  530 F.3d 724 (8th Cir. 2008) ................................................................... 20

*Soule v. Connecticut Association of Schools, Inc.*,
  90 F. 4th 34 (2d Cir. 2023) ............................................................. 10, 23

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................. 8

*Stewart v. City of Minneapolis*,
  Civil No. 17-226(DSD/TNL), 2017 WL 3588632 (D. Minn. Aug. 21, 2017) ....................................................................................... 17

*Tennessee v. Cardona*,
  No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ...................... 23

*Townsend v. Swank*,
  404 U.S. 282 (1971) .............................................................................. 32

*Trump v. Boyle*,
  606 U.S. __, No. 25A11, 2025 WL 2056889 (July 23, 2025) ............ 23, 24

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) .......................................................................... 23

*Victim Rights Law Center v. Cardona*,
  552 F. Supp. 3d 104 (D. Mass. 2021) ..................................................... 32

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................. 12

*Williams v. School District of Bethlehem*,
  998 F.2d 168 (3d Cir. 1993) .................................................................. 25

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) ........................................................... 7, 12

*Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association*,
  647 F.2d 651 (6th Cir. 1981) ..................................................... 29, 30, 31

vi

## Statutes, Rules and Regulations

20 U.S.C. § 1681(a) ................................................................. 16, 21, 22

34 C.F.R. § 106.2 ............................................................................. 31

34 C.F.R. § 106.41(c) ............................................... 24, 25, 27, 32, 33

34 C.F.R. § 106.6(b) ...................................................................... 32

34 C.F.R. § 106.6(c) ...................................................................... 17

Fed. R. Civ. P. 19(a)(1)(B) ........................................................ 17, 34

Minn. Stat. § 128C.01 .................................................................... 31

Minn. Stat. § 363A.03 .................................................................... 25

MSHSL Bylaw 101.00.................................................................... 22

MSHSL Bylaw 111.00, http://bit.ly/3J0Z51H............................5

MSHSL Bylaw 304.00(3)(A), https://bit.ly/4cOMI3o...................... 16

## Other Authorities

2026 MSHSL Physical Form 1–2 .................................................... 31

*A Policy Interpretation: Title IX and Intercollegiate Athletics*, U.S.
Department of Education (Dec. 11, 1979) ("Interpretation),
http://bit.ly/4ljpDZ8 .............................................................. 26, 27, 28

*Civil Rights Protections Against Retaliation*, U.S. Department of
Education Office for Civil Rights (Dec. 2024), http://bit.ly/4oxtUvc .................7

Compl., No. 25-cv-01608, *Minnesota v. Trump*, ECF No. 1 (Apr. 22,
2025) ............................................................................................ 17

Complaint at 15–19, *United States of America v. California
Interscholastic Federation*, No. 8:25-cv-1486 (C.D. Cal. filed July 9,
2025) ..............................................................................................6

Complaint at 21–24, *United States of America v. Maine Department of Education*, 1:25-cv0173 (D. Me. filed Apr. 16, 2025) ..........................................6

*Diagnostic & Statistical Manual of Mental Disorders Fifth Edition Text Revision* 511 (2022) ........................................................................... 22

Hannah Flood, *The pioneers that paved the way for girls' sports in Minnesota*, Fox 9 (March 27, 2022), http://bit.ly/4leeusB................................ 28

Letter, No. 25-cv-01608, *Minnesota v. Trump*, ECF No. 1-3 (Apr. 22, 2025). ...................................................................................................... 17

MDHR Commissioner Amicus Brief, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://bit.ly/4iyu5lo ................. 20

Minnesota Attorney General Opinion 1035 at 3–4 (Feb. 20, 2025), 8, 17https://bit.ly/42tcHtL ................................................................... 8, 17

Randy Shaver, *50 years after Title IX: Meet Minnesota's trailblazers in women in sports*, KARE 11 (May 6, 2022), http://bit.ly/4lopm7o ................... 28

U.S. Department of Education Letter to Roger Brooks re Re-evaluation of Complaint, https://bit.ly/4m9lPeA ............................................... 19

U.S. Department of Education, *U.S. Department of Education Announces Consequences for Maine's Title IX Noncompliance*, https://bit.ly/3U9oXL3 ...................................................................... 19

U.S. Department of Education, *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://bit.ly/4l9Pnao............................................................................. 19

# INTRODUCTION

Ignoring the clear physiological distinctions between biological males and females, Minnesota doubles down on erasing women's-only sports.

First, they challenge FAU's standing—even though FAU members have played and will play women's softball against a biologically male athlete. Hand-waving aside, the basic facts are not in dispute. ███████████ ████████████████████████████████████████████████████ ██████████████████████████████ The FAU members have already lost games to the athlete. One is already scheduled to play the athlete's team next year, and the others are likely to. That's more than enough to establish standing.

Next, on the merits, they assert Title IX compliance because girls get to play, even if they're unlikely to win. And they say they comply because the State considers the male athlete a girl. These arguments ignore basic physiology and statutory text. Title IX protects sex understood biologically; officials cannot rewrite or erase those protections by redefinition. Because males have athletic advantages, a policy that allows males to play girls' sports—while in practice maintaining boys-only sports—necessarily displaces females, deprives them of equal athletic opportunities, and treats them worse than boys. That's a Title IX violation.

Finally, they make a series of throwaway arguments against federal preemption (which applies), saying they didn't have clear notice of Title IX's obligations (they did), and contending FAU members aren't sufficiently harmed (they are). None of these have merit.

Cutting through the noise, FAU members have demonstrated that a preliminary injunction is the only way they can play women's-only softball in 2026, as Title IX protects. FAU urges that the injunction issue.

## BACKGROUND

Throughout their briefs—and in their expert reports—Defendants confuse both the available science and the effects of the League's bylaws. While Plaintiff submits three comprehensive rebuttal reports to clarify these misconceptions, a few deserve highlighting here. Brown Rebuttal Declaration, Ex. A; Levine Rebuttal Declaration, Ex. B; Carlson Rebuttal Expert Declaration, Ex. C.

### SCIENTIFIC BACKGROUND

***Male athletic advantage is well-established and substantial.*** In his original report, Dr. Brown covered the significant physiological advantages males have over females in nearly all athletic endeavors. Brown Decl. ¶¶ 13–108. In response, Defendants' expert suggested that some overlap between the sexes suggests these differences are not meaningful. Goepferd Decl. ¶¶ 74–87. That's wrong. While some overlap exists between the populations—i.e., not every single girl is slower than every single boy— males consistently outperform comparably trained and talented females across the athletic spectrum. Brown Rebuttal Decl. ¶ 56. At the high-school level, that means that the average female runner is slower than the vast majority of male runners (slower than 94.8% in one large dataset that included Minnesota), and that the fastest females will still lose to a large number of males (36% of males beat the top 1% of females in that same

2

dataset). Brown Rebuttal Decl. ¶ 57. These large population-level differences make it categorically unfair to force girls to compete against boys.

***Male athletic advantage exists before puberty, is based in biology, and isn't erased by puberty blockers or testosterone suppression.*** Despite Dr. Brown's extensive discussion of pre-pubertal performance advantages, Defendants' expert nonetheless suggests that boys and girls perform essentially the same before puberty. Goepferd Decl. ¶¶ 22–25. That's also wrong. While smaller than after puberty, male advantage before puberty is well-documented, durable, and more than enough to make a difference in athletic competition. Brown Rebuttal Decl. ¶¶ 22–25. And these differences are rooted in biology, not athletic participation rates or physical activity, as detailed in Dr. Brown's reports. Brown Rebuttal Decl. ¶¶ 27, 33–36. One study specifically examined whether equalizing participation rates would equalize performance. It didn't. Brown Rebuttal Decl. ¶ 30.

Nor is there evidence that puberty blockers or testosterone suppression equalize athletic performance. Dr. Brown's initial report painstakingly reviewed the scientific evidence in this area. Brown Decl. ¶¶ 203–222, 231–300. In response, Defendants' expert cited exactly three studies—all of which have serious methodological limitations that Dr. Brown had already addressed. *Compare* Goepferd Decl. ¶¶ 82–84 *with* Brown Decl. ¶¶ 247–248, 255, 259–63, 275, 278, 283. The weight of the scientific evidence, which Defendants' expert fails to even cite, shows that testosterone suppression has a modest effect on athletic performance that doesn't come close to erasing male advantage. Brown Rebuttal Decl. ¶¶ 67–78.

***Sex-designating school sports excludes no one and protects females.*** A consistent trope in Defendants' briefing and expert reports is that designating sports by sex excludes athletes who identify as transgender. It doesn't. Nothing prohibits a transgender-identifying athlete from playing on a team designated for his or her sex. Brown Rebuttal Decl. ¶ 114; Levine Rebuttal Decl. ¶ 257.

***Sex-designation does not require invasive testing.*** Defendants' experts equate designating teams by sex to a form of "gender policing" that will require invasive testing. McQuillan Decl. ¶¶ 42–43; Goepferd Decl. ¶¶ 67–73. Not so. The pre-participation medical clearance form that Minnesota *already uses* is sufficient to determine sex-based eligibility. Carlson Rebuttal Decl. pp. 14–15. Even at the elite level, organizations like World Athletics can designate events by sex—meaning biology—without engaging in invasive testing. Carlson Rebuttal Decl. p. 15.

***There is no reliable evidence that facilitating social transition— of which athletics is a part—improves mental health or prevents suicide.*** Finally, Defendants' experts claim that allowing transgender-identifying students to play on opposite-sex teams is necessary for their mental health and part and parcel of "gender-affirming care" that one describes as "life-saving." McQuillan Decl. ¶¶ 34–36; Goepferd ¶ 58. But no form of transition—social or medical—has been demonstrated to improve mental health. Levine Rebuttal Decl. ¶¶ 160–194. Nor is there evidence that any form of transition lowers suicide risk. Levine Rebuttal Decl. ¶¶ 195–217. No science supports the idea that schools must facilitate a student's

transition by permitting opposite-sex athletic team participation as a means to support mental health or avoid suicide. Levine Rebuttal Decl. ¶¶ 262–63.

### THE LEAGUE'S BYLAWS

Defendants acknowledge that the Minnesota State High School League's ("MSHSL" or the "League") bylaws allow students to participate in high school athletics based on their gender identity, not their sex. *E.g.*, Minn.Op.8; Martens.Opp.3; Dist.11.Opp.13 And they admit the bylaws were recommended by the Minnesota Department of Education, Martens.Opp.3, and later effectively mandated by the Attorney General, Minn.Opp.8, even though the Minnesota Legislature originally intended to exempt single-sex sports teams from the Minnesota Human Rights Act's (MHRA) requirements, Minn.Opp.25 n.16.

Critically, the bylaws require *no medical diagnoses or treatment* for biological males to participate in girls' sports. Minn.Opp.7 n.2. Eligibility is based *solely* on a student's gender identity. FAU.Mem.3–4. No hormone therapy or testosterone suppression is required. Minn.Opp.7 n.2. And male athletes may switch from the boys' team to the girls' team *at any time*, even though the League severely limits *other* means of changing teams. *E.g.*, MSHSL Bylaw 111.00, http://bit.ly/3J0Z51H (governing transfer and residence). So the relevant lens for Minnesota's policy is the effect of allowing untreated biological males to compete in women's sports.

### ARGUMENT

FAU has standing and is entitled to its requested injunction. The League's bylaws have harmed its members in the past, and its members face

a substantial risk of future harm. Indeed, one is already scheduled to play a mixed-sex softball team next season. The League's bylaws caused that harm—they force high-school girls to compete against biological boys. And FAU's requested relief redresses that harm.

FAU also has a fair chance, and is likely to succeed, on the merits. Its Title IX claims are within Title IX's zone of interest, and forcing girls to compete against biological boys deprives them of equal athletic opportunities guaranteed by Title IX. But before addressing standing or the merits, FAU first clarifies a disagreement over vocabulary.

## I.    The State's threat of sanctions against FAU's attorneys is meritless and out of bounds.

The State threatens sanctions against FAU's attorneys for referring to a biological male as a "male athlete." Minn.Opp.5 n.1. This attempt to hamstring FAU's legal arguments through language censorship is meritless. FAU's position is that "sex" under Title IX refers to biologically male or female. FAU.Mem.15–18. That position only makes sense if FAU's attorneys consistently use *biological* terms. *Accord* Minn. R. Prof'l Conduct 4.4(a) (approving means with a "substantial purpose"). The United States has made the same Title IX argument with the same biological language. *E.g.*, Compl. at 15–19, *United States of Am. v. Cal. Interscholastic Fed'n*, No. 8:25-cv-1486 (C.D. Cal. filed July 9, 2025); Compl. at 21–24, *United States of Am. v. Me. Dep't of Educ.*, 1:25-cv0173 (D. Me. filed Apr. 16, 2025). And a Florida district court agreed on Title IX and used biologically accurate language. *E.g.*, *D.N. ex rel. Jessica N. v. DeSantis*, 701 F.Supp.3d 1244, 1264 (S.D. Fla. 2023) ("Plain-

6

tiff's sex for purposes of Title IX—defined as biological sex—is male …."). So FAU continues its prior position here by referring to ███ as a "male athlete." That is, after all, the thrust of the dispute.

Threatening sanctions against FAU's attorneys is also out of bounds. *E.g.*, *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 435 (1988) (ethics and court rules bar "frivolous or improper arguments"). Prohibiting attorneys advocating a biological understanding of Title IX from using biologically accurate language would raise substantial First Amendment concerns. *Cf. Meriwether v. Hartop*, 992 F.3d 492, 508–09 (6th Cir. 2021) (using biologically accurate language conveys a message protected by the First Amendment). Plus, Title IX itself bars retaliation against those who "speak[ ] out about sex discrimination." *Jackson v. Birmingham Bd. of Educ*, 544 U.S. 167, 179 (2005). And the statute doesn't "require that the victim of … retaliation … be the victim of the discrimination that is the subject of the original complaint." *Id.* So the State's needless threats aren't merely regrettable, they pose an independent Title IX problem. *See generally Civil Rights Protections Against Retaliation*, U.S. Dep't of Educ. Office for Civil Rights (Dec. 2024), http://bit.ly/4oxtUvc.

## II. FAU has standing to challenge the League's bylaws.

FAU sues on behalf of its members under the three-part test for organizational standing. *See Worth v. Jacobson*, 108 F.4th 677, 685 (8th Cir. 2024) (describing test). Defendants only dispute the first part of that test— whether "at least one" FAU "member[] has had continuous standing." *Id.* at 686. They have. FAU's members have suffered an injury and face a

7

substantial risk of future injuries. Defendants caused their injuries, which are redressable here. *See, e.g.*, *Becker v. N. Dakota Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024). So FAU has standing.

## A. FAU's members have suffered past injuries, including losing to a mixed-sex team.

The League's bylaws have caused FAU's members "concrete" and "particularized" injuries by affecting them "personal[ly] and individual[ly]" in a "'real'" way. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016).

There should be "little question" that FAU's members have suffered an injury here because they are an "object" of the League's bylaws—those whose eligibility the bylaws determine. *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025) (cleaned up). General Ellison says the League's bylaws are to benefit "students" based on Minnesota's views of "full utilization and benefit of educational institutions." Minn.Att'y.Gen.Op.1035 at 3–4 (Feb. 20, 2025), https://bit.ly/42tcHtL. The bylaws directly regulate FAU's members by determining whether they can play and who can play against them. That rule has injured FAU's members.

Over the last two years, ███████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████████ █ ██████████████
████████████████████████████████████
████████████████████████████████████

8



9

These losses are Article III injuries because, as courts across the country have held, denying girls equal athletic opportunities injures them. *See* FAU.Mem.24–26 (collecting many cases). For example, when female high-school sprinters lost to male athletes because of Connecticut's similar policy, they had standing to challenge the policy. *Soule v. Connecticut Association of Schools, Inc.*, 90 F. 4th 34, 42–43 (2d Cir. 2023) (en banc). The Second Circuit held the injuries were "concrete"—"the denial of 'equal athletic opportunities' and the loss of publicly recognize titles and placements." *Id.* at 46. And the injuries were particular—the female athletes "personally competed" in the races. *Id.* The same logic applies here. The League's bylaws "discriminate[] against" FAU members. *Id.* The bylaws deny them "benefits that they would otherwise have enjoyed" by forcing them to compete against a male rather than only female athletes. *Id.* And FAU members participated in games where their teams lost to a mixed-sex team.

Defendants take a few swings at FAU's past injuries. But none connect.

First, Defendants say that FAU's members aren't injured because they're otherwise successful players. Minn.Opp.14; Martens.Opp.20. That's like saying that one of the female sprinters in *Soule* wasn't injured by Connecticut's policy because she "finished in 3rd place" at a state meet. 90 F.4th at 43. The Second Circuit rejected that argument even though the female sprinters sometimes "outperformed" the male athletes. *Id.* at 77 n.1 (Chin, J., dissenting). This Court should too. Defendants' argument just reframes the injury as one that FAU does not allege (general lack of success), and then says FAU has not alleged it.

10

The injuries FAU members *do* allege stem from Defendants forcing them to compete against—and ultimately losing to—a mixed-sex team when Title IX guarantees them the chance to compete only against other female athletes. The bylaws "create[] a barrier" for FAU's members to enjoy equal treatment, effective accommodation, and equal opportunities in athletics. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000); Compl. ¶¶ 136–64, 178–91. And FAU members have suffered those injuries despite their individual success. Again, the *Soule* plaintiffs were all successful athletes. 90 F.4th at 43. But the male athletes' presence in races still "deprived" the women of "an opportunity to compete in fair and non-discriminatory high school track races." *Id.* at 46. Same here.

Next, Defendants claim FAU has shown no "'unfair' competition" or that its injuries are "protected by Title IX." Minn.Opp.19–20; Dist.192.Opp.11. This is hard to square with ████████████████ ████████ and expert testimony about male advantage; ████████████ ████████████████████████████████████████████ and Title IX's text and history. *See* Compl. ¶¶ 136–64; FAU.Mem.15–29; ████ Decl. ¶¶ 14–31; ████ Decl. ¶¶ 33–39; ████ Decl. ¶¶ 28–43; Brown Rebuttal Decl. ¶¶ 22–53. Nor does Minnesota cite anything requiring FAU to "negate all the other potential factors" ████████████████████████ " Minn.Opp.20. Such a rule would erase women's sports by allowing any male—or an all-male team—to play on or against any female team so long as he could point to a good "work ethic and effort," strong "coaching," and team "cohesion." *Id.*

Regardless, these arguments turn on the merits. And "standing in no way depends on the merits", but courts assume plaintiffs' legal theories when they evaluate standing. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). *Accord Soule*, 90 F.4th at 46. Applying that assumption, Minnesota has injured FAU's members through "discriminatory treatment." *Becker*, 112 F.4th at 595–96. That's the injury Title IX meant to prevent.

### B.    FAU's members face a substantial risk of losing to the mixed-sex team next season.

Turning from past to future, FAU members face a substantial risk that the bylaws will harm them again. A regular-season game between ███████████ ████████████ is already on the schedule, ██████████████████████████



So FAU has standing to pursue prospective relief.

Defendants' contrary theory depends on a narrow view of future harm. They say FAU's injuries must be "ongoing and repeated" or "certainly impending." Minn.Opp.17. Not so. "Putting" the standing "requirements together," FAU need only show a "substantial risk" of future injuries. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). For that, FAU members' past harm serves as a "launching pad" for their risk of "future injury." *Id.* at 59.

Even so, Defendants insist that the injuries are too speculative because they rely on a list of contingencies. Minn.Opp.18–19; Dist.11.Opp.18–19; Dist.192.Opp.11–12. But what Defendants call contingencies are nearly slam-dunk certainties. ███████████████████████████████ █████ make their teams. Minn.Opp.18–19; ██████ Supp.Decl. ¶¶ 30–31; ████ Decl. ¶¶ 41–42; ██████ Supp.Decl ¶¶ 5–6; ██████ Supp.Decl ¶¶ 5–6. ██████ game against ███████ team is already on the █████████████████████ █████████████ ███ Supp.Decl. ¶ 33.



Because FAU's members' injuries come from being denied the equal treatment of only competing against other girls as guaranteed by Title IX, it is irrelevant whether they lose to the mixed-sex team ████████████████ ████████████ *Contra* Minn.Opp.18; Dist.192.Opp.11. It's not even required that FAU members play the male athlete. In discrimination cases, the "injury in fact is the invasion of a legally protected interest," so just being forced to play in a discriminatory league is enough. *Pederson*, 213 F.3d at 870–71 (citation modified). Regardless, the members don't need to show █████████████ ████████████ █████ to obtain future relief. *Contra* Minn.Opp.21; Dist.11.Opp.19–21. Still, as Minnesota concedes, █████████████████████

13

███████████████████████ Minn.Opp.21. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Defendants cite *Becker v. North Dakota University System* to oppose
FAU's standing. But that case helps FAU. There, two athletes had standing
on a Title IX claim: one had been "recruited" to play ice hockey, the other had
been "accepted" as a student. *Id.* at 595–96. Neither had played hockey at the
school, and neither was enrolled at the time of the lawsuit. *Id.* at 595–97. But
both alleged facts showing they were "'able and ready' to play if the
opportunity arises again." *Id.* at 596. That was enough. Another court
allowed a male runner who identified as female to challenge a state sports
law despite "not yet" trying out. *Hecox v. Little*, 479 F.Supp.3d 930, 960 (D.
Idaho 2020).

Better than *Becker* and *Hecox*, the FAU members already compete for
their schools. ████ will play the mixed-sex team next ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ the athletes in *Becker* and *Hecox*
had not solidified a spot on the team either—but they had standing anyway.

Defendants rely on two other cases. Both are distinguishable. First, in
*Murthy v. Missouri*, the plaintiffs lacked standing because they could not link
social media platforms' "own judgment" on content moderation to government
action. 603 U.S. at 59–60, 62, 68. But FAU easily connects ████████████



█████████████ the bylaws. Compl. ¶¶ 131–34. If not for the bylaws, ████
█████████████████████████████. "After all," the bylaws were "designed to produce a particular effect on" athletics by allowing males to compete against women and "vacating that regulation" will "reduce that effect." *Diamond Alternative Energy, LLC*, 145 S. Ct. at 2137. ████████

Next, in *Clapper v. Amnesty International USA*, the plaintiffs could be injured only after five separate contingencies occurred. 568 U.S. 398, 410 (2013). Three of them depended on the "exercise" of "judgment" of "independent decisionmakers." *Id.* at 413. The other two required fortuitous communication surveillance. *Id.* at 414. No such thing exists here. ████
team will play the mixed-sex team next █████████████████████████
███████████████████████████████████ To avoid that injury, FAU members have standing to pursue injunctive relief.

### C. Awarding FAU its requested relief redresses the harms Defendants have caused FAU members.

Rounding out causation and redressability, the bylaws cause FAU's injuries by forcing its members to play against mixed-sex teams and FAU's requested relief redresses those injuries.

Causation and redressability are "flip sides of the same coin." *Diamond Alternative Energy, LLC*, 145 S. Ct. at 2133. If a government policy causes the injury, enjoining the policy redresses that injury. *Id.* That is the case here. The bylaws forced FAU members to play a mixed-sex teams ████████

████████ *See* Compl. ¶¶ 131–64. An injunction remedies that by (a) ensuring FAU members are not denied equal athletic opportunities in the future and (b) ████████████████████████████████ *See id.*, Prayer for Relief, ¶¶ 1–5; *Soule*, 90 F.4th at 50 ("record alterations" redress past injury). It's that straightforward.

But Defendants try to hide the ball three ways. ████████████████ ████████████████████████████████████████████ ████████████████████. Minn.Opp.21–22; Dist.192.Opp.11. But this overlooks the facts and the League's own bylaws. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████ On the bylaws, the League's handbook says that if any "ineligible student" plays in a game "forfeiture of the contest and honors for team sports … shall be automatic and mandatory." MSHSL Bylaws 304.00(3)(A), https://bit.ly/4cOMI3o. So team forfeiture is a per se rule regardless of the ineligible player's individual success. In this way, the League's rules mirror FAU's requested remedy—declare that the bylaws allowed an ineligible athlete to compete against FAU's members and then correct the records. Compl., Prayer for Relief, ¶ 5.

Next, two school districts claim they cannot be liable because the League—not them—creates and enforces the bylaws. Dist.192.Opp.12; Dist.279.Opp.3–4. But "school districts" in Minnesota are "integrally" involved with "rules governing League members." *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973). And under Title IX, school

16

districts have an "obligation to comply" with Title IX regardless of "any rule or regulation of any … league." 34 C.F.R. § 106.6(c).

Finally, the Attorney General and the Human Rights Commissioner beg off because they do not receive "federal funding under Title IX." Minn.Opp.39 n.20. But they are necessary parties. Fed. R. Civ. P. 19(a)(1)(B). They "claim an interest" in this suit. *Id.* They even filed a case on this issue in this Court. *See* Compl., No. 25-cv-01608, *Minnesota v. Trump*, ECF No. 1 (Apr. 22, 2025). And without their participation, the other defendants would risk "inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii); Minn.Att'y.Gen.Op.1035 at 3–4 (Feb. 20, 2025), https://bit.ly/42tcHtL. The League admitted that these competing duties place it "in a legal quandary." Letter, No. 25-cv-01608, *Minnesota v. Trump*, ECF No. 1-3 (Apr. 22, 2025). To resolve the quandary, the Attorney General and the Commissioner must stay in this suit. *See Stewart v. City of Minneapolis*, Civil No. 17-226(DSD/TNL), 2017 WL 3588632, at *2 (D. Minn. Aug. 21, 2017) (competing obligations). So Defendants caused FAU's injuries, and a favorable judgment here would redress them.

## III.  FAU's suit to protect equal opportunities for women in athletics falls within the heartland Title IX's zone of interest.

FAU members' injuries mark the dead center of Title IX's zone of interest, which asks whether a plaintiff "belong[s] to the class of persons to whom the statute grants a right to sue." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1991 & n.3 (2025). At this stage, FAU need only show that it "'arguably'"—not "'actually'"—falls within zone, which

17

is separate from the merits determination. *Id.* at 1991–93; *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 591 (D.C. Cir. 2022).

FAU members easily clear these low hurdles. Title IX's text, regulations, and history protect female athletes' from being "excluded from participation in, denied the benefits of, or be[ing] subject to discrimination" in educational programs like sports. 20 U.S.C. § 1681(a); FAU.Mem.15–29 (making this point). And Title IX gives female athletes a private right of action when federally-funded entities deny those equal opportunities. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).[1]

To avoid this result, Minnesota says two things. First, Minnesota posits that "Title IX does not protect the right to win." Minn.Opp.16. True, but irrelevant. Just as in *Soule*, the bylaws deprive FAU's members of a fair playing field against other females, offer them fewer athletic opportunities than males, and reduce their shot at awards, titles, and records. Compl. ¶¶ 136–64. Second, Minnesota claims "Title IX does not prevent girls from competing against other athletes that the state recognizes as girls." Minn.Opp.16. But that's a merits question. And it is *at least* arguable that Title IX prevents just that when states recognize males as eligible to compete against girls. *See* FAU.Mem.15–29 (collecting cases).

Federal executive agencies—the arm of government charged with interpreting Title IX, 20 U.S.C.A. § 1682—have opened investigations against schools, athletic associations, and states suspected of violating Title IX based

---

[1] The "language" in *Cannon* "no longer controls," but its "holding" remains binding. *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2230 n.1 (2025) (citation modified).

on their policies of allowing males to compete against female athletes.[2] So FAU's members' injuries fit within Title IX's zone of interest: Title IX protects their opportunity to enjoy equal participation in athletics, and the bylaws deprive them of that opportunity by forcing them to compete against male athletes.

## IV.    The heightened preliminary injunction standard doesn't apply, and FAU meets the higher standard anyway.

Defendants say that the heightened preliminary-injunction standard applies because FAU seeks to enjoin MHRA enforcement. Minn.Opp.23–24; Martens.Opp.5–7. But they rely on their *own* interpretation of the MHRA, not a court's. *E.g.*, Minn.Opp.25 n.16. As they admit, courts have the last word on how the MHRA applies to school athletics. Minn.Opp.8. And that issue is hotly debated, not settled. *Contra* Minn.Opp.24; Martens.Opp.7.

The Minnesota Court of Appeals ruled that excluding a male athlete from a women's sporting event because of "an unfair competitive advantage over athletes with female physiology" is a legitimate "non-discriminatory reason" under the MHRA. *Cooper v. USA Powerlifting*, 5 N.W.3d 689, 708 (Minn. Ct. App. 2024). An appeal is pending before the Minnesota Supreme Court. *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. review granted July 9, 2024). Defendants tacitly assume that (1) Minnesota's high

---

[2] *See* U.S. Department of Education, *U.S. Department of Education to Investigate Title IX Violations in Athletics* (Feb. 6, 2025), https://bit.ly/4l9Pnao; U.S. Department of Education, *U.S. Department of Education Announces Consequences for Maine's Title IX Noncompliance*, https://bit.ly/3U9oXL3, U.S. Dep't of Educ. Letter to Roger Brooks re re-evaluation of complaint, https://bit.ly/4m9lPeA.

court will reverse the Court of Appeals and agree instead with them and (2) apply the same analysis to school athletics. MDHR.Comm'r.Amicus.Br., *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://bit.ly/4iyu5lo. But there's no basis for either.

Critically, FAU's lawsuit seeks to enjoin MSHSL's eligibility *bylaws*, not a state statute. FAU.Mem.2. The Eighth Circuit held that the heightened standard *doesn't* apply to challenges of the League's bylaws. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1001 (8th Cir. 2019). No exception exists for bylaws outside "the full play of the democratic process," *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.6–33 (8th Cir. 2008) (en banc) (quotation omitted), that the League claims have statutory grounding *somewhere*, Martens.Opp.7. Such a wide and easily met exception would swallow *D.M.*'s rule.

Defendants point to no similar case employing the heightened standard. FAU merely aims to enforce Minnesota's "voluntary … choice of complying with" Title IX's conditions to receive federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981). So the only "presumptively reasonable democratic processes" that matters, *Rounds*, 530 F.3d at 733, is Minnesota's "promise … not to discriminate" based on sex, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

FAU has the better of this argument. But if the Court deems FAU likely to prevail on the merits, it needn't decide which standard applies.

**V.    FAU has a fair chance, and is likely to prevail, on the merits.**

Defendants fail to show that the League's bylaws comport with Title IX's text, regulations, judicial interpretation, or history. So FAU has a fair chance, and is likely to prevail, on the merits.

**A.    The League's bylaws violate Title IX's text.**

With *Chevron* deference out of the picture, Title IX's text takes center stage. *Accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 408–09 (2024) ("The statute still has a best meaning, necessarily discernible by a court deploying its full interpretive toolkit."). And that text shows that the League's bylaws violate Title IX.

Initially, Defendants contend that as long as they don't exclude girls from athletic participation wholesale, there's no Title IX violation. *E.g.*, Minn.Opp.10–11, 14; Martens.Opp.9, 19; Dist.11.Opp.15–16. But that argument ignores Title IX's text, which bars funding recipients from "exclud[ing] [girls] from *participation*" in whole or part, as well as "den[ying] [girls] the *benefits* of" high school athletics or otherwise "subject[ing] [girls] to *discriminatio*n" in athletic programs. 20 U.S.C. § 1681(a) (emphasis added); *accord* FAU.Mem.18.

Regarding equal benefits and sex discrimination, Defendants say little. The State argues there's no sex discrimination because, on paper, the bylaws treat everyone the same. Minn.Opp.29. But, in practice, they discriminate: physiological differences mean females have little chance of making the boys' baseball team, but males have a strong chance of making the girls' softball team. The result is abolishing softball's all-female nature, an unfair playing field for all-female teams, and girls losing athletic opportunities and awards

21

or titles (*e.g.*, statistics and rankings) to boys. FAU.Mem.18–19. And that excludes female athletes from equal "participation," denies them equal "benefits," and discriminates against them "on the basis of sex." 20 U.S.C. § 1681(a).

The State argues that Title IX doesn't bar Minnesota from requiring female athletes to compete against *anyone* the State recognizes as a girl. Minn.Opp.16. But that's plainly wrong. Consider *Clark*, where biological boys sued to play on the girls' volleyball team. They lost: "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team," which would "diminish[]" "athletic opportunities for women." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). According to Minnesota, if Arizona had just "recognized" these boys as girls, the result changes. But Title IX demands equal participation and benefits— and forbids sex discrimination—in athletic programs. In reality, the bylaws deny those rights to female athletes the same way waiving age limits *only for girls' teams* would. MSHSL Bylaw 101.00.

Plus, Title IX's text assumes *two biological sexes*—male or female. FAU.Mem.15–16; *accord Cody v. Hillard*, 304 F.3d 767, 776 (8th Cir. 2002) ("Statutes are to be interpreted as a whole …"). But gender identity is *unlimited*, referring to a "social identity … as male, female, some category in between (i.e. *gender fluid*), or a category other than male or female (i.e., *gender neutral*)." *Diagnostic & Statistical Manual of Mental Disorders Fifth Edition Text Revision* 511 (2022). So there's no ambiguity: only a binary

22

definition of "sex" grounded in biology aligns with Title IX's language. *Contra* Minn.Opp.29; Martens.Opp.10.

*Bostock* doesn't support importing gender identity into Title IX for four reasons. *Contra* Minn.Opp.31–32. *First*, it's non-discriminatory for Title IX to separate "sports teams into girls' teams, boys' teams, and co-ed teams," distinctions which in no way depend "'on how students act or identify.'" *D.N.*, 701 F.Supp.3d at 1259 (quoting *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc)); *accord Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996).

*Second*, the Supreme Court hasn't applied "Bostock's reasoning … beyond the Title VII context." *United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020) (stating no "other laws are before us").

*Third*, key differences exist in the language and context of Title IX and Title VII. Accord *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *5 (11th Cir. Aug. 22, 2024) (distinguishing Title IX from Title VII and *Bostock*); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2–3 (6th Cir. July 17, 2024) (same); *Soule*, 90 F.4th at 62–64 (Menashi, J., concurring) (same); *Adams*, 57 F.4th at 808–09  (same); *Arkansas v. U.S. Dep't of Educ.*, 742 F.Supp.3d 919, 942–44 (E.D. Mo. 2024) (same).

*Finally*, in an interim order that Defendants ignore, all nine Justices agreed that "sex discrimination" under Title IX *doesn't* "include discrimination on the basis of … gender identity." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024). And that order "inform[s] how a court should exercise

23

its equitable discretion in like cases," *Trump v. Boyle*, 606 U.S. __, No. 25A11, 2025 WL 2056889 (July 23, 2025), including this one.

### B. The League's bylaws violate Title IX's implementing regulations.

Congress granted the Education Department's predecessor authority to flesh out Title IX's application to athletics. FAU.Mem.21. Those implementing regulations confirm the bylaws' illegality. *Contra* Minn.Opp.30.

### 1. The bylaws violate the regulations.

Defendants breeze past the regulations' text on their way to the Department's 1979 policy statement. *E.g.*, Minn.Opp.35–36; Dist.192.Opp.16–17. But it's the *implementing regulations* that Congress authorized and permitted to go into effect. FAU.Mem.21. So the regulatory analysis begins there. *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 789 n.3 (8th Cir. 2021) (according the regulations "controlling weight") (quotation omitted).

The State says that Title IX doesn't require excluding biological males from girls' sports teams. Minn.Opp.28. Wrong. The regulations (a) establish a "person[al]" right not to be discriminated against in "interscholastic … athletics," (b) allow separate "teams for members of *each sex*" when teams are based on "competitive skill" or a contact sport is involved, and (c) require "equal athletic opportunity for members of *both sexes*," including a "selection of sports and levels of competition [that] effectively accommodate the interests and abilities of members for *both sexes*." 34 C.F.R. § 106.41 (emphasis added).

24

The regulations' references to "each sex" and "both sexes" only make sense if "sex" is the biological binary of male or female. Gender identity doesn't fit because that concept is limitless. *E.g.*, Minn. Stat. § 363A.03, subd. 50 (defining "[g]ender identity" as "a person's inherent sense of being a man, woman, *both, or neither*") (emphasis added). So Title IX allows skill-based baseball teams for males and softball teams for females.[3] But softball teams must provide females with equal athletic opportunity and effectively accommodate their interests and abilities. The bylaws flunk both requirements: they effectively convert softball into a mixed-sex sport, while baseball remains male due to that sex's physical advantages. That gives male athletes more opportunity to join a team, play, excel, and be recognized for their achievements. FAU.Mem.22–23.

The State's rejoinder is that "equal athletic opportunity" doesn't require "sex separation in athletics." Minn.Opp.30–31. But Defendants cite no instance in which a female has made the varsity baseball team—much less evidence that the typical female athlete could. And the State fails to address effectively accommodating female athletes' *abilities* altogether. That's fatal because FAU's members, who are top softball athletes, have explained their effective *inability* ██████████████████████████████████

---

[3] The regulations make an exception when no equivalent sport exists for one sex and that sex's "athletic opportunities … have previously been limited." 34 C.F.R. § 106.41(b). In that case, "the excluded sex" can "try-out for the team" unless it's a "contact sport." *Id.* But here, the equivalent sport of baseball is available to males and that sex's "overall athletic opportunities" have never been restricted in Minnesota. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). *Contra* Minn.Opp.36 n.19.

██████████████████████████████████████

██████████████████████████████████████

████████████████████████. FAU.Mem.23–24.

### 2.     The bylaws violate the 1979 policy statement.

Defendants center their Title IX argument on a 1979 policy interpretation that the Department of Education's predecessor issued, and which courts previously viewed as controlling. *E.g.*, Min.Opp.35–39; *see also A Policy Interpretation: Title IX and Intercollegiate Athletics*, U.S. Dep't of Educ. (Dec. 11, 1979) ("Interpretation), http://bit.ly/4ljpDZ8. For *Auer* deference to apply, the regulation must be "genuinely ambiguous," and its application here isn't. *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019). Yet the Eighth Circuit looks "to the entire 1979 Interpretation, not just" part of it, "to fill any [regulatory] gaps." *Berndsen*, 7 F.4th at 787, 789; *accord id.* at 791 (Stras, J., concurring). So viewed, the Interpretation further demonstrates that the League's bylaws violate Title IX.

The Interpretation says that it was "designed specifically for intercollegiate athletics" but "its *general principles* will often apply to … interscholastic athletic programs." Interpretation.III (emphasis added). So FAU focuses on three of those. First, for both equal athletic opportunities and effective accommodation of interests and abilities, the Interpretation lists identical "Overall Determination of Compliance" factors: (1) whether recipient's policies are discriminatory in language or effect; (2) whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the

26

program as a whole; or (3) whether such disparities in individual segments of the program are substantial enough, in and of themselves, to deny equal athletic opportunity. Interpretation.VII.B.5 & C.6. Here, the League's bylaws effectively discriminate against female athletes, and the disparity in the boys' baseball vs. girls' softball program is substantial enough—in and of itself—to deny females equal athletic benefits and opportunities. *Contra* Minn.Opp.35–36; Dist.192.Opp.16–17.

Second, for equal athletic benefits and opportunities, the Interpretation underscores that the considerations listed in 34 C.F.R. § 106.41(c)(1)–(10) aren't "exhaustive" and "other factors" will be "consider[ed]." Interpretation.VII.B.1. *Contra* Minn.Opp.37–39. The principle is that the availability, quality, and kinds of benefits, opportunities, and treatment given both sexes must be equal in effect. Interpretation.VII.B.2. And that makes sense because the department couldn't have envisioned erasing a marquee female sport's single-sex nature, while preserving that of its male equivalent. In that extreme situation, the analysis writes itself: females receive fewer athletic opportunities, diminished benefits, less publicity and honors, and worse treatment.

Finally, for effective accommodation, the Interpretation says that if a recipient "sponsors a team for members of *one sex* in a non-contact sport, it must do so for members of the *other sex*" if that sex's opportunities have historically been limited and members of that sex have sufficient interest and ability to sustain a single-sex team, but they lack the skill to make, or actively compete, on a mixed-sex team. Interpretation.VII.C.4.b (emphasis

27

added). The League's bylaws keep baseball a single-sex sport for males but transform softball into a mixed-sex sport, depriving females—who have sufficient interest and ability to make, and actively compete, on softball but not baseball teams—of the equivalent single-sex sport that Title IX demands. *Contra* Minn.Opp.31.

These principles confirm the Title IX violation. Defendants focus on a specific rule instead, *i.e.*, the three-part test for *equal levels of competition*. Minn.Opp.35–39; Dist.192.Opp.16–17; *see* Interpretation.VII.C.5.a. But that test is not always relevant, *Berndsen*, 7 F.4th at 785–89, nor "an omnipotent antidote to *all* athletics-based Title IX violations," *id.* at 787–88. The problem here is more basic than competition levels: the bylaws eliminate the single-sex nature of softball, a preeminent female sport, while preserving the single-sex nature of baseball, a male sport. So the two sports aren't equal or comparable—full stop. And, by default, the bylaws *increase* males' participation opportunities and *decrease* females' participation opportunities at *every level* of competition, advancing the historical disparity between boys and girls, and reversing the State's expansion of women's sports. Interpretation.VII.C.5.; *accord* Hannah Flood, *The pioneers that paved the way for girls' sports in Minnesota*, Fox 9 (March 27, 2022), http://bit.ly/4leeusB; Randy Shaver, *50 years after Title IX: Meet Minnesota's trailblazers in women in sports*, KARE 11 (May 6, 2022), http://bit.ly/4lopm7o.

## C.    The League's bylaws violate Title IX precedent.

Precedent refutes Defendants' Houdini-like effort to "disappear" Title IX's bar on sex discrimination and "transform" the law into a gender-identity-

discrimination ban. *First*, Defendants say that as long as females have *some* ability to participate in softball, there's no Title IX violation. *E.g.*, Minn.Opp.34, 38; Martens.Opp.9, 19; Dist.11.Opp15–16; Dist.192.Opp.13. But Title IX requires "*equal* athletic opportunities for members of both sexes." *Berndsen*, 7 F.4th at 787 (emphasis added) (quotation omitted). That includes *equal*, not inferior, "opportunities to enjoy the thrill of victory" and "the agony of defeat." *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). To be clear, Title IX guarantees female athletes "a fair shot at competition and victory," not a winning result. FAU.Mem.23. *Contra* Minn.Opp.35; Martens.Opp.9. But that "fair shot" disappears when males play women's softball.

*Second*, Defendants say that "sex" under Title IX includes gender identity, or at least it could. Minn.Opp.28–29; Martens.Opp.21. But Title IX approves "gender-segregated teams" that "*necessarily* allocate opportunities separately for male and female students." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996). Ignoring physiological differences between "males and females" would "den[y] … equality" as much as inventing differences that "do[ ] not exist." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). So Title IX deems biological "women … not 'qualified' to compete for positions on men's teams, and vice-versa." *Cohen*, 101 F.3d at 177; *accord Neal*, 198 F.3d at 772 n.8 (same and Title IX implementation and enforcement requires sex-conscience decisions). And rightly so, because sex "is not an irrelevant characteristic" in "the athletics context." *Cohen*, 101 F.3d at 178.

*Third*, Defendants say that Title IX only cares about a recipient's female athletic program as a whole. Minn.Opp.35–36. But unequal boys' baseball and girls' softball programs may independently violate Title IX. *E.g.*, *Pederson v. La. State Univ.*, 213 F.3d 858, 878–79 (5th Cir. 2000); *Daniels v. Sch. Bd. of Brevard Cnty.*, 985 F.Supp. 1458, 1460–62 (M.D. Fla. 1997); *accord Parker v. Franklin Cnty. Comm. Sch. Corp.*, 667 F.3d 910,  919–24 (7th Cir. 2012) (same for basketball); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294 (2d Cir. 2004) (soccer).

*Fourth*, Defendants claim the Title IX analysis centers on particular athletes. Minn.Opp.22, 28., 36, 38; Dist.11.Opp.5–10, 20. Though FAU discusses particular athletes to establish *standing*, the *merits* don't turn on individuals. "In Title IX, Congress struck a balance between the needs of the individual athlete and the group and determined that for purposes of the statute *equality is to be measured by the opportunities offered to the group*." *Yellow Springs*, 647 F.2d at 657 (emphasis added); *accord Neal*, 198 F.3d at 772 n.8 (Title IX compliance "*requires* [sex]-conscious, group-wide comparisons"). So the facial nature of FAU's challenge to the bylaws doesn't modify "'the substantive rule of law necessary to establish a [Title IX] violation.'" *D.N.*, 701 F.Supp.3d at 1259 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)). Any violation of FAU's members' "rights under [Title IX] would necessarily constitute a violation of [Title IX] at large," regardless of the remedy sought. *Id.* at 1260.

*Fifth*, one district says that Title IX only requires it to provide equal athletic opportunity *within* its own teams. Dist.192.Opp.13–18. Yet Title IX

applies to state and local educational agencies, and the League, as direct or secondary funding recipients. 34 C.F.R. § 106.2 (defining "Recipient"). FAU challenges the MSHSL's bylaws, which control *only* because school districts voluntarily ceded authority over such matters to the League. Minn. Stat. § 128C.01. So each district is responsible for its athletes and their (largely inter-school) competition under state law, plus equal athletic opportunity under Title IX. *Accord Horner v. Ky. High Sch. Athletics Ass'n*, 43 F.3d at 265, 273–274 & n.7 (6th Cir. 1994); *Yellow Springs*, 647 F.2d at 656–57; 45 C.F.R. § 86.41(c).

*Last*, Defendants suggest that faithfully applying Title IX will cause a parade of horribles. Not so. The League's mandatory physical exam *already* requires students to disclose their sex and gender identity. 2026.MSHSL Physical.Form.1–2; Carlson Rebuttal Decl. pp. 14–15. So there's no need for more scrutiny or testing. *Contra* Minn.Opp.4, 9. And no one thinks transgender students fall *outside* Title IX or school sports. *Contra* Minn.Opp.25, 28–29, 32. Just like everyone else, they're protected against sex discrimination and may participate fully on mixed-sex teams or teams reserved for their sex. *Accord D.N.*, 701 F.Supp.3d at 1259, 1261–62, 1265. Plus, there's nothing "cruel and unnecessary" about enforcing Title IX's commands. Dist.11.Opp.25. A court's "job is to apply the law" as the democratically elected branches expressed it, not "decide whether a law is good or bad." *D.N.*, 701 F.Supp.3d at 1262.

### D.    Title IX preempts any contrary state law.

The State claims that Title IX is irrelevant and the MHRA controls, Minn.Opp.27, which is simply not credible. If it's impossible to comply with both a federal-law requirement and a state-law duty, "the state law is pre-empted," *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013), whether the obligation stems from "federal [and state] regulations" or "federal statutes," *Hillsborough Cnty. v. Automated Med. Labs.*, Inc., 471 U.S. 707, 713 (1985). More precisely, "a state eligibility standard that" conflicts with "federal [eligibility] standards violates [federal law] and is therefore invalid under the Supremacy Clause." *Townsend v. Swank*, 404 U.S. 282, 286 (1971).

The State looks to an old version of 34 C.F.R. § 106.6(b). Minn.Opp.27. But impossibility preemption doesn't turn on express regulatory (or statutory) language. *Mutual Pharm.*, 570 U.S. at 480. Such explicit language merely "clarif[ies] [federal law's] preemptive effect." *Victim Rights Law Ctr. v. Cardona*, 552 F.Supp.3d 104, 136 (D. Mass. 2021); *accord New York v. U.S. Dep't of Educ.*, 477 F.Supp.3d 279, 302 (S.D.N.Y. 2020).

### E.    Defendants had notice of their obligations.

The State argues that it lacked clear notice that Title IX requires all-female softball teams. Minn.Opp.39–41. But Defendants haven't demonstrated that a clear-notice rule applies in the context of preliminary, prospective relief. *See, e.g.*, *Grandson v. Univ. of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001) (applying notice in damages case). Plus, Defendants have been on notice of their obligations to female athletes at least since the Department of Health, Education, and Welfare promulgated implementing regulations requiring equal athletic opportunity for both sexes in 1974. 34 C.F.R.

§ 106.41. More recently, the federal government reminded Defendants of their obligations. Compl. ¶¶ 165–73. FAU only sued *after* the Attorney General and the League made the conscious decision to reject these warnings and continue violating Title IX.

Further, Defendants misapprehend what clear notice means. In the context of an institutional policy, the test is simply whether Defendants knew they were treating women differently from men by providing them unequal athletic opportunity. *Pederson*, 213 F.3d at 882. Given the clear physiological differences between males and females and Defendants' lack of any effort to mitigate male advantage, it's clear that they did.

## VI.    FAU deserves an injunction.

None of Defendants' four objections to an injunction have merit. *First*, the Supreme Court has abandoned consideration of the "status quo" because that term proved impossible to define. *E.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 930–31 (2024) (Kavanaugh, J., concurring in the grant of relief). What matters is the movant's "likelihood of success on the merits." *Id.* at 928. *Contra* Martens.Opp.17; Dist.11.Opp.13.

*Second*, Defendants contest irreparable harm by regurgitating their prior arguments, which fail for the same reasons. *E.g.*, Minn.Opp.41–43; Martens.Opp.19, 23; Dist.192.Opp.21; Dist.11.Opp.14–15. FAU's members are irreparably harmed by unequal athletic opportunity during their fleeting high-school softball careers. FAU.Mem.28–29. "Each day these inequalities go unredressed, the members … are sent a clear message … that girls are not as important as boys." *Daniels*, 985 F.Supp. at 1462. And this harm is likely

to continue in the future by impairing the members' records, which are key to college recruiting and scholarships. *Id.*

*Third*, Defendants suggest that the balance of harms requires maintaining *unequal* athletic opportunity. *E.g.*, Minn.Opp.43; Martens.Opp. 19–20; Dist.11.Opp.24; Dist.192.Opp.21–22. But that's a non-starter, FAU.Mem.29–30, ████████████████████████████

████████████████████████████████████████████

████ And the public interest favors accurate Title IX enforcement. FAU.Mem.29.

*Fourth*, Defendants' workability arguments ring hollow. A preliminary injunction that applies to the State, the League, and the school districts would bring clarity about Title IX, not "confusion," Dist.192.Opp.22, and avoid "inconsistent obligations," Fed.R.Civ.P.19(a)(1)(B)(ii). The League's physical-examination form already reveals athletes' transgender status. And FAU may readily identify its Minnesota members. *Contra* Martens.Opp.20. Plus, plenty of states have laws designating sports by biological sex, *see, e.g.*, *D.N. by Jessica*, 701 F.Supp.3d at 1265, and Defendants cite nothing to suggest this common rule isn't working.

Finally, the State's accusations of delay aren't credible. Minn.Opp.42. FAU was formed in November 2023 so it couldn't have sued a decade ago. K.Brown Dec. ¶ 4. And waiting to sue until Defendants rejected the federal government's warnings and FAU was assured of its members' standing is commendable, not dilatory.

## VII.  The Court should waive any bond requirement.

The State requests a $10 million bond that would likely put an injunction outside FAU's reach. Minn.Opp.44–45. "If the public interest favors it, the Court may waive the bond requirement." *Council on Am.-Islamic Relations-Minn. v. Atlas Aegis LLC*, 497 F.Supp.3d 371, 380 (D. Minn. 2020). It should do so here based on the public-interest nature of this litigation and "the potential chilling effect of requiring a bond," *Brooks v. Francis Howell Sch. Dist.*, 599 F.Supp.3d 795, 806 (E.D. Mo. 2022), especially as excising the bylaws' transgender exception is simple and the League's physical-examination form already records transgender status.

## CONCLUSION

For the reasons set forth above and in FAU's other filings, the Court should grant a preliminary injunction.


Respectfully submitted this 13th day of August, 2025.


Renee K. Carlson
Minnesota Bar No. 0389675
Douglas G. Wardlow
Minnesota Bar No. 0339544
True North Legal
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789-8811
rcarlson@truenorthlegalmn.org
dwardlow@truenorthlegal.org

By: /s/ Henry W. Frampton, IV
Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W Frampton, IV*
South Carolina Bar No. 75314
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rory T. Gray*

35

Georgia Bar No. 880715
Alliance Defending Freedom
1000 Hurricane Shoals Road  NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (facsimile)
rgray@ADFlegal.org

Suzanne E. Beecher*
California Bar No. 329586
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, D.C.
(202) 393-8690
(202) 347-3622
sbeecher@ADFlegal.org


*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of August, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

/s/Henry W. Frampton, IV
Henry W. Frampton, IV

Attorney for Plaintiffs