UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Female Athletes United,

        Plaintiff,

v.

Keith Ellison, *in his official capacity as Attorney General of Minnesota*; Rebecca Lucero, *in her official capacity as Commissioner of the Minnesota Commission on Civil Rights*; Erich Martens, *in his official capacity as Executive Director of the Minnesota State High School League*; Willie Jett, *in his official capacity as the Minnesota Commissioner of Education*; Independent School District No. 11 School Board; Independent School District No. 192 School Board; and Independent School District No. 279 School Board,

        Defendants.

File No. 25-cv-2151 (ECT/DLM)

**OPINION AND ORDER**

---

Rory Thomas Gray and Travis Christopher Barham, Alliance Defending Freedom, Lawrenceville, GA; Henry Frampton and Jonathan A. Scruggs, Alliance Defending Freedom, Scottsdale, AZ; Suzanne Beecher, Alliance Defending Freedom, Washington D.C.; and Douglas G. Wardlow and Renee Carlson, True North Legal, St. Paul, MN, for Plaintiff Female Athletes United.

Elizabeth C. Kramer, Peter J. Farrell, Anna L. Veit-Carter, and Maura C. Allen, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants Keith Ellison, Attorney General of Minnesota; Rebecca Lucero, Commissioner of the Minnesota Commission on Civil Rights; and Willie Jett, Minnesota Commissioner of Education.

Kevin M. Beck, Kevin M. Beck Law LLC, St. Paul, MN, for Defendant Erich Martens, Executive Director of the Minnesota State High School League.

Caitlinrose H. Fisher, Caroline Brunkow, and Virginia R. McCalmont, Forsgren Fisher McCalmont DeMarea Tysver LLP, Minneapolis, MN, for Defendant Independent School District No. 11 School Board.

Christian R. Shafer, Lauren Kingsbeck, and Timothy A. Sullivan, Ratwik Roszak & Maloney, P.A., St. Paul, MN, for Defendant School District No. 192 School Board.

Christopher Deubert, Constangy, Brooks, Smith & Prophete, LLP, Boston, MA, and Jason D. Friedman, Constangy, Brooks, Smith & Prophete, LLP, Fairfax, VA, for Defendant Independent School District No. 279 School Board.

---

In 2016, the Minnesota State High School League adopted a bylaw allowing students to participate in athletics and fine arts "consistent with their gender identity or expression." Among other consequences, the bylaw allows transgender girls to participate in girls' high school athletics in Minnesota.

Plaintiff Female Athletes United (or "FAU") claims the bylaw violates Title IX. At a high level, FAU's legal theory is straightforward: Allowing transgender girls to compete in single-sex girls' sports creates an uneven playing field that does not accommodate girls' athletic abilities and treats girls' sports differently from boys' sports in ways that discriminate against girls. To support its Article III standing and claims in this case, FAU alleges specifically that one transgender girl has been allowed to participate in high school softball pursuant to the challenged bylaw. In FAU's view, her participation results in the ineffective accommodation of some of its members' softball interests and abilities and results in its softball-playing members receiving unequal treatment as compared with baseball-playing boys.

FAU seeks a preliminary injunction that would stop Defendants from applying the bylaw to "school sports designated for women or girls that are contact sports or sports

involving competitive athletic skill." The motion will be denied. Though I conclude FAU has Article III standing to bring this case, FAU has not shown it is likely to succeed on the merits of its Title IX claims. FAU asserts a disparate-impact theory. But as I understand the law, Title IX affords no private right of action for disparate-impact claims. If that weren't so, FAU has not shown as a factual matter that bylaw-created disparities are sufficiently substantial to deny its members "effective accommodation" or "equal treatment" as those concepts are defined under Title IX. The remaining preliminary-injunction factors do not require an outcome at odds with this preliminary assessment of the merits.

I

A

*The Minnesota State High School League.* "The Minnesota State High School League is a nonprofit corporation that is a voluntary association of high schools." Minn. Stat. § 128C.01, subdiv. 1. "The league is made up of high schools whose governing boards have delegated their control of extracurricular activities . . . to the league." *Id.* The League "promote[s], manage[s] and administer[s] a program of activities for the students of member schools on subsection, section, and state levels in athletics and fine arts" and "establish[es] uniform and equitable rules for students in extra-curricular activities." Compl. [ECF No. 1] ¶ 52 (quoting *About*, Minnesota State High School League, https://www.mshsl.org/about (last visited Sep. 18, 2025)); *see also D.M. ex rel. Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 998 (8th Cir. 2019) (describing the League). The League is required by statute to maintain a twenty-two-member governing

3

board, and the board is required to "establish and adopt policies" for the League. Minn. Stat. §§ 128C.01, subdiv. 4, 128C.02, subdiv. 1. League-member schools or school-connected associations elect or appoint eighteen of the board's twenty-two members. *See* Minn. Stat. § 128C.01, subdiv. 4(a)(2), (3); *see also* 2025–2026 MSHSL Official Handbook § 211.01, https://www.mshsl.org/mshsl-handbook-governance-documents (click on "Constitution").[1] Defendant Erich Martens is the League's Executive Director, and he is sued in his official capacity only. Compl. ¶ 47. The board of a League-member school "may spend money for, and pay dues to, the league." Minn. Stat. 128C.01, subdiv. 2. The League's board establishes the dues amount each year, and League members pay their dues on an annual basis. 2025–2026 MSHSL Official Handbook § 204.00–205.00. FAU alleges the League receives federal funding indirectly through dues payments from its members, who themselves receive federal funding. Compl. ¶ 55. At this stage, the League has not disputed this assertion. *See generally* ECF No. 65.

*The challenged bylaw.* The League adopted the challenged bylaw—Bylaw 300.00(3)—in February 2016. ECF No. 72-1 at 5.[2] The bylaw's adoption occurred in response to a recommendation by the Minnesota Department of Education's Division of Compliance and Assistance. *Id.* Relevant here, the bylaw does two things. First, the bylaw establishes a rule allowing athletic and fine-arts "participation for all students

---

[1]    Under the statute, the governor must appoint the remaining four members, each of whom "must be a parent," and "[a]t least one of [whom] must be an American Indian, an Asian, a Black, or a Hispanic." Minn. Stat. § 128C.01, subdiv. 4(a)(1).

[2]    Page citations are to pagination assigned by CM/ECF, appearing in a document's upper right corner, not to a document's original pagination.

consistent with their gender identity or expression."  ECF No. 72-1 at 4; Compl. ¶ 132.

Among other applications, the rule requires that transgender students be allowed to

participate on athletic teams based on "their gender identity or expression" and not be

restricted to participating on athletic teams based on their sex assigned at birth.  ECF

No. 72-1 at 4.[3]  Second, the bylaw establishes an appeal procedure to be followed when a

school makes "a determination of ineligibility based on the student's gender identity."

*Id.*[4]  As the rule describes it, an appealable ineligibility determination occurs when a

school does not allow a student to participate on an athletic team based on gender identity

"after receiving information . . . that the gender identity is sincerely held as part of the

student's core identity and the gender identity is different from the student's sex assigned

at birth and that the student wishes to participate in athletics in a manner consistent with

the student's gender identity."  *Id.*  The bylaw says nothing about how a school is to

determine a student's eligibility at the first step; it establishes only the appeal procedure.

*See id.* at 4–5; *see also* ECF No. 129 at 7–8.  And a school's determination that a student

is eligible under the bylaw is not appealable.  *See* ECF No. 72-1 at 4; ECF No. 129 at 9–

---

[3]    In an introductory paragraph, the bylaw indicates this rule "accord[s] with applicable state and federal laws, rules and regulations."  ECF No. 72-1 at 4.  The bylaw, however, identifies no specific state or federal law, rule, or regulation.  *See id.* at 4–5.  If the League considered the complex interplay between Title IX and Minnesota's anti-discrimination laws as they existed in 2016, the record here does not show it.

[4]    The bylaw does not assign responsibility for an initial eligibility determination to any specific group or individual within a school; it references just the "school" as having this responsibility.  *See* ECF No. 72-1 at 4.  At the hearing on FAU's motion, the League represented that initial eligibility determinations could be made by the "member school" or perhaps at the "district level."  ECF No. 129 at 8.

10. The bylaw identifies non-exclusive categories of information that may be submitted to support a student's appeal. ECF No. 72-1 at 4. Among these are statements from witnesses and healthcare professionals attesting to the sincerity of a student's gender-related identity and "[a]ny other evidence that the gender identity is sincerely held as part of the person's core identity as may be required by the school or the [League] relative to the eligibility determination." *Id.* The bylaw assigns the task of adjudicating an appeal to an "Independent Hearing Officer." *Id.* at 5.[5] And the bylaw lists categories of information the Independent Hearing Officer may consider in addition to information submitted by the student. *Id.* at 5. These include subject-matter experts, state and federal agencies, "legislative counsel," and other legal authorities. *Id.* "If the Independent Hearing Officer affirms the eligibility of the student, the student will be eligible to participate in [League] activities consistent with the student's gender identification for the balance of the student's high school eligibility." *Id.*

---

[5] The bylaw does not specify who is eligible to serve as an Independent Hearing Officer. Publicly available information shows that the League selects, hires, and pays Independent Hearing Officers to adjudicate claims under the League's Fair Hearing Procedure, and that these may include retired judges and arbitrators. Minnesota Office of the Legislative Auditor, Program Evaluation Division, Minnesota State High School League 2017 Evaluation Report, https://www.auditor.leg.state.mn.us/ped/pedrep/mshsl.pdf at 37 & n.40; *see also id.* at 39 ("the executive director and assistant director" of the League "[s]elect and contract with independent hearing officers"); *see also W.D. ex rel. M.J.D. v. Minn. State High Sch. League*, No. 12-cv-2892 (JRT/SER), 2012 WL 5985514, at *3 (D. Minn. Nov. 29, 2012) (noting independent hearing officers presiding over a Fair Hearing Appeal is league-appointed). It seems safe to presume the League follows the same Independent Hearing Officer appointment process when appeals occur under the challenged bylaw.

B

*Attorney General Keith Ellison.*  In addition to the League and Director Martens, FAU alleges facts attempting to connect each Defendant to the bylaw's implementation. Begin with Attorney General Ellison who, like the other individual Defendants, is sued in his official capacity only.  Compl. ¶ 40; *see id.* ¶¶ 43, 58.  FAU does not allege that Attorney General Ellison had a direct role in the bylaw's creation.  *See generally* Compl. However, in February 2025, he issued a formal opinion pursuant to Minn. Stat. § 8.07[6] describing the bylaw's gender-identity-participation rule as restating a requirement already in the Minnesota Human Rights Act (or "MHRA").  ECF No. 72-2.  In the Attorney General's view, "educational institutions and the [League] would violate the MHRA by prohibiting transgender athletes from participating in extracurricular activities according to their gender identity."  *Id.* at 5.  The Attorney General also serves as counsel for the Minnesota Department of Human Rights, Minn. Stat. § 363A.32, subdiv. 1, meaning his office responds to MHRA violations reported to the Department.  FAU did not allege that the Attorney General receives federal financial assistance.  *See generally*

---

[6]    Minnesota Statute § 8.07 provides:

> The attorney general on application shall give an opinion, in writing, to county, city, town, public pension fund attorneys, or the attorneys for the board of a school district or unorganized territory on questions of public importance; and on application of the commissioner of education shall give an opinion, in writing, upon any question arising under the laws relating to public schools.  On all school matters such opinion shall be decisive until the question involved shall be decided otherwise by a court of competent jurisdiction.

Compl.  In responding to FAU's motion, the Attorney General claimed he receives no federal funding.  ECF No. 83 at 39 n.20.  FAU did not dispute this assertion.  *See* ECF No. 112 at 26.

*Department of Human Rights Commissioner Rebecca Lucero.*  "Any person aggrieved by a violation" of the MHRA may file a charge with Commissioner Lucero.  Minn. Stat. § 363A.28, subdiv. 1; *see also id.*, subdiv. 6(a)–(b); Minn. Admin. R. 5000.0400, subpart 1a.  So, for example, any charge that the League or a member school violated the MHRA might start with her.  Commissioner Lucero is tasked with investigating and determining whether there is probable cause to credit the charge.  Minn. Stat. § 363A.28, subdiv. 6(c)–(d).  If she determines probable cause exists, a respondent may seek reconsideration of that determination.  *Id.*, subdiv. 6(d).  If the Commissioner upholds that determination and a conciliation process does not result in the complaint's resolution, Commissioner Lucero may initiate proceedings before an administrative law judge.  *Id.*  "If, at any time after the filing of a charge, the commissioner has reason to believe that a respondent has engaged in any unfair discriminatory practice, the commissioner may file a petition in the district court" seeking temporary relief.  *Id.*, subdiv. (e).  Separately, Commissioner Lucero may initiate MHRA charges "[w]henever [she] has reason to believe that a person is engaging in unfair discriminatory practice."  *Id.*, subdiv. 2.  As with the Attorney General, FAU does not allege that the Minnesota Department of Human Rights receives federal financial assistance.  *See generally* Compl.  Commissioner Lucero says she does not.  ECF No. 83 at 39 n.20.  And FAU has not disputed the assertion.  *See* ECF No. 112 at 26.

*Minnesota Department of Education Commissioner Willie Jett.* Among other responsibilities, Commissioner Jett ensures Minnesota schools' Title IX compliance. Compl. ¶ 59; *see* Minn. Admin. R. 3535.2800, 3535.3600, 3535.3700. And publicly available information shows that the Department of Education fulfills this responsibility by, among other things, "conduct[ing] on-site reviews of school districts." *Civil Rights Compliance*, Minnesota Department of Education, https://education.mn.gov/mde/dse/civil (last visited Sep. 18, 2025). Separately, the Department of Human Rights may "obtain upon request and utilize the services of" the Department of Education to carry out Department of Human Rights functions. Minn. Stat. 363A.06, subdiv. 1(a)(6); *see* Compl. ¶ 60. The Department of Education's Division of Compliance and Assistance recommended that the League adopt the challenged bylaw. ECF No. 72-1 at 5. The Department of Education "may accept and administer federal funds when such funds become available." Minn. Stat. § 127A.09, subdiv. 1.

*Boards of Independent School Districts 11, 192, and 279.* The school districts may be connected to the bylaw's adoption and enforcement in several ways. Regarding the bylaw's adoption, the League's Representative Assembly—the "legislative body" tasked with "making and changing bylaws"—is made up primarily of representatives from League-member schools. 2025–2026 MSHSL Official Handbook § 210.00.[7] And as the Eighth Circuit has observed, "the rules governing League members are promulgated

---

[7]    No record evidence shows the Representative Assembly's membership when the challenged bylaw was adopted in February 2016. We don't know, in other words, whether any of the school-district Defendants had any part in the bylaw's creation or adoption.

pursuant to a procedure which integrally involves the member school districts in the decision-making process. Beyond this, the ultimate enforcement of the rules becomes the responsibility of the member school and the public officials of those schools and school districts." *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973) (quotation omitted).[8] As noted earlier, League-member schools or perhaps their districts initially determine a student's eligibility under the challenged bylaw, meaning they are the bylaw's first level of enforcement. ECF No. 129 at 8. The school districts receive federal funding. Compl. ¶¶ 62, 69, 76; *see* ECF No. 62 at 3 ("As a recipient of federal funds, [Independent School District 192] does not dispute that it is subject to the requirements of Title IX.").

C

*Female Athletes United.* FAU "was founded in November 2023." ECF No. 8-1 ¶ 4. It is a non-profit organization "formed for the purpose of defending women's sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field." ECF No. 8-1 ¶ 3; *see also* Compl. ¶ 11. "FAU promotes girls' and women's right not to compete against males who identify as females on girls' and women's sports teams." ECF No. 8-1 ¶ 3; *see also* Compl. ¶ 11. Four FAU members, each of whom plays girls' softball for a League-member high school, have filed

---

[8]     Representatives from League-member schools also serve on region committees which are "responsible for the immediate and general supervision of the region events assigned by the Board of Directors." 2025–2026 MSHSL Official Handbook § 209.02(1). However, region committees do not have the power to "determine eligibility, to interpret eligibility bylaws" or "to penalize schools for bylaw infractions." *Id.*

declarations supporting FAU's claims in this case. Among other things, each FAU member testifies regarding experiences playing with and competing against a transgender female softball player, Jane Doe, and Doe's team. These FAU members' experiences competing against Doe prompted FAU to bring this case, and their declaration testimony deserves a detailed recounting because the testimony is central both to the threshold Article III standing question and the merits of FAU's claims.

*FAU member Athlete 1.* Athlete 1 is a high-school senior. ECF No. 113 ¶ 4. She attends a high school in Independent School District 279. *See id.*; Compl. ¶¶ 17–18. She plans to play for her high school's varsity softball team during the 2026 season, ECF No. 113 ¶ 30, just as she did during her sophomore and junior years, *see* ECF No. 8-3 ¶¶ 2, 29, 32. Athlete 1 began playing against teams on which Doe played before Athlete 1 turned twelve years of age. *Id.* ¶ 20. Most of Athlete 1's experience playing against Doe, however, "has been during the high school season from 2023" forward. *Id.* ¶ 27. In 2023, Athlete 1's junior-varsity team played Doe's junior-varsity team. *Id.* ¶ 28; ECF No. 113 ¶ 14. Doe pitched part—or perhaps all—of that game. *See* ECF No. 8-3 ¶ 28; *see also* ECF No. 113 ¶ 14. Athlete 1 "got zero hits in 3 attempts, going 0-3 that day," in a season where she finished with a batting average of .300. ECF No. 8-3 ¶ 28. During the 2024 varsity season, Athlete 1's team played Doe's team twice, first during a regular-season game and again at sectionals. *Id.* ¶ 29. Doe pitched every inning of both games. ECF No. 113 ¶¶ 17–18. Athlete 1's team lost both games, the regular-season game by a score of 3–4 and the sectional game by a score of 2–5. *Id.* "The [regular-season] game went an extra inning, and [Doe] pitched all eight innings, only giving up 3 runs, with 5 strikeouts

and 7 hits." *Id.* ¶ 17.  The section game went seven innings with Doe "giving up only two earned runs and six hits."  *Id.* ¶ 18.  The sectional loss ended the 2024 season for Athlete 1's team.  ECF No. 8-3 ¶ 31.  During the 2025 season, Athlete 1's team played Doe's team twice, first during the regular season and again at sectionals.  ECF No. 8-3 ¶ 32; ECF No. 113 ¶ 23.  During the regular season game, Doe pitched all seven innings and Athlete 1's team lost 0–2.  ECF No. 8-3 ¶ 32; ECF No. 113 ¶ 22.  The batting average of Athlete 1's team for this game was .090, or "about one third of [their] average for the season." ECF No. 113 ¶ 22.  Athlete 1's "team only had one hit the entire game.  [They] had 7 strikeouts and only got one ball out of the infield.  The farthest [they] advanced a runner against [Doe] was to second base in one inning."  ECF No. 8-3 ¶ 33.  Doe pitched the entire sectionals game, and Athlete 1's team lost 2–4, ending their season.  ECF No. 113 ¶¶ 24–25, 28.  In that game, Doe "pitched 7 strikeouts" and "allowed only 6 hits in 24 at bats."  *Id.* ¶ 26.  Had Athlete 1's team won that game they would have advanced "to the final round of the section championship tournament."  *Id.* ¶ 29.  In Athlete 1 and Doe's upcoming senior (2026) season, their teams are scheduled to play a regular-season game in mid-May.  *Id.* ¶ 33.  And the teams remain assigned to the same section, meaning that if things go as they did in the 2024 and 2025 sectional playoffs, the teams will face each other for the opportunity to play in the 2026 state tournament.  *Id.* ¶ 32.  According to Athlete 1, she has "never faced pitches like [Doe's] before, [and] the speed and unmatched movement on the ball is different from that of female pitchers [she] ha[s] been up against."  ECF No. 8-3 ¶ 35.

*FAU member Athlete 2.* Athlete 2 is a high-school senior. ECF No. 114 ¶ 4. She attends a high school in Independent School District 192. *Id.*; Compl. ¶¶ 23–24. She plans to play for her high school's varsity softball team during the 2026 season, ECF No. 114 ¶ 5, just as she has done since eighth grade, *id.* ¶ 6. Athlete 2's primary position is pitcher, ECF No. 8-4 ¶ 15, and she is the starting pitcher for "most" of her high-school team's games, ECF No. 114 ¶ 6. Athlete 2 competed on the same club softball team as Doe. *See* ECF No. 8-4 ¶¶ 18–28. Following her sophomore year of high school, Athlete 2 noticed Doe had "improved by an unusually significant margin." *Id.* ¶ 20. According to Athlete 2, Doe, who had grown "much taller and had much longer arms, was suddenly pitching the ball much faster than [she] had only a season ago—and faster than [Athlete 2] ha[s] typically observed other high-school females pitch." *Id.* ¶ 22. Athlete 2 was invited back to the club team following the 2023–2024 season but was told she "would have to compete for the opportunity to pitch," as Doe "would now be the first-string pitcher." *Id.* ¶ 23. After learning of Doe's transgender status, Athlete 2 decided not to return to play for the club team. *Id.* ¶ 28. Athlete 2's high-school team played Doe's high-school team in a 2025 pre-season scrimmage. *Id.* ¶¶ 33–39. "Many of the girls on [Athlete 2's] team did not want to participate in the scrimmage because they were upset and opposed to playing against a male." *Id.* ¶ 36. The coaches reached an agreement: in consideration for Doe not pitching, Athlete 2 would not pitch, either. *Id.* ¶ 37. Doe's team won the game 4–2, with Doe hitting a two-run homerun. *Id.* ¶ 39. Athlete 2 believes her high-school "team is likely to compete against [Doe's team] in a pre-season scrimmage again" in 2026, ECF No. 114 ¶ 9, though Athlete 2 does not explain why she believes this is

likely. Athlete 2's high-school team qualified for and competed in the 2025 state tournament but did not play against Doe's team. ECF No. 114 ¶¶ 10–11. Athlete 2 believes it is "very likely" that her team will advance to the state tournament in 2026 based on her knowledge of the returning and new players. *Id.* ¶ 14. In Athlete 2's opinion, Doe's team also "has a strong chance of again making it to the state tournament" because Doe is on the team and because Doe's "team has other strong returning players who play advanced club teams outside the school season." *Id.* ¶ 15. Athlete 2 points out, among other things, that Doe "pitched every pitch of every inning of every game of the [2025] state championship," which amounted to twenty-one total innings, and allowed two runs. *Id.* ¶¶ 29–30.

*FAU member Athlete 3.* Athlete 3 is a high-school junior. ECF No. 115 ¶ 4. She attends a high school in Independent School District 192. *Id.*; Compl. ¶¶ 32–33. She plans to play for her high school's varsity softball team during the 2026 season, ECF No. 115 ¶ 5, just as she has done since her freshman year, *id.* ¶ 6. Athlete 3's primary positions are catcher and utility. *Id.* ¶ 5. Athlete 3 plays on the same high-school team as Athlete 2. *See id.* ¶ 4. Athlete 3 was on a club team with Doe. *See* ECF No. 8-5 ¶ 17. According to Athlete 3, the "force, speed, and spin" of Doe's pitches "are unlike what [she] has faced with other pitchers, even as part of [her] club softball team, which faces some of the country's top girls' softball teams." *Id.* ¶ 20. In her declaration, Athlete 3 recounted essentially the same description given by Athlete 2 of the 2025 pre-season scrimmage with Doe's team. *See id.* ¶¶ 22–26. Like Athlete 2, Athlete 3 believes it is "very likely that [her] team will make it to the state tournament again" in 2026. ECF No.

115 ¶ 12. Athlete 3's belief is based on the team's final 2025 ranking, the fact that several team members—some who have committed to play college softball—will be returning, and her knowledge of the abilities of newer, younger players whom she believes will be on the 2026 team. *Id.* ¶¶ 12–16. Athlete 3 also believes that Doe's team will return to the state tournament based on Doe's pitching abilities and the "pivotal" role a pitcher plays in a softball team's success. *Id.* ¶¶ 17–18.

*FAU member Athlete 4.* Athlete 4 is a high-school junior. ECF No. 116 ¶ 3. She attends a high school in Independent School District 196. *See id.* She plans to play for her high school's varsity softball team during the 2026 season, *id.* ¶ 10, just as she has done beginning part-time her freshman year and full-time her sophomore year, *id.* ¶ 9. Athlete 4's positions are pitcher, outfield, and shortstop. *Id.* ¶ 5. Athlete 4's team played Doe's team in their first game of the 2025 state tournament. *Id.* ¶ 17; *see also* ECF No. 71-6. Doe's team won 5–0, ending Athlete 4's team's chances of making it to the state championship. ECF No. 116 ¶ 21. Doe pitched the entire game, and Athlete 4's team "didn't get a single run," or "any extra-base hits," and "only advanced a runner past first base on two occasions." *Id.* ¶¶ 21–22. Against Doe, Athlete 4 "batted one for three with one strikeout," and Athlete 4 "ended the season as the second-best hitter on [her] team, only striking out around 10% of the time." *Id.* ¶ 31. If Doe's team attends a 2026 regular-season tournament hosted by Athlete 4's high school, their teams "will potentially play against" each other. *Id.* ¶ 43. The two teams "could" also play against each other again in the 2026 state tournament. *Id.* ¶ 44.

15

D

*FAU's expert.*  FAU filed declarations from three experts, but the declarations of just one of those experts, Gregory A. Brown, Ph.D., will be considered.  ECF Nos. 8-2; 117.[9]  Dr. Brown is "Professor of Exercise Science in the Department of Kinesiology and Sport Sciences at the University of Nebraska Kearney."  ECF No. 8-2 at 5.  Dr. Brown received his Ph.D. "from Iowa State University, where [he] majored in Health and Human Performance, with an emphasis in the Biological Bases of Physical Activity."  *Id.*  He has an extensive list of publications, presentations, and awards, and he is a Fellow of the American College of Sports Medicine.  *See id.* at 5–9, 185–90.  Dr. Brown offers five high-level opinions in his report and supports each of these opinions with extensive citations to evidence, including scientific studies.  Dr. Brown's first opinion is that males—whether they are adolescent boys or adults—possess "large, well-documented performance advantages over women and adolescent girls in almost all athletic contests."

---

[9]    FAU submitted Dr. Brown's first declaration with its motion and his rebuttal declaration with its reply brief.  FAU submitted its two other expert declarations—one prepared by Stephen B. Levine, M.D., and the other by Chad Thomas Carlson, M.D.—for the first time with its reply brief.  *See* ECF Nos. 118–19.  Whether these declarations could properly be considered seems questionable.  Courts in this District ordinarily do not consider evidence filed for the first time with a reply brief unless the evidence was "necessary to address factual claims of the responding party that were not reasonably anticipated."  *ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, No. 16-cv-4070 (SRN/HB), 2021 WL 1668013, at *9 (D. Minn. Apr. 28, 2021) (quoting D. Minn. LR 7.1(b)(2) 1999 Advisory Comm.).  FAU does not justify its with-reply filing of Dr. Levine and Dr. Carlson's declarations by reference to this standard.  And it is difficult to independently discern what evidence or expert opinion Defendants filed in opposition to FAU's motion that FAU could not reasonably have anticipated.  Regardless, for purposes of adjudicating FAU's preliminary-injunction motion, Dr. Brown's declarations are enough.

ECF No. 8-2 at 17; *see id.* at 17–39.  His second high-level opinion is that "large measured anatomical and physiological differences compared to women . . . likely explain the[] performance advantages" enjoyed by males.  *Id.* at 40; *see id.* at 40–49.  Dr. Brown's third opinion is that boys enjoy these advantages before puberty "when compared to similarly aged, trained, and talented girls."  *Id.* at 49; *see id.* at 49–90.  As part of this opinion, Dr. Brown addresses whether the administration of puberty blockers—medications "designed to delay the development of physical sex characteristics," *United States v. Skrmetti*, 605 U.S. ---, 145 S. Ct. 1816, 1825 (2025)—might erase male athletic advantages.  ECF No. 8-2 at 90–97.  Dr. Brown observes that "there is very limited research on how puberty blockers affect physical fitness and none on sports performance."  *Id.* at 94.  He concludes that "[i]t seems likely that males who have undergone puberty suppression will have physiological and performance advantages over females somewhere between those possessed by pre-pubertal boys, and those who have gone through full male puberty, with the degree of advantage in individual cases depending on that individual's development and the timing of the start of puberty blockade."  *Id.* at 91.  Dr. Brown's fourth high-level opinion is that higher testosterone levels in males as compared with females give males a tremendous athletic advantage.  *Id.* at 97–101.  His fifth opinion is that post-pubertal testosterone-suppression therapies do not reverse or eliminate male athletic advantages. *Id.* at 102–149.

*Defendants' expert A. Kade Goepferd, M.D.*  Defendants filed two expert declarations.  The first of these was prepared by A. Kade Goepferd, M.D.  ECF No. 70. Dr. Goepferd is a staff physician at Children's Minnesota.  *Id.* ¶ 5.  Dr. Goepferd "founded

and served as the Medical Director for the Gender Health Program at Children's Minnesota from 2019–2025, and currently "serve[s] as the Chief Education Officer, Clinical Director of Equity and Inclusion and Pediatrician in the Gender Health Program." *Id.* Dr. Goepferd has an extensive list of publications, presentations, media appearances, and awards, and is a Fellow of the American Academy of Pediatrics. *See* ECF No. 70-1; *see also* ECF No. 70 ¶¶ 6–12. Dr. Goepferd's declaration testimony may be divided into several categories: (1) basic medical and scientific information regarding sex, gender identity, and gender expression; (2) information regarding pre-pubertal athletes; (3) a description of medical care for transgender youth; (4) a review of scientific studies regarding adult transgender female athletes; and (5) the benefits youth experience from participating in sports. *See generally* ECF No. 70. In discussing these topics, Dr. Goepferd expresses several noteworthy opinions. Dr. Goepferd disagrees with Dr. Brown that pre-pubescent children have different athletic abilities based on sex. *Id.* ¶ 22. As Dr. Goepferd puts it, "[a]ge-grade competitive sporting records show no or minimal sex differences prior to puberty." *Id.* To the extent Dr. Brown cited studies suggesting the opposite, Dr. Goepferd testifies that "several societal and cultural factors . . . influence athletic advantage," and Dr. Goepferd faults these studies for not accounting for these factors. *Id.* ¶ 28; *see id.* ¶¶ 30–46. These include, for example, "more encouragement and opportunity for boys to engage in sports and physical activity," *id.* ¶ 30, "parent and societal views about gender expression and gender identity," *id.* ¶ 31, "peer socialization," *id.* ¶ 32, and "family income and socioeconomic status," *id.* ¶ 45. Though Dr. Goepferd agrees with Dr. Brown that "there is medical consensus that the difference in testosterone

is the primary known biological driver of differences in athletic performance between male and female athletes," *id.* ¶ 24, Dr. Goepferd disagrees with him regarding the effects of "puberty suppressing medications," testifying that they "prevent masculinizing changes of puberty (including muscle mass changes, changes to hemoglobin and heart size, and changes to bone structure) that would convey any athletic or competitive advantages associated with testosterone," *id.* ¶ 60. Dr. Goepferd testifies it would contradict science "[t]o prevent transgender girls from participating in high school sports . . . if those girls are pre-pubertal, receiving puberty suppressing medication or have initiated puberty with estrogen without going through endogenous puberty." *Id.* ¶ 66. At the same time, Dr. Goepferd acknowledges that each "transgender woman's medical and transition journey" is unique, *id.* ¶ 79, and that "[u]nfortunately, there is a relative lack of research on cis and transgender differences" in athletic ability, *id.* ¶ 78. "In summary," Dr. Goepferd concludes, "there is no conclusive scientific or empirical evidence that when [sic] youth sports are concerned there is any reason to restrict the participation of transgender athletes to protect the integrity of girls' and women's sports." *Id.* ¶ 92.

*Defendants' expert Mollie T. McQuillan, Ph.D.* Defendants' second expert declaration was prepared by Mollie T. McQuillan, Ph.D. ECF No. 69. Dr. McQuillan is "a tenure-track faculty member in the Department of Educational Leadership and Policy Analysis at the University of Wisconsin – Madison." *Id.* ¶ 5.[10] Dr. McQuillan "received

---

[10] Dr. McQuillan "served as Section 2A and 5A representatives for the Minnesota State High School League." ECF No. 69 ¶ 17. Ordinarily, an expert witness's past connection with a party might raise a concern regarding the witness's objectivity. FAU

a bachelor's degree from the University of Chicago in Political Science in 2000" and "a master's degree in teaching with a specialization in social studies for middle and high school from the University of Saint Thomas in 2005." *Id.* She earned a "master's degree in Human Development and Social Policy from Northwestern University in 2014." *Id.* And she earned her Ph.D. in that same field from Northwestern University in 2019. *Id.*

¶ 6. Dr. McQuillan has an extensive list of awards, honors, publications, presentations, and media appearances. *See* ECF No. 69-1 at 2–17. Dr. McQuillan offers essentially four high-level opinions. First, she opines that transgender youth "face pervasive discrimination that significantly contributes to physical health, mental health, and academic risks." ECF No. 69 ¶ 20; *see id.* ¶¶ 21–23. Second, she opines that "trans youth are less likely to participate in physical activity and athletics." *Id.* ¶ 24. Dr. McQuillan's third opinion is that the adult and peer support athletic teams often provide "can be a critical buffer against mental health challenges that trans students face." *Id.* ¶ 28. Her fourth opinion is that policies allowing transgender girls to participate in girls' sports benefit all girls. *See id.* ¶¶ 38–50.[11]

---

did not raise this concern as a ground for rejecting Dr. McQuillan's testimony in connection with its preliminary-injunction motion.

[11] Dr. McQuillan concludes her declaration with a section criticizing Dr. Brown's declaration, analysis, and opinions. It doesn't matter at this point, but this critique seems questionable in several respects. For example, Dr. McQuillan characterizes Dr. Brown's opinion "that transgender girls have an 'inherent advantage' over cisgender girls in athletics" as "rest[ing] upon essentialist, sex-based stereotypes rather than empirical evidence," and she testifies that "[t]hese stereotypes ignore the complex interaction of hormones, training, and physical variation, instead relying on outdated notions of binary gender roles." ECF No. 69 ¶ 53. Dr. Brown cited many seemingly reasonable sources to

E

*FAU's claims.*  FAU asserts two Title IX legal theories in its Complaint.  Compl.

¶¶ 178–191.  Both theories are grounded in Title IX's athletics regulation, 34 C.F.R.

§ 106.41.  First, the regulation requires funding recipients that "operate or sponsor

separate teams for members of each sex" to ensure that "the selection of sports and levels

of competition effectively accommodate the interests and abilities of" girls and women.

*Id.* § 106.41(b), (c)(1).  FAU claims that, "[b]y opening up girls' teams to" transgender

female participation via the challenged bylaw, Defendants have failed "to fulfil[l] their

duty to effectively accommodate the abilities of girls."  Compl. ¶ 181.  As I understand

the theory, this violation arises from the athletic advantages FAU alleges transgender

females possess and results in "unequal" opportunities as compared with the transgender

female competitors, *id.* (alleging that "the athletic opportunities of girls are unequal when

males are allowed to compete against them or compete with them for spots or playing time

on their team"), and discriminatory treatment when compared with "competitive

opportunities . . . offered to boys" who can play on boys-only teams, *id.*  Second, the

regulation requires funding recipients that "operate or sponsor separate teams for members

of each sex" to "provide equal athletic opportunity for members of both sexes."  34 C.F.R.

§ 106.41(b), (c)(1).  FAU claims that, by adhering to the challenged bylaw, Defendants

---

support his opinion.  Without a careful, specific review of those sources—something Dr.
McQuillan did not provide—it is difficult to understand how Dr. Brown's opinion might
be fairly characterized as resting on outdated stereotypes.  And without knowing more,
Dr. McQuillan and Dr. Brown's respective education, training, and experience seem to lie
in mostly distinct areas.

have adversely affected "girls' opportunities to compete safely and on a level playing field," resulting in lost games and individual achievements. Compl. ¶ 188. FAU claims this deprives girls of equal treatment in athletics as compared with boys. As FAU puts it: "By providing competitive opportunities in baseball and softball and failing to offer female athletes an equal opportunity to participate and advance in their sport based on their abilities, all Defendants have violated the Title IX obligations to extend equal treatment, benefits and opportunities in athletic competition to girls." *Id.* ¶ 189. For relief, FAU seeks declaratory and injunctive relief, "nominal damages," attorneys' fees and costs, and any "other relief as the Court may deem just and proper." *Id.* at 42–44.

*The case's procedural history.* FAU filed its Complaint on May 19, 2025. ECF No. 1. It filed its preliminary injunction motion and supporting papers the next day, May 20. *See* ECF Nos. 6–9. FAU did not ask that its motion be adjudicated on an expedited basis, *see* ECF No. 6, and a hearing on the motion was scheduled for July 7, ECF No. 11. Under the District's Local Rules, Defendants' responses to the motion originally were due June 10. *See* D. Minn. LR 7.1(c)(2). Several Defendants asked for more time to respond based on their need to identify experts who might be able to respond to Dr. Brown, their claimed need for standing-related discovery from the FAU members who filed declarations, and the need to brief and resolve disputes regarding an appropriate protective order. *See* ECF No. 24 at 2–3. These Defendants suggested either that the hearing be delayed "a couple of months," or that the preliminary injunction motion be consolidated with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *Id.* at 3. FAU did not object to "a brief postponement of the preliminary injunction hearing to

accommodate the . . . request for more time." ECF No. 25 at 1. FAU asked, however, that any extension "be short to allow sufficient time for briefing, a decision, and a potential appeal before the [2026] softball season begins." *Id.* FAU opposed combining the preliminary injunction hearing with a trial. *Id.* At a status conference on June 2, I denied the request to consolidate the motion with a trial on the merits. ECF No. 35. Following that conference, the parties agreed on a schedule to govern the preliminary injunction motion, including that the July 7 hearing date would be extended to August 20. ECF No. 36. The parties' agreement was memorialized in an order on June 5. ECF No. 37. Between then and now, the parties undertook limited discovery, and a protective order was litigated and entered. *See* ECF Nos. 40–60; 86–87; 100–01; 103–05; 108–11; 122–23.

## II

### A

Defendants argue that FAU has not shown an Article III–worthy injury, meaning it lacks standing to sue, and this jurisdictional issue must be the starting point. *See United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 828 (8th Cir. 2013). Article III of the Constitution limits the federal judicial power (or jurisdiction) to adjudicating "Cases" and "Controversies." This provision keeps the federal courts out of the business of the legislative and executive branches, and the Supreme Court's standing jurisprudence guides the federal courts in determining whether a litigant seeks adjudication of a genuine "Case" or "Controversy" or instead hopes to have the court act as if it were one of the political branches. The general rules governing Article III standing are settled:

> Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies. Therefore, the plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth* [*v. Seldin*, 422 U.S. 490, 498 (1975)]. To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury-in-fact," (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified).

To have standing to obtain injunctive relief, the plaintiff must show that it is likely to suffer future injury by the defendant and that the sought-after relief will prevent that future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citation modified); *see Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (citation modified)). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). And when a plaintiff seeks forward-looking declaratory or injunctive relief, "past injuries are relevant only for their predictive value." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). In other words, past injuries do not by

themselves show a plaintiff's standing to seek prospective relief, but they may "serve as evidence of threatened future injury." *Id.*

FAU may seek judicial relief from its own injuries or from an injury to its members as a representative of those members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To invoke standing as a representative of its members, or "associational standing," FAU must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). FAU "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth,* 422 U.S. at 511). In other words, when it comes to showing associational standing, one injured member is enough. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

"[S]tanding is based on the facts as they existed at the time the lawsuit was filed." *Steger*, 228 F.3d at 893. Standing "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 561). "At the

25

preliminary injunction stage . . . the plaintiff must make a clear showing that [it] is likely to establish each element of standing." *Murthy*, 603 U.S. at 58 (citation modified). When, as here, parties introduce evidence to support their positions regarding whether a preliminary injunction should be entered, "the plaintiff cannot rest on mere allegations, but must instead point to factual evidence." *Id.* (citation modified). The standing analysis can be "fact-intensive." *Denmon v. Kan. Couns., Inc.*, --- F.4th ---, No. 23-3612, 2025 WL 2329189, at *2 (8th Cir. Aug. 13, 2025).

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But "[i]n assessing a plaintiff's Article III standing, we must 'assume that on the merits the plaintiffs would be successful in their claims.'" *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016) (quoting *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008)).

B

Here, FAU's Article III injury theory rests, not on any injury the organization suffered independently, but on injuries FAU says have been inflicted—and are likely to be inflicted again—on four of its members, Athletes 1, 2, 3, and 4. And FAU claims these members' injuries arise from playing games against Doe and her team. It is reasonably clear that the interests FAU seeks to protect are germane to its purpose and that FAU's asserted claims or requested relief do not require the participation of FAU's individual members as parties to the case. *Students for Fair Admissions, Inc.*, 600 U.S. at 199. No Defendant argues otherwise. If any of FAU's members was injured, there is a causal

relationship between the challenged bylaw and the injury. *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (explaining that traceability "requires no more than *de facto* causality") (Scalia, J.). And enjoining the challenged bylaw would redress the injury by effectively preventing Doe from competing during the 2026 season. The standing issue, then, boils down to whether FAU has shown that any of its members is sufficiently likely to suffer Article III injury.

To understand FAU's Article III injury theory, it helps to place it in the context of FAU's larger Title IX liability theories. FAU's two liability theories proceed essentially in the same four steps. (1) The challenged bylaw permitted—and will continue to permit—Doe, whose birth-assigned sex was male, to play League-sanctioned girls' softball. (2) Athletes 1, 2, 3, and 4, and their teams have played against Doe's team in the past and are likely to do so again during the 2026 season. (3) As females, Athletes 1, 2, 3, and 4, and their teams are at a competitive disadvantage when they play against Doe's team, owing at least in part to Doe's male birth-assigned sex/transgender female sex. (4) This competitive disadvantage means Athletes 1, 2, 3, and 4 lack "equal treatment" and that their "interests and abilities" in softball have not been "effectively accommodate[d]" in violation of Title IX. 34 C.F.R. § 106.41(c), (c)(1). As I understand things, the second and third steps in FAU's liability theory overlap with its Article III injury theory. In other words, to show Article III injury, FAU's members testified regarding the second step that they have played against Doe's team in the past and are likely to play against her team in the future. Regarding the third step, FAU's members testified that Doe is a dominant softball player who plays a critical position, and FAU's

expert testified in substance that Doe's competitive advantage is attributable to her sex. This member and expert testimony, in FAU's view, shows the challenged bylaw has caused various injuries to its members.

Most of the evidence FAU relies on to support its Article III injury showing at the second step doesn't. To understand why this is so, it helps to keep in mind that, to show Article III injury, FAU must make a "clear showing," *Murthy*, 603 U.S. at 58, that for at least one of its members, *Summers*, 555 U.S. at 498, "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur," *In re SuperValu, Inc.*, 870 F.3d at 769 (citation modified). In her supplemental declaration, Athlete 2 testified that she believes her high-school "team is likely to compete against [Doe's team] in a pre-season scrimmage" in 2026. ECF No. 114 ¶ 9. Athlete 2 does not explain why this is likely, however, *see id.*, and it would seem inconsistent with at least the "clear showing" requirement to accept the bare representation a scrimmage is "likely" to occur. Athlete 4 said something similar. In her declaration, she testified that if Doe's team attends a 2026 regular-season tournament hosted by Athlete 4's team, then the teams "will potentially play against" each other. ECF No. 116 ¶ 43. Saying that this game might "potentially" occur does not (by definition) clearly show it is substantially likely to occur. All four FAU members testified regarding the chances their teams may play Doe's team during the 2026 post-season. Athlete 1 testified that her team is in the same section as Doe's team and that, if things go as they did in the 2024 and 2025 sectional playoffs, the teams will face each other for the chance to play in the 2026 state tournament. ECF No. 113 ¶ 32. Athletes 2 and 3 (who play for the same high-school team) testified that they believe their

team and Doe's team are likely to return to the state tournament in 2026 and, if that happens, there is a reasonable chance the two teams might play against each other. ECF No. 114 ¶¶ 14–15 (Athlete 2); ECF No. 115 ¶¶ 12–18 (Athlete 3). Athlete 4 testified that her team "could" play against Doe's team in the 2026 state tournament. ECF No. 116 ¶ 44. This testimony doesn't clearly show that these post-season match-ups are certainly impending or substantially likely to occur in the relevant sense. Whether any one of these match-ups might occur some eight or nine months from now is subject to innumerable variables. These include regular-season records, the relative strength of regular-season and sectional opponents, upsets, and tournament seedings, to name just a few. These variables, in turn, make predictions about whether any FAU member's team might play Doe's team in the post-season speculative.

One aspect of one FAU member's declaration testimony is different, and though the question is close, I conclude this testimony is enough to clearly show that a future game between this FAU member and her team and Doe and her team is substantially likely. Athlete 1's team and Doe's team are scheduled to play a game against each other in mid-May 2026. ECF No. 113 ¶ 33; *see* Nw. Suburban Conf., https://www.nwsconference.org (enabling viewer to link to 2026 varsity girls' softball schedule) (last visited Sep. 18, 2025). The record gives every reason to think that Athlete 1 and Doe will be playing for each of their teams at that time. Athlete 1 and Doe are seniors, and both testified that they plan to remain at their current schools and play softball during the 2026 season. *See* ECF No. 113 ¶ 30; ECF No. 80 ¶ 29. Athlete 1 is likely to play in that game. *See* ECF No. 113 ¶¶ 4–10, 30–31, 34–35. If it matters—and

for reasons explained in a bit, I think it does—Doe is substantially likely to play in the game. She is one of the best high-school-softball pitchers in Minnesota. ECF No. 80 ¶ 15. During her sophomore year, she received statewide recognition and pitched the majority of her team's innings. *Id.* ¶ 13. The evidence is unrebutted that, during her junior year, Doe pitched every inning of her team's final two sectional-playoff games and all her team's state-tournament games. ECF No. 116 ¶ 26. Though it seems fair to ask whether the posted 2026 schedule might change between now and May 2026, nothing about the posted schedule suggests it is tentative or likely to change, and Defendants do not argue or cite evidence suggesting it will. Against that background, the better answer is that the game is substantially likely to be played. And on this record, discounting that likelihood to account for a host of schedule-altering or game-cancelling contingencies that might conceivably arise—from issuance of a revised schedule to a rain-out—would require speculation.

The next question is whether Athlete 1 has clearly shown that she is substantially likely to suffer claim-tethered injuries arising from the scheduled game, and I conclude she has. The better standing-specific take on the expert evidence is that, owing to their sex, high-school-aged transgender females possess athletic advantages over cisgender females. Dr. Brown offered that opinion and cited extensive evidence supporting this conclusion. ECF No. 8-2 at 17–39. Dr. Goepferd seemed to agree, at least as to those transgender females who do not undergo puberty-suppressing therapy. ECF No. 70 ¶¶ 24, 60. As a finding of fact, this conclusion is consistent with many cases addressing a comparable question. *See, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S.

1301, 1307 (1980) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events.") (Stevens, J., in chambers); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."); *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) (concluding that, "due to physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team"); *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (finding plaintiffs' allegation "that they were denied equal opportunities in track and field competitions" by having to compete against transgender girls sufficient to show Article III injury).

At this stage, Dr. Goepferd's opinions regarding the impact of puberty-suppressing therapies do not justify a different conclusion. The challenged bylaw does not require or account for puberty-suppressing therapies; in other words, the bylaw does not require a student assigned male at birth who identifies as female to undergo puberty-suppressing therapies to participate in athletics based on the student's female gender identity or expression. ECF No. 72-1 at 4. And Dr. Goepferd testified that each "transgender woman's medical and transition journey cannot be assumed to [be] the same as another's." ECF No. 70 ¶ 79. I infer from this testimony that determining the effects of puberty-suppressing therapies on any one person's athletic abilities as compared with that person's

31

without-therapy abilities would require an extensive, individualized record not present here.

From the conclusion that high-school-aged transgender females generally possess athletic advantages over cisgender females and based on the extensive record evidence showing that Doe demonstrates these advantages, two concrete, claim-tethered Article III injuries follow. First, Athlete 1 is substantially certain to be injured because, when she plays Doe and her team, Athlete 1 will be at a disadvantage owing to Athlete 1's sex. In this respect, the competition will be less accommodative of Athlete 1's abilities as a female. Second, and separately, FAU's Title IX "effective accommodation" and "equal treatment" claims overlap to the extent they are based on a discrimination theory—*i.e.*, that FAU's members have been denied equal athletic opportunities as compared with boys. *See* Compl. ¶¶ 181, 189; *see also* ECF No. 52 at 1–2 (explaining the discrimination theory). "[S]tigmatic injury, though not sufficient for standing in the abstract form . . . , is judicially cognizable to the extent [a plaintiff is] personally subject to discriminatory treatment." *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984), *abrogated on other grounds by*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see TransUnion*, 594 U.S. at 425–26 (identifying "discriminatory treatment" as an example of a "concrete, *de facto* injur[y]"); *see also Soule*, 90 F.4th at 46 (finding Article III injury based on the plaintiffs' allegations showing "the denial of 'equal athletic opportunities' and loss of publicly recognized titles and placements in track and field competitions"). Here, Athlete 1 is substantially likely to be personally subject to this (allegedly)

discriminatory treatment because she and her team are scheduled to play Doe and her team.[12]

Defendants advance three standing arguments warranting analysis, though none is convincing. (1) They argue that FAU's members are excellent softball players and "are thriving." ECF No. 83 at 14. From that starting point, Defendants say the logical conclusion is that FAU's members cannot have been injured or face a substantially certain future injury for Article III's purposes. This is not correct. A person who is subject to unlawful activity (including discrimination) might nonetheless thrive (despite the discrimination). The discriminatory treatment remains an injury for Article III's purposes. (2) Defendants argue that "FAU's members fail to allege any of the types of actions that are precluded by Title IX"—*i.e.*, that FAU's claimed injuries are not within Title IX's "zone of interest." *Id.* at 15. This argument implicates the concept of statutory standing; it implicates no Article III question. "When a plaintiff alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d

---

[12]    FAU argues that its members suffer Article III injury regardless of whether they play against Doe and her team. In FAU's view, "just being forced to play in a discriminatory league is enough." ECF No. 112 at 22. I disagree. An FAU member is not "personally subject to discriminatory treatment" unless she is required to compete against a transgender female who was allowed to compete under the challenged bylaw. *Allen*, 468 U.S. at 757 n.22; *see Soule*, 90 F.4th at 50 (finding that the plaintiffs lacked standing to seek removal of "victories of transgender girls who never competed against Plaintiffs"). In other words, the bylaw's mere existence does not cause FAU's members to suffer Article III injury.

928, 934 (8th Cir. 2012). Statutory standing is not jurisdictional; it "goes to the merits of the claim." *Id.*; *see Lexmark Int'l*, 572 U.S. at 128 n.4. "Statutory standing is simply statutory interpretation: the question it asks is whether Congress . . . has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Miller*, 688 F.3d at 934 (quotation omitted). (3) Defendants argue that FAU has not shown causation or redressability because softball is a team sport. As Defendants put it, FAU "makes no effort at all to demonstrate that its members would have received different awards, different championships, or different college scholarships" if Doe were prohibited from competing in girls' high-school softball. ECF No. 83 at 22. In my understanding of the law, FAU did not *have* to show any of these things to show its Article III standing; discriminatory treatment is injury enough for Article III. If Defendants' argument is that Doe's contributions were not (or are not likely to be) material to her team's success, I find that the record belies that contention. Pitcher is a key—if not the most important— position in softball, and Doe is one of the best pitchers in the state.

## III

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (citation omitted). "When deciding whether to grant a preliminary injunction, a district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.'" *CEZ Prior, LLC*

*v. 755 N Prior Ave. LLC*, 126 F.4th 1353, 1358 (8th Cir. 2025) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  Consider each of these factors in turn.

A

1

"While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation modified).  Generally, courts require a movant to show it has a "fair chance of prevailing" on the merits of a claim to obtain a preliminary injunction.  *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Under the "fair chance of prevailing" standard, a movant "need not show that it has a greater than fifty per cent likelihood of success."  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1017 (8th Cir. 2022) (citation modified).  However, "where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, [a] district court[] [must] make a threshold finding that a party is likely to prevail on the merits."  *Rounds*, 530 F.3d at 732–33 (footnote omitted).  This "more rigorous standard reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."  *Id.* at 732 (citation modified).  Where other forms of government action are involved, such as "administrative actions by federal, state or local government agencies," the "suggested course of action is to first 'evaluate whether the full play of the democratic process was involved' in the actions and 'then determine which standard

35

would be more appropriate.'" *D.M. ex rel. Bao Xiong*, 917 F.3d at 1000 (quoting

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040

(8th Cir. 2016)) (citation modified).

Here, FAU and Defendants disagree whether the MHRA—the enactment of which

no doubt involved the democratic process's every step—required the challenged bylaw's

adoption. If it did, as Defendants argue, then FAU's challenge to the bylaw is effectively

a challenge to the statute, and the heightened likely-to-prevail standard would apply. If it

did not, then we're dealing with a state actor's voluntary decision to adopt a rule via a

non-democratic process, and the ordinary fair-chance-of-prevailing standard would apply.

Though the underlying question of Minnesota law is important, I conclude it is not

necessary to resolve it because it doesn't make a difference—FAU is not likely to prevail

on the merits of its Title IX claims under the more lenient fair-chance-of-prevailing

standard.[13]

---

[13]     In addition to being important, the question is difficult. The MHRA makes it "an
unfair discriminatory practice to discriminate in any manner in the full utilization of or
benefit from any educational institution, or the services rendered thereby to any person
because of . . . sex [or] gender identity . . . ." Minn. Stat. § 363A.13, subdiv 1. To
"discriminate" includes to "segregate" or "separate." Minn. Stat. § 363A.03, subdiv. 13.
At the same time, however, the MHRA exempts single-sex athletic teams. The statute
says: "it is not an unfair discriminatory practice for an educational institution … to operate
or sponsor separate athletic teams and activities for members of each sex or to restrict
membership on an athletic team to participants of one sex, if this separation or restriction
meets the requirements of section 121A.04." Minn. Stat. § 363A.23, subdiv. 2. Section
121A.04, Minnesota's Title IX analog, requires "equal opportunity for members of each
sex" to participate in a school's athletic program, and provides that "it is not an unfair
discriminatory practice to restrict membership on an athletic team to participants of one
sex whose overall athletic opportunities have previously been limited." Minn. Stat.
§ 121A.04, subdivs. 2, 3(a). If "sex" as used in these statutes means sex assigned at birth,

2

a

For two alternative reasons, FAU has not shown it has a fair chance of prevailing on either its Title IX effective-accommodation claim or its Title IX equal-treatment claim. First, both claims are based exclusively on disparate-impact allegations, but Title IX does not authorize private persons to sue on a disparate-impact theory. It is true that no Defendant raised this issue, but the rule seems reasonably settled, and the rule's purely legal character requires its application here. Second, if Title IX authorized a private person to sue on a disparate-impact theory, the statute and its regulations require a fact-intensive inquiry to determine whether effective accommodation and equal treatment exist, but on this record, FAU has not shown that either effective accommodation or equal treatment do not exist.

---

then it is difficult to understand how the MHRA required the League to adopt the challenged bylaw. Among other things, then, answering whether the MHRA required the bylaw's adoption would require predicting how the Minnesota Supreme Court would define "sex" as it is used in these statutes. *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006) ("When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue."). Federal courts have reached different conclusions regarding the word's meaning as it is used in Title IX. *See A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023) (Easterbrook, J., concurring). Here, no party briefed this question. *See* ECF No. 129 at 39. No evidence shows the League answered this question in adopting the bylaw. And though the Attorney General concluded in his February 2025 opinion letter that the League would violate the MHRA if it prohibited students from participating in extracurricular activities consistent with their gender identity, the letter did not address this central question; it did not mention the single-sex-team exemption in Minn. Stat. § 363A.23, subdiv. 2. *See* ECF No. 72-2.

Before addressing these issues, it helps to orient them to Title IX's larger context. Enacted in 1972, Title IX, provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "In short, the statute bars federally funded educational institutions from engaging in sex-based discrimination." *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580 (8th Cir. 2021) (citation omitted). Title IX includes several exceptions or qualifications to this general rule, but none apply here. *See* 20 U.S.C. § 1681(a)(1)–(9). Title IX does not address athletics explicitly. *See generally id.* § 1681.

In 1974, Congress amended Title IX, directing the Secretary of Health, Education and Welfare (or "HEW") to "prepare and publish . . . proposed regulations implementing the provisions of title IX . . . relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93–380, § 844, 88 Stat. 484, 612 (1974) (Javits Amendment). On June 20, 1974, HEW published its proposed regulation addressing Title IX's application to athletics. Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance, 39 Fed. Reg. 22,228, 22,236 (June 20, 1974). President Ford signed the final version of the regulation—now 34 C.F.R. § 106.41—on May 27, 1975, and as required by the General Education Provisions Act (or "GEPA"), it was submitted to Congress for review. Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413, 71,413

(December 11, 1979); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531 (1982); *see also* § 509, 88 Stat. at 567 (amending the GEPA).  Congress did not disapprove the regulation within the 45-day period allowed by the GEPA, meaning the regulation became effective July 21, 1975.  44 Fed. Reg. at 71,413; *Bell*, 456 U.S. at 533.

The regulation begins with a default rule that "no recipient shall provide . . . athletics separately" "on the basis of sex."  34 C.F.R. § 106.41(a).  The regulation provides, however, that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 106.41(b).  The regulation then provides a series of rules to govern funding recipients that "operate or sponsor separate teams for members of each sex."  *Id.*  "[W]here a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport."  *Id.*  The regulation requires recipients—both those who sponsor mixed-sex teams and those who sponsor single-sex teams—to "provide equal athletic opportunity for members of both sexes."  *Id.* § 106.41(c).  In determining whether a funding recipient provides equal athletic opportunity to both sexes, the following, non-exhaustive list of factors is considered:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>
> (2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

*Id.* § 106.41(c)(1)–(10). The "effective accommodation" requirement appears in the first factor. The remaining nine factors are considered to determine if the "equal treatment" requirement has been met. *Portz*, 16 F.4th at 580. "Effective accommodation claims . . . concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010).

i

A private plaintiff may enforce Title IX through an implied private right of action, *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)), but almost all signs indicate that a private Title IX plaintiff may sue only for intentional discrimination and not for disparate impact.[14] Title

---

[14]    By definition, "disparate-impact claims 'involve . . . practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group

IX is closely modeled after Title VI, which prohibits discrimination based on race, color, or national origin.  *Cannon*, 441 U.S. at 694 ("Title IX was patterned after Title VI of the Civil Rights Act of 1964"); 42 U.S.C. § 2000d (Title VI); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." (citations omitted)).  Title IX's provision banning sex discrimination and its administrative-enforcement provision mirror Title VI's corresponding provisions in all relevant respects.  *Cannon*, 441 U.S. at 694–96.  As the Supreme Court observed in *Cannon*:

> Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefitted class.  Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.  Neither statute expressly mentions a private remedy for the person excluded from participation in a federally funded program.  The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.

*Id.* (footnotes omitted).  And in *Alexander v. Sandoval*, the Supreme Court held that private individuals may not sue on a disparate-impact theory under Title VI.  532 U.S. 275, 285, 293 (2001).  To reach this holding, the Court first determined that Title VI's

---

than another . . . .'"  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

general prohibition on race, color, and national origin discrimination—§ 601[15]—
"prohibits only intentional discrimination." *Id.* at 280.  Though a Justice Department
regulation promulgated under Title VI "proscribe[d] activities that have a disparate impact
on racial groups," *id.* at 281, the Court determined that "the private right of action to
enforce § 601 does not include a private right to enforce [the] regulations," *id.* at 285.  *See
id.* at 291 ("Language in a regulation may invoke a private right of action that Congress
through statutory text created, but it may not create a right that Congress has not.").
Considering their shared discrimination-prohibiting text and the Supreme Court's
recognition that "Congress modeled Title IX after Title VI . . . with the explicit
understanding that it would be interpreted as Title VI was," *Fitzgerald*, 555 U.S. at 258,
applying *Sandoval*'s holding to Title IX is the logical next step.

Many courts have reached this conclusion.  *See, e.g.*, *Poloceno v. Dallas Indep.
Sch. Dist.*, 826 F. App'x 359, 363 (5th Cir. 2020) ("*Sandoval* stands for a broader
proposition: A plaintiff's Title IX claim must be based on intentional discrimination, not
disparate impact."); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019)
("We have never recognized a private right of action for disparate-impact discrimination
under Title IX." (citing *Sandoval*, 532 U.S. at 283)); *Doe v. BlueCross BlueShield of Tenn.,
Inc.*, 926 F.3d 235, 240 (6th Cir. 2019) (explaining that Title VI "doesn't prohibit
disparate-impact discrimination" and "[i]t's unlikely that Title IX, which was patterned on

---

[15]    Section 601 provides: "No person in the United States shall, on the ground of race,
color, or national origin, be excluded from participation in, be denied the benefits of, or
be subjected to discrimination under any program or activity receiving Federal financial
assistance."  42 U.S.C. § 2000d.

Title VI, does so either."); *Soule v. Conn. Ass'n of Sch.*, 755 F. Supp. 3d 172, 187–88 (D. Conn. 2024) ("In light of [*Sandoval*], the private right of action under Title IX does not encompass disparate-impact claims."); *York v. Wellmark, Inc.*, No. 4:16-cv--00627-RGE-CFB, 2017 WL 11261026, at *16 (S.D. Iowa Sep. 6, 2017) ("Courts agree—and Plaintiffs here do not contest—that in the aftermath of the United States Supreme Court's decision in *Alexander v. Sandoval* . . . a Title IX plaintiff cannot assert a disparate impact theory." (collecting cases)), *aff'd*, 965 F.3d 633 (8th Cir. 2020); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 n.6 (S.D.N.Y. 2015) ("Since Title IX is to be interpreted and applied in the same manner as Title VI, it follows that Title IX also reaches only intentional discrimination." (citation omitted)); *Manley v. Tex. S. Univ.*, 107 F. Supp. 3d 712, 726 (S.D. Tex. 2015) ("There is no basis for a disparate impact claim under Title IX."); *Tsuruta v. Augustana Univ.*, No. 4:15-CV-04150-KES, 2015 WL 5838602, at *3–4 (D.S.D. Oct. 7, 2015) ("The court agrees with the reasoning of those courts that have held that, post-*Sandoval*, a claimant cannot bring a disparate impact cause of action under Title IX."); *Barrett v. W. Chester Univ. of Pa. of State Sys. of Higher Educ.*, No. CIV.A. 03-CV-4978, 2003 WL 22803477, at *10–11 (E.D. Pa. Nov. 12, 2003) ("We see no reason why *Sandoval* would not apply to disparate impact claims under § 902 of Title IX."); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002) ("Because Title IX is derived from Title VI, *Alexander v. Sandoval* implies that no . . . private right of action [to enforce regulations prohibiting disparate-impact discrimination] exists under Title IX as well."), *aff'd*, 41 F. App'x 521 (2d Cir. 2002).  If a case addressed *Sandoval* and found that Title IX authorized private disparate-impact claims, we haven't found it.  *See Doe v. Univ. of*

*Denv.*, 952 F.3d 1182, 1193 n.8 (10th Cir. 2020) (suggesting Title IX may allow for disparate-impact claims but citing pre-*Sandoval* cases). At this stage, and without controlling precedent or the benefit of briefing addressing the question, I agree with the weight of authority holding that a private Title IX plaintiff may sue only for intentional discrimination and not for disparate impact.

Here, FAU asserts disparate-impact theories. This makes sense. The challenged bylaw's requirement that "all students" be allowed to participate in athletics and fine arts "consistent with their gender identity or expression" draws no distinction between males and females. *See* ECF No. 72-1 at 4. The requirement applies equally to both. And the harm FAU alleges results, not from the challenged bylaw's direct application to its members, but from the impacts of allowing a third-party transgender female to compete consistent with her gender identity in compliance with the bylaw. The Complaint confirms the disparate-impact character of FAU's Title IX claims. It includes several allegations regarding the bylaw's disparate impacts. *See* Compl. ¶ 188 (alleging the "Policy has a detrimental *effect* on girls' opportunities" and "*resulted* in fewer opportunities for girls" and "has a discriminatory *impact*" (emphasis added)); *see also* ECF No. 112 at 30 (arguing "in practice" the League's bylaw "discriminate[s]").[16]

---

[16]    Again, it makes no difference that FAU brings its claims under the "equal athletic opportunity" mandate of § 106.41 because a "private plaintiff may not bring a [suit under a regulation] against a defendant for acts not prohibited by the text of [the statute]." *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 173 (1994); *see also Sandoval*, 532 U.S. at 284 ("[R]egulations . . . construe the statute itself . . . and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." (citations omitted)).

Consistent with these disparate-impact allegations, the Complaint all but disclaims—and clearly does not allege—an intentional-discrimination theory. "To support a claim of intentional discrimination, a plaintiff must show that a defendant 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Soule*, 755 F. Supp. 3d at 198 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *see also Wolfe v. Fayetteville Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011) ("We glean from this language of [Title IX] a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate because of one's sex or gender."). As the Fifth Circuit has explained, a defendant "need not have intended to violate Title IX, but need only have intended to treat women differently." *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000). Here, FAU alleges the opposite—that "at no point prior to the adoption of the Policy did the [League], or any of the Defendant Schools take into consideration whether the Policy provided equal opportunity or effectively accommodated female athletes." Compl. ¶ 135. The Complaint includes no allegations consistent with an intentional-discrimination theory. *See generally id.* It includes, for example, no allegations that the League or any other Defendant would have acted differently were males the impacted athletes. *See Soule*, 755 F. Supp. 3d at 199–200. Though FAU claims Defendants were "on notice" the bylaw violated Title IX, there is no suggestion Defendants continued to adhere to the bylaw because of its disparate impact on girls. *See* Compl. ¶¶ 165–73.

45

Because I conclude at this stage that FAU's Title IX disparate-impact theories are not legally available, and because FAU has not alleged that the challenged bylaw's adoption resulted from intentional sex discrimination, I find that FAU has not shown it has a fair chance of prevailing on the merits of its Title IX claims.

ii

If Title IX authorized FAU's disparate-impact theories, I would conclude that FAU is not likely to prevail on the merits of its disparate-impact claims because it has not shown the challenged bylaw resulted in the ineffective accommodation of its members' interests and abilities or the unequal treatment of its members. Under the regulation and cases applying it, effective-accommodation and equal-treatment claims are adjudicated by reference to numerous fact-intensive considerations. FAU does not engage with these considerations in asking for a preliminary injunction. Its position is that one transgender athlete's participation in Minnesota high school softball is enough. As I understand it, the law requires more.

Before turning to this analysis, a prefatory explanation is in order. The analysis of these issues at this stage assumes that "sex" as the term is used in Title IX means "biological" sex—that is, "'[e]ither of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions,'" and "[t]he cluster of sex-linked traits—i.e., chromosomal, gonadal, endocrinological (hormonal), and phenotype characteristics—commonly used to establish and denote sex." Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination*

*Rule*, 27 Duke J. of Gender L. & Pol'y 69, 75 (2020) (quoting *sex*, Am. Heritage Dictionary of the Eng. Language (5th ed. 2020)).  Reasonable people can disagree about the meaning of the term "sex" in Title IX.  But there is ample support for at least assuming "sex" refers to "biological" sex.  *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning at the time Congress enacted the statute." (citation modified)); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (finding that, in 1972, "the overwhelming majority of dictionaries defin[ed] 'sex' on the basis of biology and reproductive function" and collecting contemporary dictionary definitions of "sex"); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530 (E.D. Ky. 2024) (same), *appeal dismissed sub nom. Tennessee v. McMahon*, No. 24-5588, 2025 WL 848197 (6th Cir. Mar. 18, 2025); *Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 941 (E.D. Mo. 2024) ("At the time Title IX was enacted in 1972, the term 'sex' was understood to mean the biological distinctions between males and females.").

Several important conclusions follow from a close examination of just the Title IX athletics regulation's text.  (1) The regulation's general rule forbids a funding recipient from providing athletics separately based on sex.  34 C.F.R. § 106.41(a).  In other words, as the agency understands Title IX, the statute does not require a funding recipient to operate or sponsor separate athletic teams based on sex.  The Sixth Circuit agrees with this understanding.  *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024).  It explained: "Basically, the regulations permit, but do not require, aid recipients to

organize their athletic programs and facilities by biological sex. Schools could, for example, choose coeducational teams and facilities. It follows that they could also separate programs and facilities by gender identity." *Id.*[17] (2) Though a recipient may choose under the regulation to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), the regulation does not require a recipient who goes that route to maintain sex-separation across every team or sport. In other words, the regulation allows a hypothetical recipient that operates or sponsors sex-separated track-and-field teams to simultaneously offer a mixed-sex golf team.[18] (3) Regardless of how a recipient chooses to organize its athletics program, it must "effectively accommodate the interests and abilities of members of both sexes" and "provide equal athletic opportunity for members of both sexes." *Id.* § 106.41(c), (c)(1). Whether a recipient meets these requirements is determined by applying many fact-bound considerations. *Id.* § 106.41(c)(1)–(10). And the regulation applies these factors to recipients that sponsor only mixed-sex teams (just as it applies them to recipients that sponsor single-sex teams) to determine whether the recipient affords its student-athletes effective accommodation

---

[17]    For this reason, FAU's argument that the challenged bylaw alone violates Title IX's text is not persuasive. *See* ECF No. 7 at 23–29; ECF No. 112 at 30–33. FAU cites no authority supporting the conclusion that the regulation is at odds with the statute.

[18]    The regulation requires a recipient that "operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex" to allow "members of the excluded sex . . . to try-out for the team offered unless the sport involved is a contact sport." 34 C.F.R. § 106.41(b). This requirement applies only when "athletic opportunities for members of [the excluded sex] have previously been limited." *Id.* No party suggests this requirement is relevant here.

and equal treatment. Based on that content and structure, the regulation cannot reasonably be understood to say that requiring female athletes to compete against male athletes—or more specifically, a girls' team to compete against a mixed-sex team—amounts to a per se Title IX violation. Of course, it may in a particular case, but answering that question requires a robust factual record that enables careful consideration of the factors listed in the regulation, "among other[s]." *Id.* § 106.41(c).

FAU's "effective accommodation" and "equal treatment" claims derive from the regulation's subsection (c). The "effective accommodation" requirement appears in the first listed factor. 34 C.F.R. § 106.41(c)(1). The remaining nine factors "among other[s]," are applied to answer whether a recipient is complying with the "equal treatment" requirement. *Portz*, 16 F.4th at 580. "Effective accommodation claims . . . concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Mansourian*, 602 F.3d at 965.

HEW and its successor, the Department of Education ("DOE"), *see Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993), published several policy interpretations to clarify how the regulation should be applied. *See, e.g.*, 44 Fed. Reg. at 71,413–71,419. The 1979 policy interpretation provides guidance regarding how to determine compliance with § 106.41, and the Eighth Circuit and other courts have consistently relied on the document for that purpose. *See, e.g.*, *Portz*, 16 F.4th at 581; *Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 785–86, 787–88 (8th Cir. 2021); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1047 (8th Cir. 2002) ("We conclude . . . that the policy interpretation constitutes a

reasonable and considered interpretation of the regulation." (citation modified)); *Cohen*, 991 F.2d at 896–97 ("Because this document is a considered interpretation of the regulation, we cede it substantial deference.").   Though the policy interpretation "is designed specifically for intercollegiate athletics," "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by [§ 106.41]."  44 Fed. Reg. at 71,413.[19]

For effective-accommodation claims, the policy interpretation explains that compliance is assessed by examining three distinct issues: "(a) 'determination of athletic interests and abilities of students'; (b) 'selection of sports offered'; and (c) 'levels of competition available including the opportunity for team competition.'" *Berndsen*, 7 F.4th at 785 (quoting 44 Fed. Reg. at 71,417–18).  "[T]o correspond to those three issues, the agency sets forth three separate 'Application of the Policy' provisions: (1) Section VII.C.3 ('Determination of Athletic Interests and Abilities' provision); (2) Section VII.C.4 ('Selection of Sports' provision); and (3) Section VII.C.5 ('Levels of Competition'

---

[19]    No party argues that *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) undermines the 1979 policy interpretation's persuasive value.  This makes sense.  Whether to credit an agency's interpretation of a statute—the issue addressed in *Loper Bright*—is a different issue from whether to credit an agency's interpretation of its regulation.  *See United States v. Kukoyi*, 126 F.4th 806, 817 (2d Cir. 2025) (Menashi, J., concurring in part) ("*Loper Bright* said nothing about deference to an agency interpretation of a regulation."); *Niblock v. Univ. of Ky.*, No. CV 5:19-394-KKC, 2024 WL 4891025, at *4 (E.D. Ky. Oct. 28, 2024) (noting "*Loper Bright* applies when a plaintiff challenges an agency regulation interpreting a statute" and "*Kisor* [*v. Wilkie*, 588 U.S. 558 (2019)] governs" agency interpretation of a regulation"); *see also Myers v. Stephen F. Austin State Univ.*, No. 9:25-CV-00187, 2025 WL 2254006, at *5 (E.D. Tex. Aug. 1, 2025) ("Since *Kisor*, many courts have continued interpreting § 106.41(c) under the DOE's 1979 Policy Interpretation and/or the 1996 Clarification Letter." (collecting cases)).

provision)." *Id.* "Each of those separate provisions addresses *different* ways the agency will assess compliance." *Id.* The policy interpretation also includes an "Overall Determination of Compliance" provision in Section VII.C.6 that "encompasses all three of Section VII.C's 'Application of the Policy' provisions." *Id.* at 786.

The "Determination of Athletic Interests and Abilities" application provision addresses the methods by which "[i]nstitutions may determine the athletic interests and abilities of students." 44 Fed. Reg. at 71,417.

The "Selection of Sports" provision addresses sports options that must be made available to members of both sexes. The policy interpretation says that funding recipients are not required "to integrate their teams [or] to provide exactly the same choice of sports to men and women." *Id.* at 71,417–18. "However, where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex." *Id.* at 71,418.

The "Levels of Competition" provision says that "institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities." *Id.* Compliance with this provision's "participation-opportunity" component is assessed using the following three-part test:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

51

> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.*; *see Berndsen*, 7 F.4th at 786. Subsequent agency guidance clarified that "institutions need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities." *Berndsen*, 7 F.4th at 787 (quoting U.S. Dep't of Educ., Off. of C.R., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996)). Compliance with the "competitive-schedule" component of the Levels of Competition provision is assessed by considering:

> (1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or
>
> (2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

44 Fed. Reg. at 71,418; *Berndsen*, 7 F.4th at 786.

Finally, the "Overall Determination of Compliance" provision explains that compliance is assessed in the following ways:

> a. Whether the policies of an institution are discriminatory in language or effect; or
>
> b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or
>
> c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

44 Fed. Reg. at 71,418. The Eighth Circuit has made clear that a district court must consider all these tests to determine whether a funding recipient provides effective accommodation. *Berndsen,* 7 F.4th at 787 ("Our precedent directs us to give controlling deference to the entire 1979 Interpretation, not just the three-part test in Section VII.C.5.a.").

For equal-treatment claims, as noted earlier, factors (2) through (10) in the regulation's subpart (c), "among other[s]," are applied to answer whether a recipient is complying. *Portz,* 16 F.4th at 580. The 1979 policy interpretation identifies tests for each of the subpart (c) factors and provides equal-treatment-related tests for the "Recruitment of Student Athletes" and the "Provision of Support Services." 44 Fed. Reg. at 71,415–17. Relevant here, regarding the "[s]cheduling of games and practice times," 34 C.F.R. § 104.61(c)(3), the policy interpretation provides:

> Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The number of competitive events per sport;

(2) The number and length of practice opportunities;

(3) The time of day competitive events are scheduled;

(4) The time of day practice opportunities are scheduled; and

(5) The opportunities to engage in available pre-season and post-season competition.

44 Fed. Reg. at 71,416.  The policy statement's overall-compliance test is also used to determine "if an institution is . . . providing equitable treatment and benefits to its athletes."  *Portz*, 16 F.4th at 581.  The policy statement makes clear that "[i]nstitutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect."  44 Fed. Reg. at 71,415.  "[I]dentical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible."  *Id.*

Cases inform the application of the relevant subsection (c) factors and the policy interpretation's corresponding guidance.  "[I]n evaluating a program's distribution of treatment and benefits, a court may find a program-wide violation (global) when 'substantial and unjustified' disparities exist."  *Portz*, 16 F.4th at 581.  However, "[t]he [regulation's] text also allows a court to find a violation where disparities in 'individual segments of the program' (i.e., a specific [factor listed in § 106.41(c)(2)–(10)]) 'are substantial enough in and of themselves' to deny 'equality of athletic opportunities.'"  *Id.* at 581–82 (first citing *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 919–20 (7th Cir. 2012); then citing *McCormick,* 370 F.3d at 292–93).  Institutions "have

considerable flexibility in complying with Title IX." *McCormick*, 370 F.3d at 293; *see also Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) ("Title IX mandates [discretion] be given recipient schools to determine how best to provide equal athletic opportunity."). But the "governing principle is that male and female athletes should receive equivalent treatment, benefits, and opportunities." 44 Fed. Reg. at 71,414. As the Second Circuit pointed out in *McCormick*,

> a disparity in one program component (i.e., scheduling of games and practice time) can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school. Under the Policy Interpretation, a disparity is a difference, on the basis of sex, in benefits, treatment, services, or opportunities that has a negative impact on athletes of one sex when compared with benefits, treatment, services, or opportunities available to athletes of the other sex. A disparity does not mean that benefits, treatment, services, or opportunities are merely different.

370 F.3d at 293; *see also Parker*, 667 F.3d at 922 (7th Cir. 2012) ("[W]e must first determine whether a difference in scheduling has a negative impact on one sex, and then determine whether that disparity is substantial enough to deny members equality of athletic opportunity.").

Considered against this extensive body of law, FAU has not shown it has a fair chance of prevailing on its effective-accommodation and equal-treatment claims. There are two basic problems. First, FAU's liability theory is at odds with the Title IX athletics regulation's text. To recap, the regulation makes mixed-sex athletic teams the default. It does not forbid a recipient that sponsors single-sex teams from also sponsoring mixed-sex

55

teams. And it cannot reasonably be understood to say that a mixed-sex team or mixed-sex league per se denies effective accommodation or equal treatment. Under the regulation, whether a mixed-sex league (or some other challenged practice) denies effective accommodation or equal treatment is a fact-bound, situation-specific question. FAU's theory, by contrast, is not. It depends on finding that unequal athletic opportunities exist for FAU's softball-playing members based on one transgender athlete's league participation (authorized under the challenged bylaw) and her top-tier, sex-attributable abilities. With mixed-sex teams as the regulation's default, it is difficult to understand why that might be so. In other words, if the League might lawfully operate or sponsor a mixed-sex athletic league in which many players are male, one highly skilled transgender female's participation in a league defined by "gender identity or expression" does not alone show a likely violation of Title IX's athletics regulation.

Second, FAU did not engage with the applicable legal framework. It did not apply the 1979 policy statement's effective-accommodation guidance to the facts alleged in the Complaint. It did not, for example, address whether Doe's participation adversely impacted female students' participation opportunities. It made no claim that Doe's participation adversely affected the expansion of high school softball or girls' participation levels in the sport. It did not show how Doe's participation resulted in a "substantial and unjustified" disparity. 44 Fed. Reg. at 71,418. Nor did FAU apply the regulation's factors, the policy statement's guidance, or guidance from cases addressing the subject, to its equal-treatment claim. Perhaps FAU might be able to make these connections as the case proceeds. Its failure to do them at this stage means—if Title IX

56

authorized a disparate-impact theory—FAU would remain unlikely to prevail on the merits.[20]

b

One other merits-related issue deserves mention. Defendants argue FAU's claims against them fail because "they lacked clear notice that Title IX requires the exclusion of transgender girls from girls' sports." ECF No. 83 at 39. Though not necessary, it would make judicial-administrative sense to answer this question, either as a backstop (to the risk I erred in finding that FAU is not likely to prevail on the merits of its claims) or to minimize the work potentially associated with a post-appeal remand. For reasons about to be explained, I conclude an answer is not possible on this record.

Start with the basics. Congress enacted Title IX under its Spending Clause powers. *See, e.g.*, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for

---

[20]    FAU argues the bylaw results in unequal treatment because it causes girls to "receive fewer athletic opportunities, diminished benefits, less publicity and honors, and worse treatment" than their biological male counterparts. ECF No. 112 at 36. FAU identifies past adverse consequences to support its claims. But FAU has not shown that Doe's 2026 participation is likely to deprive any FAU member of a roster spot, an honor or award, recognition, or a scholarship. If we assume that Athlete 1's team is likely to lose to Doe's team when they play in May 2026—a speculative proposition—it is difficult to understand how a single loss might show ineffective accommodation or unequal treatment.

federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Pennhurst*, 451 U.S. at 16–17); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("[T]o be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly." (citation modified)). A state "cannot 'knowingly accept' the deal with the Federal Government unless [it] 'would clearly understand . . . the obligations' that would come along with doing so." *Cummings*, 596 U.S. at 219 (quoting *Arlington*, 548 U.S. at 296). Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. In other words, Congress must provide "clear notice" of the requirements under Spending Clause legislation. *Arlington*, 548 U.S. at 296.

Without citing applicable authority, FAU argues the "clear notice" requirement does not apply to preliminary prospective relief. ECF No. 112 at 41. I don't think that's right. As the Ninth Circuit recently pointed out, *Pennhurst*—the seminal case on the issue—involved injunctive relief. *Roe v. Critchfield*, 137 F.4th 912, 930 (9th Cir. 2025).[21] In *Pennhurst*, the Supreme Court applied the clear-notice requirement to the Developmentally Disabled Assistance and Bill of Rights Act of 1975 ("DDA"), and in doing so held that states were not required to bear the costs of providing certain services

---

[21] Though the *Pennhurst* plaintiffs sought both money damages and injunctive relief, only the grant of injunctive relief was at issue on appeal. *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 90 n.4 (3d Cir. 1979), ("The court entered judgment in favor of the defendants on the claim for money damages, and no appeal has been taken from that determination."), *rev'd*, 451 U.S. 1 (1981).

to disabled individuals.  451 U.S. at 24–25.  In that case, the district court had held that

the DDA required Pennsylvania to provide "community living arrangements," and

"individual treatment plans" for all 1,200 residents at the Pennsylvania owned-and-

operated Pennhurst institution.  *Id.* at 5, 8–9.  The district court entered an injunction

requiring that "suitable 'community living arrangements' be provided for all Pennhurst

residents" and that Pennhurst be closed.  *Id.* at 8.  In substantially affirming the district

court's order, the Third Circuit based its ruling on a "bill of rights" provision in the DDA,

which the circuit court found to "grant to" mentally disabled people "a right to

'appropriate treatment, services, and habilitation' in 'the setting that is least restrictive of

. . . personal liberty.'"  *Id.* at 8.  However, rather than requiring Pennhurst to be closed,

the Third Circuit remanded the case to the district court for "individual determinations"

as to whether an "improved Pennhurst" would be appropriate for each patient.  *Id.* at 9.

The Supreme Court disagreed that the "bill of rights" provision of the DDA created

substantive rights.  *Id.* at 18–19.  Specifically, the Court found nothing "to suggest that

Congress intended to require the States to assume the high cost of providing 'appropriate

treatment' in the 'least restrictive environment' to their mentally [disabled] citizens."  *Id.*

at 18.  In so holding, the Court stated:

> Our conclusion is . . . buttressed by the rule of statutory
> construction established above, that Congress must express
> clearly its intent to impose conditions on the grant of federal
> funds so that the States can knowingly decide whether or not
> to accept those funds.  That canon applies with greatest force
> where, as here, a State's potential obligations under the Act
> are largely indeterminate.  It is difficult to know what is meant
> by providing "appropriate treatment" in the "least restrictive"
> setting, and it is unlikely that a State would have accepted

> federal funds had it known it would be bound to provide such treatment. The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice. In this case, Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with § 6010. Not only does § 6010 lack conditional language, but it strains credulity to argue that participating States should have known of their "obligations" under § 6010 when the Secretary of HHS, the governmental agency responsible for the administration of the Act and the agency with which the participating States have the most contact, has never understood § 6010 to impose conditions on participating States. Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or "retroactive" conditions.

*Id.* at 24–25.

The Supreme Court applied these principles in *Arlington*. 548 U.S. 291. And *Arlington* did not address money damages. It addressed whether the Individuals with Disabilities Education Act's ("IDEA") cost-shifting provision required states to cover expert expenses for parents who prevail in an IDEA action. *Id.* at 293–94. The Court began its analysis by declaring its "resolution of the question presented" was "guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause." *Id.* at 295. The Court explained:

> [W]e must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds. We must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees. In other words, we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case.

60

*Id.* at 296.  The Court held that "the terms of the IDEA fail to provide the clear notice that would be needed to attach such a condition to a State's receipt of IDEA funds."  *Id.* at 300.

In *School District of the City of Pontiac v. Secretary of the U.S. Department of Education*, the Sixth Circuit considered whether the No Child Left Behind Act ("NCLB") required recipient states to spend their own resources on NCLB-required programming. 584 F.3d 253, 259 (6th Cir. 2009).  As with *Pennhurst* and *Arlington*, *Pontiac* did not involve money damages.  Rather, the case was brought by "school districts and education associations . . . that receive federal funding under the NCLB in exchange for complying with the Act's various" requirements.  *Id.* at 256.  The plaintiffs sought only a declaration that "they need not comply with the Act's requirements where doing so would result in increased costs of compliance not covered by federal funds."  *Id.*  The Sixth Circuit applied the rules of *Pennhurst* and *Arlington* to answer whether the NCLB provided "clear notice" to the recipient-states that they would be required to cover the costs of complying with the terms of the NCLB where federal funding fell short.  *Id.* at 271–72 ("[T]he only relevant question is whether the Act provides *clear notice to the States* of their obligation." (citing *Arlington*, 548 U.S. at 296)).

In *Osseo Area Schs., Indep. Sch. Dist. No. 279 v. M.N.B. ex rel. J.B.*, the Eighth Circuit addressed whether the IDEA required a Minnesota school district to reimburse mileage expenses for transportation between a student's home and the school district where her parents elected to enroll her through an open enrollment process.  970 F.3d 917,

920 (8th Cir. 2020).  The district court affirmed an administrative law judge's grant of both past and future mileage costs.  *See Osseo Area Schs.*, 344 F. Supp. 3d 1040, 1046 (D. Minn. 2018), *rev'd*, 970 F.3d 917 (8th Cir. 2020); Complaint Exhibit 2, *Osseo Area Schools* (No. 17-cv-2068), ECF No. 1-2 at 3.  The Eighth Circuit reversed.  It applied the clear-notice rule to its IDEA interpretation, and it did so without differentiating between past and future costs.  *See generally Osseo Area Schs.*, 970 F.3d 917.

Against this backdrop, I conclude the Spending Clause's clear-notice requirement may apply to a case in which injunctive relief is sought if the relief would impose a fiscal obligation stemming from compliance.  The problem here is that the record is too thin to say whether the relief FAU seeks would require that kind of obligation.  Defendants' expert Dr. Goepferd suggested FAU's requested injunction would implicate the need for expensive testing to prove students' sex assigned at birth.  *See* ECF No. 70 ¶ 68 ("More recent anti-transgender legislation focused on restricting transgender athletes' participation in sports aligned with their gender identity have asked for a range of invasive and expense [sic] 'testing' or methods of 'confirmation' to determine if an athlete is allowed to compete as female."); *see also id.* ¶ 69 ("The idea of 'confirmatory' tests or exams raises several ethical concerns from a medical perspective. Who should be subject to this invasive and expensive testing?").  But Dr. Goepferd provided no information showing the cost associate with the testing they described.  FAU's expert, Dr. Brown, discussed testing in his rebuttal declaration.  *See* ECF No. 117 ¶¶ 52–53.  Dr. Brown testified that at least one type of test "is no more expensive than the commonly used Non-Invasive Prenatal Test."  *Id.* ¶ 53.  Again, however, neither Dr. Brown nor FAU

provided information regarding the expense associated with this test.  The parties also disputed the question as part of their advocacy.  FAU argued "[t]he pre-participation medical clearance form" the League has available "is sufficient to determine sex-based eligibility."  ECF No. 112 at 13.  At the hearing, however, Defendants rejected that idea that that form would be sufficient, and instead argued "prohibitively expensive" testing would be required.  ECF No. 129 at 77–78.

On this record, a decision about whether injunctive relief would fiscally burden any Defendant would seem speculative, meaning the party who had the burden of proof (to show the absence or presence of a fiscal burden) would lose.  But the parties have not cited, and I have not identified, authority answering that question.  In view of the absence of a factual record and law answering the burden question, it seems wiser just to leave the question for another day.

## B

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "To show irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'"  *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)).  A plaintiff must show "the harm is 'not merely a possibility' but is likely to occur absent preliminary injunctive relief."  *Id.* (quoting *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665

(8th Cir. 2022)). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a 'clear showing of immediate irreparable injury.'" *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (quoting *Internet Inc. v. Tensar Polytechnologies, Inc.*, No. 05-cv-317 (RHK/AJB), 2005 WL 2453170, at *5 (D. Minn. Oct. 3, 2005)). "Speculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (citation omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted); *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

FAU argues its members will lose athletic opportunities without a preliminary injunction. ECF No. 7 at 36–37. Courts have held that students who are denied the opportunity to participate in school-sponsored sports suffer irreparable harm. *See Ng*, 64 F.4th at 997; *D.M. ex rel. Bao Xiong*, 917 F.3d 994 at 1003; *see also, e.g.*, *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 (M.D. Pa. 2022) (noting "courts' longstanding finding that lost opportunity in the context of student athletics can be considered irreparable harm"); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 597 (N.D. W. Va. 2023) (collecting cases). FAU's members are not at risk of losing their ability to participate, a fact FAU acknowledges. *See* Compl. ¶ 150 ("The cycle will repeat itself next season," as Doe and Athletes 1, 2, and 3 "are all sophomores or juniors."). FAU's assertions that Doe's participation harms FAU's members by taking "accolades"

and "playing time" from them, *see* ECF No. 7 at 9, 26, are not supported.  As noted earlier, FAU has not shown that Doe's 2026 participation is likely to deprive any FAU member of a roster spot, an honor or award, recognition, a scholarship, or any other similar benefit. Against these facts—and considering that FAU has not shown it is likely to prevail on the merits—the added challenges associated with competing against Doe do not show injunction-worthy irreparable harm.

## C

The final two factors to consider are the balance of the relative harms and the public interest.  The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued."  *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015). For practical purposes, the public interest and balance of harm factors "merge" when a plaintiff seeks injunctive relief against the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Angelica C. v. Immigr. & Customs Enf't*, No. 20-cv-913 (NEB/ECW), 2020 WL 3441461, at *17 (D. Minn. June 5, 2020), *R. & R. adopted*, 2020 WL 3429945 (D. Minn. June 23, 2020).  These factors weigh against issuing the requested injunction. Though the absence of a preliminary injunction would not prevent FAU's members from playing softball next season, the presence of a preliminary injunction would prevent Doe from doing so.  *See S.J.W. ex rel. Wilson*, 696 F.3d at 779 (noting the interests of non-party "students" are "important").  And it is difficult to imagine how the public interest might be assessed without weighing the policy interests implicated by the challenged bylaw.  A federal court can't do that and remain faithful to Article III.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff Female Athletes United's Motion for a Preliminary Injunction [ECF No. 6] is **DENIED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 19, 2025                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court