# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **Female Athletes United,**<br><br>Plaintiff,<br><br>v.<br><br>**Keith Ellison**, in his official capacity as Attorney General of Minnesota; **Rebecca Lucero**, in her official capacity as Commissioner of the Minnesota Commission on Civil Rights; **Erich Martens**, in his official capacity as Executive Director of the Minnesota State High School League; **Willie Jett**, in his official capacity as the Minnesota Commissioner of Education; **Independent School District No. 11 School Board**,<br><br>Defendants. | Case No. 0:25-cv-02151-ECT-DLM<br><br>**Verified Amended Complaint** |

## Introduction

1.     Plaintiff Female Athletes United ("FAU") is an organization that advocates for fairness, safety, and equal opportunity for women and girls in sports. FAU has members across the country, including female athletes who are playing high-school sports in Minnesota.

2.     For decades, Minnesota provided a level playing field in sports by intentionally maintaining a designated category for female sports and allowing either males or females to try out for "boys'" sports.

3.     Then, Minnesota intentionally adopted and maintained a policy that removed the protection for female sports, and with it the level playing field for female athletes.

4.     Under this modified policy, male students can compete in girls' sports if they claim a female gender identity. This policy intentionally discriminates against female athletes. It intentionally treats female athletes differently and knowingly deprives them of a safe and level playing field, while allowing male athletes to continue to compete fairly and safely.

5.     Because of this policy, though Minnesota still purports to provide "girls'" sports, there are no sports actually reserved for females. As a result, boys are displacing and defeating girls in competitive sports.

6.      Defendants are aware of this. They know that FAU members and other girls in high school softball are harmed by losing games, opportunities to advance, and visibility to a mixed-sex team.

7.      Minnesota's policy expands opportunities for male athletes to compete and experience victory at the expense of female athletes. This discriminates against and denies Minnesota's female athletes the benefits of their high-school sports. Female athletes experience fewer opportunities to fairly and safely compete, play, win, advance, and receive recognition in their own high-school sports. And these female athletes also suffer the mental burden of knowing that their rights are secondary.

8.      By sacrificing protection and opportunity for female athletes, in the name of gender ideology, Minnesota discriminates against female athletes, intentionally violating their rights under Title IX by failing to treat girls equally and by failing to provide them with competitive opportunities that account for the physiological differences between males and females. This subverts the purpose and requirements of Title IX by subordinating the rights and opportunities of females.

9.      This policy choice is no accident. Minnesota itself maintained a protected category for female-only sports because of the physical differences between males and females and the harm to women from mixed-sex

competition. It intentionally chose to remove that protection and admit boys to girls' sports, knowing the harm that would occur.

10. Many voices warned Minnesota of the discriminatory harm to female athletes before it opened girls' sports up to boys, and Minnesota deliberately disregarded them. Since then, parents, athletes, scientists, and even the federal government have tried to warn Minnesota that it's hurting girls and prioritizing boys. But instead of listening, Minnesota has repeatedly doubled down on its discriminatory policy. That's intentional discrimination, and it violates Title IX.

## Jurisdiction and Venue

11. This action, pursuant to Title IX, 20 U.S.C. § 1681, et seq. and its interpreting regulations, raises federal questions and seeks redress for deprivation of rights protected by federal law.

12. This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

13. This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief

under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; (3) nominal damages; and (4) costs and attorneys' fees under 42 U.S.C. § 1988.

14. Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the District of Minnesota; the effects of the challenged laws are felt here; Defendants can and do perform official duties here; and Defendants reside here.

## Plaintiff

15. Plaintiff Female Athletes United ("FAU") is a nonprofit corporation organized under the laws of Texas.

16. FAU is a membership organization formed for the purpose of defending women's and girls' sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field. FAU promotes girls' and women's right not to compete against biological males who identify as females on girls' and women's sports teams.

17. FAU is a coalition of current and former female athletes and anyone, whether male or female, who wants to ensure women's sports remain a place for only women and girls.

18. FAU has members in states across the country, including Minnesota.

19.     Some FAU members participate on their girls' and women's sports teams at schools governed by Title IX, including public schools in Minnesota. These members compete on female teams at their schools and desire the benefits of competing against only women and girls in athletic competitions. And some members attend or compete against schools with classmates who identify as transgender or non-binary.

*Athlete 1*

20.     Athlete 1 is a 17-year-old female and resident of ▮▮▮▮▮ ▮▮▮▮ Minnesota.

21.     She is a member of FAU.

22.     In the fall, she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23.     Athlete 1 just completed her senior year at ▮▮▮▮▮▮▮▮ High School.

24.     ▮▮▮▮▮▮▮▮▮ High School is a public school governed by the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is a recipient of federal funding.

25.     ▮▮▮▮▮▮▮▮▮ High School is a member of the MSHSL.

26.     Athlete 1 competed on the ▮▮▮ basketball team and ▮▮▮ softball team at ▮▮▮▮▮▮.

6

27.     Softball is Athlete 1's main sport; she has been playing since she was 8 and practiced nearly year-round during high school.

28.     On multiple occasions, Athlete 1 has competed in ▇▇▇ softball against a male athlete (Athlete Doe), who attended a school and competed for that school's girls' softball team in the same section as Athlete 1's team.

29.     During her freshman year, Athlete 1 competed on the ▇▇▇ ▇▇▇ softball team. As a freshman on the team, Athlete 1 competed against a team with Athlete Doe. Athlete Doe pitched during the game, and Athlete 1 ▇▇▇▇▇▇▇▇▇▇▇▇. Athlete 1's team lost that game.

30.     During 2024, Athlete 1's sophomore year, she was on ▇▇▇ and competed against Athlete Doe's team once during the regular season and once in the post-season. Athlete 1's team lost both games.

31.     During the regular season game that year, Athlete 1's team lost ▇. The game ▇▇▇▇▇▇▇▇, and the male athlete pitched all ▇▇ ▇▇▇, only giving up ▇ runs, with ▇ strikeouts and ▇ hits.

32.     In the tournament game that season, Athlete 1's team lost ▇ with Athlete Doe pitching all seven innings and giving up only ▇ earned runs and ▇ hits. Athlete 1 batted only once in this game and ▇▇▇▇ ▇▇▇▇▇. This loss ended the season for Athlete 1.

33.     During her junior year, Athlete 1's ▮▮▮▮ team again competed against and lost to Doe's team in a regular season game and during the sectional tournament.

34.     In the regular season game, Athlete 1's team ▮▮▮▮▮▮▮ and Doe pitched ▮▮▮▮▮▮▮▮, allowing only ▮ hit and striking out ▮▮ batters.

35.     Later in her junior year, Athlete 1's team competed against Doe's team at the sectional tournament.

36.     Doe pitched the entire game. Athlete 1's team lost ▮▮. Doe threw ▮ strikeouts and allowed only ▮ hits in ▮ at bats.

37.     Losing this game meant that Athlete 1's team did not advance in the sectional tournament to compete for a chance to go to state. Only one team per section goes to the state tournament.

38.     Athlete Doe's team took the spot that advanced from the section to state, where the Doe's team ▮▮▮▮▮▮▮.

39.     Athlete 1 felt uncomfortable being up to bat when a male was pitching in a competitive game. She thinks it is unsafe, unfair, and demoralizing to compete against a male. During the games where she faced Athlete Doe, she experienced an emotional toll impacting her mentality during the game, because she knew she was not competing on a level playing field.

40.     Athlete 1 believes that her team unfairly lost the following games and that the records should be changed to reflect a win for ████████ High School:

41.     The ████████ game between ██████████████████ ██ on ████████.

42.     The ████ game between ████████████████████ on ████████.

43.     The ████ sectionals game between ██████████████ ██ on ████████.

44.     The ████ game between ████████████████ on ████████.

45.     The ████ sectionals game between ██████████████ ██ on ████████.

*Athlete 4*

46.     Athlete 4 is a rising senior at ████ High School, where she competes on the ████ softball team and plays pitcher, outfield, and short stop.

47.     ████ High School is a public school governed by the ████████████████████ School Board, which receives federal funding. It is an MSHSL member school.

48.    Athlete 4 is a member of Female Athletes United.

49.    As a sophomore, Athlete 4's team went to the state softball tournament. Athlete 4 received ███████████████████████████████ ██████████ .

50.    During the first game of the tournament, her team played Athlete Doe's team. Athlete Doe pitched the entire game. Athlete Doe also had a ████████████████████████ during this game.

████ Athlete 4's team lost ████ . Her team ████████████████████████ , ████████████████████████████████████████████████████ ████ .

52.    Because her team lost this game, it was knocked out of the state tournament championship. This was crushing because she had dedicated so much time and energy, and she felt like her team lost before the game even started.

53.    Athlete 4 believes it was unfair for her team to face a male athlete in the state tournament. Athlete 4 was discouraged because she felt like she did not have an equal chance at victory in the state tournament before she even set foot on the field.

54.    Athletes 4 believes that her team unfairly lost the state tournament quarterfinal on ████████████ to ██████████████ . Athlete 4

10

believes that the records should be corrected to reflect a win for ▮▮▮ High School.

*Athletes 2 and 3*

55.   In addition to Athletes 1 and 4, who directly lost regular and post-season games to Doe's team, other FAU members were affected by policies allowing the participation of male athletes in girls' sports.

56.   Athlete 2 is an 18-year-old female who resides in ▮▮▮ County, Minnesota.

57.   Athlete 2 is a member of Female Athletes United.

58.   She just completed her senior year at ▮▮▮ High School in ▮▮▮ County, Minnesota, where she played softball on the girls' ▮▮▮ team. ▮▮▮ High School is a member school of the MSHSL.

59.   Athlete 2 was awarded ▮▮▮. In the fall, Athlete 2 will ▮▮▮.

60.   During her sophomore year of high school, Athlete 2 was on the same club team as Athlete Doe outside of the school softball season. That year, Athlete 2 was one of the team's best pitchers. In Athlete 2's junior year, she made the club team but was told she would have to compete against Athlete Doe for pitching time and would no longer be the team's main pitcher.

61. At first, Athlete 2 agreed to be on the team. At the time, Athlete 2 did not realize that Athlete Doe was male. But after her parents told her, she was upset and decided to no longer play for the club team.

62. Athlete 2 is the top pitcher on her high school varsity softball team.

63. As a junior, her team competed against Athlete Doe's team in the pre-season. Girls on Athlete 2's team expressed discomfort to the coach about facing a male pitcher. Because of this, the coaches agreed to not have Athlete Doe pitch on the condition that Athlete 2, as the top pitcher for her team, also not pitch. During that game, a freshman pitched instead.

████ Her junior season, Athlete 2's team made it to the state tournament. Athlete Doe's team also advanced to state and ███████████ ████████.

65. As a competitive pitcher, Athlete 2 believes that she has been harmed by male athletes being allowed to compete on girls' teams in Minnesota. Because of the Policy, Athlete 2 had to vie with a male athlete for the attention of recruiters.

*Athlete 3*

66. Athlete 3 is a 17-year-old female resident of ████ County, Minnesota.

67. She is a member of Female Athletes United.

68.    Athlete 3 is a rising senior at ████████ High School, a public high school in ████████ County, Minnesota. She plays ████ softball and ████ basketball for her high school.

69.    Athlete 3 plays utility and catcher for the ████████ girls' ████ softball team.

70.    As a sophomore, she received an ████████████████████████ player award.

71.    During a pre-season game in Athlete 3's sophomore year, her team played the team with Athlete Doe. Athlete Doe hit ████████████ ████, which critically impacted the result of the game. Athlete 3's team lost. Athlete 2 played on the same team as Athlete 3 during this game.

72.    Athlete 3 also plays club softball.

████    When playing club softball, Athlete 3 was ████████████ by the male athlete competing in girls' softball. Athlete 3 had never experienced pain like this when getting ████████ on other occasions. The ████████████████████████████████████████████ ████████████████████.

74.    Athlete 3's team advanced to the state tournament her sophomore year, as did Doe's team. Athlete Doe's team ████████ ████████████████████████.

75.    It was demoralizing and mentally harmful to Athlete 3 to know that her team may face a mixed-sex team during the state tournament. This made Athlete 3 discouraged knowing that her team would not have a fair chance even if they made it to the final round of the state tournament.

76.    Additionally, Athlete 3 was concerned for her safety knowing she might face a biologically male pitcher. ████████████████████████ ███████████████████████, Athlete 3 was scared to be at bat when this athlete was pitching.

77.    The mental burden of potentially facing a male in the state tournament impacted her experience at the state tournament that year.

78.    Athletes 1 and 2 have participated on a team with Athlete Doe either as part of the same team or as substitutes for the club team Athlete Doe plays on.

79.    At the conclusion of the state tournament in 2025, Athlete Doe was named to the ████████████████, taking a slot for which Athletes 3 and 4 could have competed.

80.    In the 2024 season, Athlete Doe was awarded █████████ ████████. These honors are awarded to a group of players who are ████████████████████████████████████████. That year, Athletes 1, 2, and 3 were all in contention for these honors.

81.    Athletes 1, 2, 3, and 4 all believe that it is unsafe and unfair to play against a male athlete, particularly in softball. Males are on average bigger, stronger, and taller than women. In softball, this translates to a significant advantage in pitching, hitting, and running. Female athletes trying to hit a pitch thrown by a male or catch the ball when hit by a male athlete, are at a significant disadvantage. Additionally, they reasonably fear that they could be injured.

82.    Each of the FAU members identified above has been harmed by competing against biological males in their school sports, regardless of how those male competitors personally identify themselves. These members have suffered unfairness, discouragement, and limits on their ability to enjoy participating in sports including losing games and therefore being unable to advance to critical competitions. This significantly impaired their ability to fully participate, win, and earn awards and recognition in their competitive high-school sports.

83.    The concrete losses in regular and post-season games suffered by Athletes 1 and 4 provide individual standing sufficient to confer associational standing on Female Athletes United. Athletes 2 and 3 have also been harmed by the Policy, but FAU's standing does not hinge on whether Athletes 2 and 3 would individually have standing, since Athletes 1 and 4 are clearly able to meet the standing requirements.

**Defendants**

84.    Defendant Keith Ellison, sued in his official capacity, is the Attorney General of Minnesota.

85.    General Ellison issued a formal legal opinion stating that the Minnesota Human Rights Act (MHRA) prohibits schools from protecting girls' sports by maintaining a designated female category. Minn. Att'y. Gen. Op.1035 at 2 (Feb. 20, 2025), https://perma.cc/3PR9-V9VE.

86.    The Attorney General serves as the attorney for the Minnesota Department of Human Rights. The Commissioner of the Department refers matters alleging violations of the MHRA to the Attorney General for enforcement. Minn. Stat. § 363A.32, subd. 1. The Attorney General has authority on behalf of the Department to seek interim relief during the pendency of a charge. Minn. Stat. § 363A.28, subd. 6(e).

87.    Defendant Rebecca Lucero, sued in her official capacity, is the Commissioner of the Minnesota Department of Human Rights.

88.    The Commissioner may initiate charges of discrimination whenever she "has reason to believe that a person is engaging in an unfair discriminatory practice[.]" Minn. Stat. § 363A.28, subd. 2. And any "person who claims to be aggrieved" by an MHRA violation or any person who believes they have witnessed discrimination that violates the MHRA can file a report of discrimination. Minn. R. 5000.0400, subp. 1b; *Report*

16

*Discrimination*, Minn. Dep't of Human Rights, https://tinyurl.com/3ky9tnsx (last visited May 15, 2025).

89. Minnesota and private organizations have engaged testers to seek out violations of the MHRA. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) ("It has even employed 'testers' to target noncompliant businesses"); Zoë Jackson, *Want to go undercover to test housing discrimination? Legal Aid is seeking Minnesota volunteers*, Star Tribune (April 23, 2023), https://perma.cc/NT7R-ECS5 .

90. The Minnesota Department of Human Rights is tasked with determining "whether or not there is probable cause to credit" alleged violations of the Minnesota Human Rights Act. Minn. Stat. § 363A.28, subd. 5. If the Commissioner of the Department of Human Rights reasonably believes that there was a violation, he or she may file a petition in the district court seeking temporary relief pending the Department's final determination. *Id.* at subd. 6(b)-(e).

91. Erich Martens, sued in his official capacity, is the Executive Director of the Minnesota State High School League (MSHSL).

92. The MSHSL is a voluntary association of high schools with power and duties created by state statute. Minn. Stat. §§ 128C.01, *et seq.*

93. The MSHSL provides extracurricular opportunities, including interscholastic athletic competitions, to its over 500 member schools. *About*, MSHSL, https://www.mshsl.org/about.

94. The MSHSL is considered a state agency under Minnesota law for at least some purposes. *See, e.g.*, Minn. Stat. §§ 128C.15 (making MSHSL a "political subdivision" under some statutes) & 128C.22.

95. By joining the MSHSL, a high school (via its governing board) delegates control over extra-curricular activities, including athletics, to the MSHSL. Minn. Stat. § 128C.01.

96. MSHSL's purposes include to "promote, manage and administer a program of activities for the students of member schools on subsection, section, and state levels in athletics and fine arts" and to "establish uniform and equitable rules for students in extra-curricular activities." *About*, MSHSL, https://www.mshsl.org/about.

97. The MSHSL exercises control over high-school athletics in Minnesota via the delegation from its member schools, the vast majority of which are public schools that receive federal financial assistance and are subject to Title IX.

98. The MSHSL's official policy is to allow students to compete in the girls' category based on their stated gender identity without regard for sex.

99. The MSHSL receives funding via dues paid by high schools, including public schools, that themselves receive federal financial assistance.

100. MSHSL's rules "are promulgated pursuant to a procedure which integrally involves the member school districts[.]" *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973).

101. MSHSL exists to "promote extra-curricular participation in amateur athletics and fine arts while establishing consistent and fair eligibility guidelines for interscholastic contests." *MSHSL History*, MSHSL, https://www.mshsl.org/about/mshsl-history.

102. MSHSL states that its purposes include "establish[ing] uniform and equitable rules" and "elevat[ing] standards of sportsmanship and… encourag[ing] the growth of responsible citizenship among students, member schools and their communities." *About*, MSHSL, https://www.mshsl.org/about.

103. The MSHSL declares that it seeks to offer athletic experiences that offer students "an equal opportunity to participate in all activities offered by their school." *About*, MSHSL, https://www.mshsl.org/about.

104. Willie Jett, sued in his official capacity, is the Minnesota Education Commissioner for the Minnesota Department of Education.

105. The Minnesota Department of Education is authorized to conduct on-site reviews of school districts to assess Title IX compliance.

106. The Minnesota Department of Education also regulates school athletic programs via administrative rules on the designation of teams by sex and athletic opportunities provided to members of each sex.

107. Under the MHRA, the Minnesota Human Rights Commissioner can enlist the services of state departments and agencies, including the Department of Education. Minn. Stat. Ann. § 363A.06, subd. 1(6).

108. Defendant Independent School District No. 11 (ISD 11) School Board is the governing board for public schools located in ▮▮▮▮▮ ▮▮▮▮▮ counties in Minnesota, including ▮▮▮▮▮ High School.

109. The ISD 11 School Board and the schools it governs, including ▮▮▮▮▮ High School, receive federal financial assistance.

110. The ISD 11 School Board and the schools it governs, including ▮▮▮▮▮ High School, are subject to Title IX.

▮▮▮ Under the MSHSL gender eligibility policy, schools determine gender-related eligibility for sports participation. So, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

112. The ISD 11 School Board has delegated control of some aspects of its high-school athletics to the MSHSL.

113. High schools governed by the ISD 11 School Board, including ▮▮▮▮▮ High School, are members of the MSHSL.

114.    High schools governed by the ISD 11 School Board, including

███████████ High School, pay dues to the MSHSL.

115.    Defendant ISD 11 Schools Board provides opportunities for and

subject to the discriminatory policies of the MSHSL.

## Factual Background

### A.    Male Athletic Advantage and Its Recognition in Law and Society

116.    Biological males have, on average, inherent, sex-based

physiological advantages over biological females in the vast majority of

sports.

117.    Even before puberty, boys consistently outperform girls on

average by a measurable degree. After puberty, male advantage vastly

increases due to the wide range of changes that occur during puberty.

118.    Male physiology differs from female in a variety of ways. Male

puberty brings with it stronger bones, greater efficiency in blood

oxygenation, taller height, broader wingspan, and increased lean body mass.

*See* Alison M. McManus & Neil Armstrong, *Physiology of elite young female

athletes,* 56 J. Med. & Sport Scien. 23 (2011), DOI:10.1159/000320626; *The

Role of Testosterone in Athletic Performance*, Duke Ctr. For Sports L. &

Poly's 1 (Jan. 2019), https://perma.cc/J9Z6-E9QY. These attributes translate

to an ability to jump higher, throw farther, run faster, and hit harder. *Role of Testosterone, supra*, at 1.

119.   Male athletes retain many of these performance advantages, including greater strength and lean body mass, even when engaging in testosterone suppression. Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 200, 211 (2021).

120.   Puberty blockers likewise do not erase male advantage. For example, males who take puberty blockers have been found to still achieve the height predicted at birth. Lidewij Sophia Boogers et al., *Transgender girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment*, 107 J. Clinical Endocrinology Metabolism e3805 (2022). This gives them both the benefits of being taller and also of having longer limbs. Likewise, evidence suggest that males who take puberty blockers retain advantages in lean body mass and strength. Silvia Ciancia et al., (2024). *Effects of puberty suppression on bone, body composition, handgrip strength and glucolipid profile in early-pubertal transgender adolescents*, Int'l. J. Transgender Health. https://doi.org/10.1080/26895269.2024.2353224; B. Navabi et al. (2021). *Pubertal Suppression, Bone Mass, and Body Composition in Youth With Gender Dysphoria*, Pediatrics 148: e2020039339.

22

Nor is there evidence that puberty blockers eliminate all other aspects of male advantage, including advantages that predate puberty.

121. These differences are central to softball performance. In pitching, male advantage manifests through throwing faster and farther. Greater wingspan and larger hands provide advantages for grip, allowing increased control in putting spin on the ball. Males also have an advantage in hitting and running—they can hit harder and run faster.

122. Males exhibit great speed, distance, and accuracy in throwing early on. Xiao Liu & Guobing Zhao, *Age and Gender Differences of Motor Skills of the Overarm Throw in Children and Adolescents*, 6 Educ. Rev., U.S.A. 391 (2022) ("Males outperformed females in throwing at all ages on a number of metrics including motion composition, throwing speed, distance, and accuracy.… no historical changes in age or gender differences were observed in developmental level or ball velocity measurements over the past 40 years."). "A pronounced male advantage emerges…around the age of 3 yr, when structural differences across genders are still negligible. The gap is maintained and typically increases throughout development." Antonella Macelli et al., *A whole body characterization of individual strategies, gender differences, and common styles in overarm throwing*, 122 J. Neurophysiology 2486, 2487 (2019), https://doi.org/10.1152/jn.00011.2019. "[A]t 17 years of age,

the average male throws a ball further than 99% of 17-year-old females."

Hilton & Lundberg, *supra*, at 204.

123.   Males also outperform females in batting. A 2021 study found trained male batters in cricket "generated greater maximum bat speeds, ball launch speeds, and ball carry distances than their female counterparts." Stuart A. McErlain-Naylor et al., *Comparing power hitting kinematics between skilled male and female cricket batters*, 39 J. Sports Science 2393, 2398 (2021), https://tinyurl.com/73fmu96c.

124.   From an early age, boys also run faster than girls. A study of 8 and 9-year-old boys and girls found that "data for all ages and distances indicates that the average times for males were 4.8 ± 1.2% faster than the females, and the fastest males were 3.7 ± 2.3% faster than the fastest females" Gregory A. Brown et al., *Sex-based differences in track running distances of 100, 200, 400, 800, and 1500m in the 8 and under and 9–10-year-old age groups*, 24 European J. Sports Science 217, 220 (Feb. 2024).

125.   Science proves, and society and the law have long recognized what the Supreme Court explained in 1996: the "enduring" "[p]hysical differences between men and women[.]" *United States v. Virginia*, 518 U.S. 515, 533 (1996).

126.   Sex-designated sports exist because of genuine physiological differences between men and women, boys and girls. When males compete in

24

girls' sports, these genuine differences raise real safety and fairness issues that are substantiated by significant data illustrating that on average male athletes outperform female athletes of comparable talent and training in nearly every sport.[1]

127. States and organizations across the country and the world have created female-only teams to provide fair competitive opportunities for women and to avoid eliminating women from the ranks of elite athletes. As a *Washington Post* article explained, "To see that this is true, play with a competition results database and look at what happens to female athletes when rankings are combined: by early-to-mid adolescence, female competitors disappear from the upper echelons." Doriane Lambelet Coleman, *Why elite women's sports need to be based on sex, not gender*, Wash. Post (Aug. 16, 2024), https://perma.cc/X3GD-YKJZ.

128. Ignoring the physiological differences between men and women, girls and boys, will allow males to "displace females to a substantial extent." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). The biology-based differences between girls and boys are what justify sex-designated categories. Without protected teams on which girls can compete, equal opportunity for them to participate in athletics is illusory.

---

[1] Konstantinos D. Tambalis et al., *Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method*, 16 Eur. J. Sports Sci. 736, 738, 744 (2016), DOI:10.1080/17461391.2015.1088577 (2016).

Male advantages are such that even "isolated instances of male participation upon girls teams creat[es] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979); *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1306–07 (1980) (Stevens, J., in chambers) ("The answer must depend on whether it is permissible for the defendants to structure their athletic programs by using sex as one criterion for eligibility. If the classification is reasonable in substantially all of its applications, I do not believe that the general rule can be said to be unconstitutional simply because it appears arbitrary in an individual case. It seems to me that there can be little question about the validity of the classification in most of its normal applications. Without a gender–based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events. The defendants' program appears to have been adopted in full compliance with the regulations promulgated by the Department of Health, Education and Welfare.")

129.    And this has been documented as male athletes across the country are winning state titles in girls' athletic competitions. *Soule v. Connecticut Ass'n of Schs.*, 755 F. Supp. 3d 172 (D. Conn. 2024); Amanda Sullender, *East Valley teen is the first Washington transgender athlete to win*

*a state high school track championship. But controversy followed*, The Spokesman-Review (June 2, 2024), https://perma.cc/XVG2-75QG.

130.   The basic physiological differences between males and females have long been recognized and respected by the different standards set for boys and girls in a number of athletic events. For example:

a. The net height used for women's volleyball is more than 7 inches lower than that used for men's volleyball. *Regulation Volleyball Net Heights: A Definitive Guide*, Sports Imports (Dec. 12 2024), https://perma.cc/5RKW-BNDA.

b. The standard weight used in high school shot put is 4 kilograms for girls, and 5.44 kilograms (36% heavier) for boys. *Track & Field Throwing Implements Weight Requirements (Rules)*, Everything Track & Field, https://perma.cc/X5J2-SXEC (last visited May 31, 2026).

c. The hurdle height used for the high school girls 100−meter hurdle event is 33 inches, whereas the standard height used for boys' high school 110−meter hurdle is 39 inches. *Hurdle Heights*, Track Star USA, https://perma.cc/L6ZA-5ULR (last visited May 31, 2026).

d. The standard women's basketball has a circumference of 28 1/2 to 29 inches and a weight of 20 oz, while a standard basketball used in a men's game has a circumference between 29.5−30 inches and a weight of 22 oz. *Basketball Sizes Chart: What Size Ball Should a Player Use?*, Basketball for Coaches, https://perma.cc/9H96-SLT8 (last visited May 31, 2026).

e. Historically, in wrestling, the minimum body fat percentages were 7% for males and 12% for females, but in April 2026, the National Federation of High School Sports raised the percentage for females to 19%, while males' remains at 7%. Natalie Ronshaugen et al., *Adjustment in Minimum Body Fat Percentage for Females Highlights High School Wrestling Rules Changes*, Nat'l Fed'n of State High School Ass'n (April 16, 2026), https://perma.cc/BET3-PFKA?type=image; Natalie Ronshaugen et al., *Rules in Place to Guard Against Weight Cutting in Wrestling*, Nat'l Fed'n of State High School Ass'n (Oct. 5, 2022), https://perma.cc/JB5B-JF8Q?type=image.

f. Baselines in baseball are 90 feet, whereas in softball they are 60 feet. Andrew F. Pecora, *NFHS Softball and Baseball 2016 Rules Differences*, Nat'l Fed'n of State High School Ass'n (Feb. 2, 2016), https://perma.cc/K755-VWLU.

131. The MSHSL created separate teams for boys and girls to account for the physiological advantages male athletes possess and provide girls equal educational opportunity. And acting on behalf of its member schools and districts, the MSHSL has long adopted each of the differing standards above, demonstrating their knowledge and recognition of male physiological athletic advantage. *MSHSL Manual for Athletic Officials 2025-26* at 24, Society of Refs, https://perma.cc/T9TW-7WQT (last visited May 31, 2026) (listing sports where NFHS Standards are adopted unless expressly modified).

132. Further showing their knowledge and recognition of the physiological differences between boys and girls as they relate to athletics, the MSHSL, acting on behalf of its member schools and districts, designates state champions in both the male and female categories, which under the common understanding refers to biological males and females. The MSHSL acting on behalf of its member schools and districts, maintains a database of state records for males and females organized by sport and separated based on the records for each sex: https://www.mshsl.org/tournaments/records. Even

28

a casual review of these records shows boys consistently outperforming girls in comparable events.

### B.    Congress Enacts Title IX to Protect Female Athletes

133.    At the time Title IX was passed in 1972, there was a significant gap in athletic participation between men and women.

134.    Female Athletes United's Secretary Sandra Bucha's story epitomizes the discrepancy of athletic opportunities offered to girls and boys in the school context.

135.    Sandra attended public high school in Illinois from 1968–1972. Sandra was an incredibly talented swimmer, but at this time, there were no competitive sports opportunities offered to women at her school. She brought a lawsuit against the state high school association for the inequality of opportunity.

136.    Though she lost this battle, female athletes won this war. Title IX was passed the same year Sandra's case was decided—opening the door for female athletes to enjoy the opportunities and benefits that come from being part of a competitive sports team.

137.    The physiological differences between boys and girls in athletics were at the forefront of the legislative debate on Title IX. Indeed, Dr. Bernice Sandler, often called the Godmother of Title IX, testified to Congress that co-ed athletic programs could not offer the true equality of opportunity and

competition to female athletes that Title IX mandates. *Hearings Before the Subcommittee on Postsecondary Educ. of the Comm. on Educ. & Labor*, H.R. at 343 (June 1975) ("Hearings on Postsecondary Educ.") (statement of Dr. Bernice Sandler), https://bit.ly/39rvo2H (Co-ed athletic programs will "effectively eliminate opportunities for women to participate in organized competitive athletics.").

138. In the wake of Title IX's passing, schools across the country created girls-only teams to comply with Title IX and provide women equal athletic opportunities.

139. The purpose behind having designated teams for girls is to provide female athletes the opportunity to participate in and enjoy the benefits of sports without being disadvantaged because of their sex.

140. Men and women are not similarly situated when it comes to sports. Females have an overall athletic disadvantage that schools must account for to comply with the equal-opportunity guarantee of Title IX.

141. Schools across the country instituted female-designated teams after Title IX to ensure female athletes can participate in and enjoy the benefits of sports without discrimination.

142. Male-designated teams are not necessary to protect male athletes, who have biological advantages over female athletes and have not experienced comparable historic discrimination in sports. *See* ¶ 116-25.

143. Absent female teams, girls would also never make the highest levels of competition in sports.

144. Male advantage was commonly known at the time of Title IX's passage. Indeed, in November 1975, the U.S. Department of Health, Education, and Welfare's Office of Civil Rights issued a memorandum to all chief state school officers (including one of Defendant Jett's predecessors, Howard B. Casmey) and to all superintendents of local education agencies warning schools that "an institution would not be effectively accommodating the interests and abilities of women if it abolished all its women's teams and opened up its men's teams to women, but only a few women were able to quality for the men's teams." Letter to Chief State School Officers from Director of the Office for Civil Rights on Title IX Obligations in Athletics, Dep't of Educ. (Nov. 11, 1975), https://perma.cc/4NCT-QZNB.

145. To ensure effective enforcement of Title IX's guarantees, Congress gave the United States Department of Health, Education, and Welfare (HEW) authority to promulgate regulations implementing Title IX. 20 U.S.C. §1682. HEW published regulations in 1975. 34 C.F.R. Part 106 ("Regulations").

146. In the congressional hearings concerning these regulations, multiple witnesses and materials submitted for the record discussed the need

for female-only teams to effectuate Title IX's guarantee of equal athletic opportunity. In addition to Dr. Sandler, quoted above, they included:

a. The Eastern branch of the **Association for Intercollegiate Athletics for Women**, which submitted a resolution detailing the "physiological differences for the female" in sports, "especially in regard to strength and speed." Hearings on Postsecondary Educ. at 526. Its president, **Laurie Mabry**, offered similar live testimony. *Id.* at 123.

b. The **Women's Equity Action League** submitted a detailed paper titled "What Constitutes Equality for Women in Sports?" (*Id.* at 333) arguing that "[b]ecause of differences in physiology," failing to create female-only teams would "have the effect of eliminating almost all females from top level competition." *Id.* at 294. The paper cited commentary by a lawyer for the **ACLU Women's Rights Project**, which reached the same conclusion. *Id.* at 355. WEAL's education committee member, **Dr. Norma Raffel**, offered similar live testimony. *Id.* at 283–287.

c. **Sen. Birch Bayh**, the primary sponsor of Title IX, who agreed that co-ed teams would deprive women of equal athletic opportunities. *Id.* at 168.

d. **Rep. William Goodling**, who testified that trying to provide equal athletic opportunity through co-ed teams would result in women losing opportunity. *Id.* at 151-54.

e. **Carl Croyder**, a father of five, who submitted an editorial acknowledging the physiological differences between males and females and arguing for a protected and well-funded women's category. *Id.* at 382-83.

f. Editorials submitted for the record from the **Boston Globe** and **Spokane Daily Chronicle** arguing that failing to provide a separate women's category would result in fewer athletic opportunities for women. *Id.* at 452; 454-55.

147. And since the implementation of the 1975 regulations, female-designated teams have been the all-but-exclusive measure chosen by schools and sports leagues around the country to accord women equal athletic opportunity.

148. Recognizing the physiological differences between males and females, the 1975 regulations, now codified at 34 C.F.R. § 106.41, required

"equal athletic opportunity for members of both sexes," and for schools to "effectively accommodate the interests and abilities of members of both sexes" in the "the selection of sports and levels of competition." 34 C.F.R. § 106.41(c).

149.  Further recognizing—as the 1975 memorandum discussed above did—that purely co-ed sports would *not* effectively accommodate the interests and abilities of women in competitive and contact sports, the 1975 regulations provided a mechanism and safe-harbor for female-only sports. 34 C.F.R. § 106.41(b). And to ensure this safe harbor was used to protect women and not prioritize men's sports, the safe harbor allowed girls (the sex whose athletic opportunities "have previously been limited") to try out for boys' competitive teams when no comparable girls' team was available, but not vice versa. This demonstrates the background understanding that boys do not need the protection of sex-designated sports because of their biological advantages, but girls do.

150.  What the 1975 regulations did not allow—and still do not allow— is partial sex-designation. If a team does not fit into the safe harbor, it cannot be sex-designated at all. 34 C.F.R. § 106.41(a). This also ensures that the safe harbor is confined to its original purpose: protecting girls-only sports because of the biological distinctions between males and females.

151. In 1979, a few years after the Regulations took effect, the Office for Civil Rights (OCR) at the Department of Education published more detailed guidance on Title IX and the Regulations' requirements in the collegiate athletic context through a policy interpretation. This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

152. The Regulations and Policy Interpretation both provide that "the athletic interests *and abilities* of male and female students must be equally effectively accommodated." Policy Interpretation, 44 Fed. Reg. at 71,414 (emphasis added); 34 C.F.R. § 106.41(c).

153. The Policy Interpretation spells this out, stating that Title IX requires "equal opportunity in . . . levels of competition," and competitive opportunities for each sex "which equally reflect their abilities." The guiding principles for "equivalent treatment, benefits and opportunities" are also explained in the Regulations and Policy Interpretation. The Policy Interpretation specifies that equivalent treatment includes equal opportunities to be recognized, 34 C.F.R. § 106.41(c), "to engage in . . . post-season competition," and to be free of any policies that deny "equality of athletic opportunity." Policy Interpretation, 44 Fed. Reg. at 71,416–17.

### C.    Minnesota Elects to Create a Protected Category for Girls Sports

154.    Until 1969, the MSHSL did not sponsor any girls' sports. Rather, at the high-school level, interscholastic girls' sports existed, if at all, in a smattering of local programs. *See, e.g.*, John Kolb, *Girls Basketball Makes Its Debut in Austin*, Austin Herald, Jan. 24, 1969, at 6 (describing local recreation-league program); Anne Gillespie, *Sports for Girls Dates Back to '20s*, Minn. Tribune, Apr. 26, 1969, at 15 (describing lack of interscholastic competition for girls' sports).

155.    In a reflection the MSHSL published to celebrate the 50th anniversary of Title IX's passage, female athlete advocate Dorothy McIntyre reminisces on how her experience "overseeing the Girls Recreation Association, a club-type setting where girls could participate in sports and other activities. But it was just for fun. There were no games or other competitions. The girls' participants were also eager for more." *Driving Force: McIntyre's advocacy created change and opportunities*, MSHSL (June 15, 2022), https://perma.cc/SE5F-H2QB.

156.    In 1969, the MSHSL passed its first set of bylaws for girls' athletics, thus making girls' sports an official program of the League for the first time. *Interscholastic sports for girls gradual trend*, Minneapolis Star (Apr. 26, 1969), https://tinyurl.com/33r3kmcb; John Kolb, *Girls' Basketball*

36

*Makes It's Debut in Austin, Austin Daily Herald* (Jan. 24, 1969),

https://tinyurl.com/mtj7vu3c.

157.   In 1972, the same year that Title IX passed, the MSHSL held its first girls' state tournament—in track and field. Over the next decade, the MSHSL added girls' tournaments in a few other sports, including girls' softball, which MSHSL added in 1977.

158.   In 1975, Minnesota passed the Kahn Act, officially allowing the creation of female-only teams where necessary "to provide members of each sex with an equal opportunity to participate in the athletic program" and requiring substantial parity in funding. Minn. Stat. § 126.21(1) (1975). At the time, the concept of gender identity as separate from biological sex was not widely recognized or part of the public consciousness, so "girls" and "female" teams were understood to be designated based on biological sex.

159.   Rep. Phyllis Kahn, the sponsor of the bill, stated publicly that girls-only teams were necessary to provide girls with equal athletic opportunities because of the physical differences between boys and girls. Jim Klobuchar, *One Flak Jacket for the Lady*, Minn. Star, Mar. 3, 1975, at 7.

160.   The editorial board of the *Minneapolis Tribune* agreed: advocating for the bill so that "girls could have their own basketball team" and "would not have to compete with taller, heavier boys for spots on a single

37

team." Editorial Board, *Equal Opportunity in School Sports*, Minn. Tribune, Feb. 19, 1975, at 6.

161. This development tracked—and signaled an intent to comply with—the 1975 Title IX regulations by blessing the MSHSL's creation of § 106.41(b)-compliant girls' teams and to satisfy the § 106.41(c) requirement to provide equal athletic opportunity. And it expressly recognized that creating girls' teams would be necessary to provide equal athletic opportunities.

162. In 1980, Minnesota went a step further, amending the Kahn Act to recognize "past inequities in access to athletic programs" and affirmatively requiring schools to "provide equal opportunity for members of both sexes to participate in its athletic program." Minn. Stat. § 126.21(2) (1980).

163. The 1980 amendments created a protected category in athletics only for females—the "sex whose overall athletics opportunities have previously been limited"—and turned boys sports into an open category for which "members of either sex" could try out. Minn. Stat. § 126.21 subd. 3(4).

164. Creating a series of female-only teams was an intentional, sex-based decision, designed and intended to remedy the "past [sex-based] inequities in access to athletic programs" that the legislature identified. Indeed, the entire 1980 bill was intentionally sex-based, allowing "girls to try out for boys' teams but not vice versa," controversially permitting the MSHSL to set boys and girls seasons at "different times of the year" for the same

38

sport, and declining to require a girls team "for every sport in which boys participate." Associated Press, *House approves bill setting guidelines in boys', girls' sports*, Minn. Tribune, Mar. 7, 1980, at 16.

165. It further tracked the 1975 Title IX regulations and 1979 Title IX policy interpretation, again signaling an intent to comply with § 106.41(b) and (c) via the creation and maintenance of a program of girls-only teams.

166. From 1980 until 2014, the MSHSL maintained a sports program along these lines with a series of girls' sports designated for and limited to females, and all other sports—even those called "boys'" sports—open to members of either sex.

167. Having and promoting a protected category for female sports was highly successful in Minnesota and elsewhere. In the over 50 years since Title IX's passage, opportunities for female students to participate in school sports has burgeoned. The expansion of girls' participation in high school athletics is especially striking. In the first half century of Title IX, the number of girls participating in high school sports went from 300,000 to 3.4 million. During the same period, boys' participation in high school sports rose from 3.6 million to 4.5 million. Brenda Alvarez, *Title IX At 50: Where We've Been, Where We're Headed, and Why It Still Matters*, NEA Today (July 7, 2022).

168. The MSHSL went from not administering girls' interscholastic sports until 1968, with only 55 schools offering girls' sports by 1971 (*Girls*

39

*Basketball in the 1970s: The first official MSHSL state tournaments*, MSHSL (Feb. 3, 2026), https://perma.cc/4AZ5-NLFJ) to having girls make up 44% of the state's high school athletes. *Women & Girls in Sports*, Office on the Economic Status of Women (Feb. 2026), https://perma.cc/9RGZ-SB4T.

### D. Minnesota Erases the Policy Protecting Girls' Sports, and Intentionally Allows Boys into Girls' Sports

169. In 2014, the MSHSL proposed to change its policy to permit students to compete in interscholastic sports in accordance with their gender identity.

170. The MSHSL claimed it was simply clarifying the rules based on state laws—enforced by the State Defendants—that required such a change.

171. The plan was "drafted by League staff with the help of OutFront Minnesota," an LGBT advocacy organization. David LaVaque, *Transgender athlete decision delayed again*, Minn. Star-Trib., Oct. 3, 2014, at A1.

172. An early version of the policy would have attempted to mitigate male athletic advantage by requiring evidence of testosterone suppression, but the MSHSL declined to adopt that version or those attempted protections.

173. Before adopting this proposal, the MSHSL received letters from multiple organizations highlighting how the Policy would deprive female athletes of fairness and safety. A letter from the Catholic Conference

highlighted how girls were already allowed to try out and participate on boys' teams in certain situations, so the key change resulting from the policy was to allow males on girls' teams. The letter raised the concern that allowing males on girls' teams could "jeopardize the competitive playing field for women." Letter from Jason Adkins, Minnesota Catholic Conference, to Board of Directors, Minnesota State High School League (July 28, 2014), CPL Action, https://tinyurl.com/mvz94c62.

174.    A letter from Liberty Counsel stated that the new Policy "will serve to gut the protections of female athletic equality set forth in Title IX…. Height, weight, and body mass disparity of boys raises competitiveness and injury concerns for girls in girls' sports. All of these concerns create barriers to equal female athletic participation, thus turning Title IX on its head, transforming it into a disincentive to girls' full athletic participation." Letter from Richard L. Mast, Liberty Counsel, to Board of Directors of, Minnesota State High School League (Dec. 3, 2014), CPL Action, https://perma.cc/XK3S-ZM8U.

175.    A letter from the American College of Pediatricians raised concerns about sports injuries: "There is low scientific evidence which supports the healthfulness of hormone treatments currently administered to many of these youth. Science simply cannot demonstrate that gender discordant youth either on or off these hormones are not at greater risk for

41

physical injury particularly when participating on opposite-sex teams for contact sports." Letter from Den Trumbull & Michelle A. Cretella, American College of Pediatricians, to Board of Directors of Minnesota State High School League (Dec. 3, 2014), CPL Action, https://perma.cc/36TA-HD66.

176.   A letter from Alliance Defending Freedom voiced that "creating such obviously unsafe conditions" could be found to "show[] deliberate indifference to student's physical safety" and interfered with student's rights to participate in sports by conditioning it on compromising their safety and privacy. Letter from Rory T. Gray, et al., to Board of Directors, Minnesota State High School League (Sept. 30, 2014), https://tinyurl.com/mrxz6jpa.

177.   A parent of children in the Anoka Hennepin School District (ISD 11) also wrote to a member of the Board opposing the policy and expressing safety concerns. Letter from Brenda Look to Wade Johnson, Board of Directors of Minnesota State High School League, CPL Action, https://perma.cc/36TA-HD66.

178.   On September 30, 2014, the MSHSL held a public hearing on the proposed policy change. At that hearing, multiple members of the public raised concerns and made MSHSL aware that the proposal would be unfair, unsafe, and harmful to girls. Pioneer Press, *Hearing on policy for transgender high school athletes draws supporters, detractors*, Twin Cities (Sept. 30, 2014), https://perma.cc/MV7W-C9NR; Cam Smith, *Minnesota High School*

*League holds open forum on transgender ruling* (Oct. 1, 2014),

https://tinyurl.com/s85mjvsh (highlighting snapshots of the testimonies at the

September 30th hearing) ("We are about to open a Pandora's box … our

anatomy is what it is, not what we would like it to be.") (cleaned up); ("True

underlying presumption of your policy is that gender is a matter of choice,

which is preposterous.") (cleaned up).

179.   On October 2, 2014, in light of public outcry, the MSHSL tabled

the proposal. At that meeting, MSHSL members received a new version of

the proposed policy that watered down the school's gatekeeping role in

determining eligibility.

180.   On December 4, 2014, the MSHSL voted on the proposal. But

before it did so, a female high school student expressed concern that the new

Policy would harm her ability to compete in volleyball by allowing males on

the girls' team. Nonetheless, after about 30 minutes of discussion, the

MSHSL passed the Policy, opening up girls' sports to male athletes. Tim Post,

*High school league votes to let transgender athletes pick their teams*, MPR

News (Dec. 4, 2014), https://perma.cc/9AJQ-44DM?type=image.

181.   The next year, the MSHSL adopted the current version of the

Policy, which effectively eliminated any gatekeeping role for schools or the

MSHSL to evaluate a student's claimed gender identity.

182. MSHSL's Policy, as ultimately adopted, states that "[i]n accordance with applicable state and federal laws, rules and regulations, the Minnesota State High School League allows participation for all students consistent with their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics and fine arts." MSHSL Bylaws 300.00(3)(A), https://perma.cc/8JM8-R9PH.

183. Additionally, the Handbook only sets out an appeal process if a student is deemed ineligible to participate on an athletic team designated for the opposite sex. MSHSL Bylaws 300.00(3)(B), https://perma.cc/8JM8-R9PH. There is no appeal if a student is deemed eligible by the school district.

184. This Policy did not change access to "boys'" sports. Those were already open to members of both sexes. The only change was to girls' sports, which were previously § 106.41(b) programs appropriately reserved for girls, but under the Policy, stopped qualifying for the § 106.41(b) safe harbor by being open to boys who subjectively identify as girls. By rejecting the § 106.41(b) safe harbor for which girls' sports previously qualified (via the MSHSL Policy or any state laws requiring it), Minnesota made a sex-based choice to allow males on exclusively female teams.

185. This was intentional. Minnesota intentionally set up a sex-based and sex-conscious system to provide equal opportunity and comply with the Title IX regulations, and then intentionally dismantled that system on the

44

girls' side in a way that flouted the Title IX regulations and knowingly harmed girls.

186. Minnesota intentionally discriminated by adopting a Policy that it was warned would harm girls. Adopting the Policy was "deliberate indifference to discrimination," as Minnesota was "advised of a Title IX violation [and] refuse[d] to take action [but made] an official decision by the recipient not to remedy the violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

187. The Policy "disregard[s] a strong likelihood that the challenged action would result in a violation of federally protected rights," which suffices to establish deliberate indifference. *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335, 345 (2025).

188. This intentionally discriminates against girls by depriving them of the protections Title IX affords.

### E.  Minnesota's Policy Harms Female Athletes, Including FAU Members

189. Minnesota's Policy caused girls to unfairly lose to male athletes opportunities to play, advance, and receive recognition in girls' softball in Minnesota.

190. In rejecting the Title IX safe harbor that permits sex-separated teams to ensure that girls have equal opportunity, the Policy and any state

45

laws requiring it are a sex-based choice that changes the rules, and erases the level playing field, only for female athletes.

191. Minnesota was aware that male athletes have physiological advantages that jeopardize the safety and fairness of female softball players in Minnesota. Their institution of female-only teams and practice of having distinct rules for women's sports in order to comply with Title IX and open competitive athletic opportunities to women illustrates this.

192. The physical differences are reflected in the NCAA sponsoring one bat-and-ball diamond sport for boys (baseball), and one for girls (fast-pitch softball). Many high-school leagues, including the MSHSL, mirror this same decision, sponsoring boys' baseball and girls' softball and treating those sports as effective equivalents. While these sports have some different rules and equipment, their similarities are legion, and it is common for there to be some differences in equivalent boys' and girls' sports.

193. Although MSHSL baseball is technically open to members of either sex, it is for boys. It is often referred to as "boys' baseball" among schools, and it is highly unusual for a girl to try out for—much less make—an MSHSL-sponsored baseball team. Boys thus do not have to compete against others with inherent physiological advantages.

194. Softball regularly involves high-speed collisions between players and the ball (hit by pitch, attempting to throw out runners, batted balls),

46

players and the ground or equipment (diving for a catch, sliding into a base, running into the fence), and players and each other (contact on the base path or sliding into a base, contact between fielders, contact at home plate). Players wear safety equipment like face masks, elbow and knee guards, and catchers' gear to mitigate these high-speed collisions. Accordingly, softball is a contact sport.

### F.    Minnesota Has Continued to Receive and Deliberately Disregard Notice that Its Policy Discriminates Against and Harms FAU Members

195.   Because of the MSHSL's Policy, Athlete Doe has been permitted to compete on a girls' high school fast-pitch softball team.

196.   As a biological male, Athlete Doe has inherent physiological advantages over female athletes.

197.   Minnesota was aware that having Athlete Doe competing against FAU members in softball harmed them.

198.   In April 2025, a parent of an FAU member emailed Erich Martens of MSHSL discussing how the top pitcher in Minnesota high school girls' softball is male. ████████████████████████████████ ████████████████████████████████. The email discusses how Minnesota is violating Title IX and harming his daughter and other female athletes in Minnesota via its discriminatory practice. Email from ████ ████ to Erich Martens (Apr. 14, 2025, 9:20 AM). He received no response.

199.   This parent also emailed the superintendent of Anoka Hennepin on April 14, stating that by allowing Athlete Doe to compete on the girls' team, the school was violating Title IX and harming girls, despite being federally funded and so required to follow the law. ███████████████

████████████████████████████████████████████████████████████

██████. This underscored to the school district the harm to girls and gave them a chance to restore fairness and safety in their sports. Email from ████████████ to Cory McIntyre (Apr. 17, 2025, 12:06 PM). He received a response making it clear nothing would change.

200.   Athlete Doe and Athletes 1, 2, 3, and 4 all play for high-school softball teams in the ██████ Class—████████████████████████████ high schools.

201.   This means that they all competed against each other for the ██████ state championship, which only one team can win.

202.   Athlete Doe was the ████████ pitcher for Athlete Doe's team. Athlete Doe has pitched numerous strikeouts, striking out ██ batters against the ████████████████████████.

203.   Athlete 2 was told she would have to compete with Athlete Doe for pitching time on her club softball team and so decided to join a less advanced team in the league.

204.  As her team's best pitcher, Athlete 2 also had to sacrifice pitching in a pre-season game against Athlete Doe's team, because the girls on her team objected to hitting against a male pitcher, so the best pitchers from both teams (Athlete Doe and Athlete 2) had to step aside. And Athlete 2 had to compete for the attention of recruiters with another pitcher in the same class, who has physiological advantages as a biological male.

205.  Athlete 3 ███████████████████ by Athlete Doe during club softball and experienced pain unlike that she had ever experienced when ███████████████ when a female pitched. This caused her mental challenges in the state tournament knowing that she could again ████████ ████ if their teams faced each other either when she was up to bat or playing catcher.

206.  Athlete 2 and 3 both lost a pre-season game to Athlete Doe's team and Athlete Doe's ████████ played a critical role in the final score.

207.  From 2023 to 2025, FAU member Athlete 1 played against and lost to Athlete Doe on multiple occasions. Her team has lost games to Athlete Doe's team in both the regular season and the sectional tournaments during her sophomore and junior years.

208.  During the regular season game where Athlete 1's team faced Athlete Doe's team during her junior year, Athlete Doe pitched the entire

game and ███████████████. Athlete 1's team ███████████████ in this game.

209.    When playing Athlete Doe's team in the sectional's tournament, Athlete 1's team lost again. This ended their season, depriving Athlete 1 and her team of the opportunity to advance to compete for a spot at the girls' state softball championship tournament.

210.    And Athlete 4 lost the chance to advance to the state championship game after losing to Athlete Doe's team in the first round of the state tournament, during which Athlete Doe pitched the entire game. Athlete 4 felt demoralized, because it seemed that the results of the games were determined before she and her teammates even stepped on the field.

211.    In 2025, . All of this reflects a pitcher who was extraordinarily hard to beat and had a substantial effect on any game in which the athlete pitched, including the games against Athlete 1's and Athlete 4's teams.

212.   Athlete Doe's 2025 pitching stats were better than the team's next-best pitcher, who pitched in ▮ games. So having Athlete Doe in the circle gave Doe's team an advantage compared to its best female option.

213.   Athlete Doe's 2025 pitching stats are also better than any of that team's pitchers' 2026 stats, which again demonstrates that having Athlete Doe pitch provided an advantage over that team's best female options.

214.   In 2025, Athlete Doe batted in



. Removing Athlete Doe from the lineup would have forced Doe's team to add a batter with poorer statistics and a lower likelihood of producing hits, extra-base hits, walks, and runs.

215.   In 2024, as a sophomore, Athlete Doe was already making a significant mark on the team. Athlete Doe pitched in



. Doe was the team's best pitcher and thus gave the team an advantage over its best female option. Doe was also a high performer at bat with a batting average of ▮▮▮▮▮▮▮▮▮▮▮. Taking Doe out of the lineup would have forced the team to play a batter with poorer statistics and less chance of getting on base and producing runs.

216. Allowing a male athlete to compete on the girls' team not only deprives female athletes of opportunities for victory and advancement in sports, but also of awards.

217. In 2024, Athlete Doe was awarded ██████████████████ ██████████████████████████████████████. That year, Athletes 1, 2, and 3 were eligible for ████████████████████████████████████████ recognition and competed for the select number of spots given to athletes competing in ████████████ girls' softball.

218. And both Athlete Doe and Athlete 2 were named to the ████ ████████████████████████████████ in 2025. None of the other FAU members named here received this recognition, but Athletes 3 and 4 were eligible to be ████████████████████████████████████████████████ for their class.

219. By awarding a girls' athletic award to a male athlete, Minnesota is decreasing the opportunities for girls to receive recognition and expanding opportunities for male victories.

220. Being forced to compete on an unfair and unsafe playing field also causes mental harm to FAU's members. FAU members had the added mental burden during their season and in the state tournament because they knew they did not have a fair chance at victory, and also knew that they could have to compromise their safety by facing a male pitcher.

221.

222. Near the end of the Spring Softball season, when it was clear that Athlete 2 and 3's team would go to state and so would Athlete Doe's team, several of Athlete 2 and 3's teammates told their coach that they thought it would be unsafe and unfair to compete against Athlete Doe at state.

223. The coach told the girls that they had to inform him before the state tournament if they would be willing to compete against Athlete Doe at state, if the teams were set to face each other. If not, he told them that they would forfeit a spot on the state roster for any games.

When Athlete 4's team realized they would be competing against Athlete Doe's team at state, many of the girls on the team believed this was unfair.

53



225.    Athlete 4 and her family thus feared retaliatory or disciplinary action if they expressed their view that males should not compete in girls' sports, or if they expressed concerns about fairness or safety relating to this issue. Despite this fear, Athlete 4's mom still wore a t–shirt to the game to expressing the importance of protecting women's sports and her fairness and safety concerns for her daughter and her daughter's teammates.

226.



227.   Defendants knew or should have known of the participation of a male athlete in girls' softball and the harm it was doing to female athletes. Yet they did nothing.



After the ▇▇▇▇▇▇▇▇▇▇▇▇ of the team with Athlete Doe pitching for the entire game, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇

▇▇▇▇▇▇▇▇

General Ellison posted a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

230.   Minnesota's Policy harms far more than just FAU members; it violates the rights of all female athletes in Minnesota who are forced to play against or compete for playing time with a male athlete.

55

231. Fifty years after Title IX's passage, girls are still participating in sports at a lower rate than boys were at the time Title IX was passed, yet Minnesota disregards the rights of girls and the mandates of Title IX in favor of a political agenda. *See* Alvarez, *supra*.

232. This known negative impact on athletic opportunities for Minnesota's female softball players is likely just the tip of the iceberg. Under Minnesota's policy, other male students are eligible to join girls' teams even if they have been competing on a boys' team.

233. The MSHSL's harmful Policy is not only encouraged but mandated by General Ellison's interpretation of state law through a formal opinion declaring that Minnesota's law prohibits protecting female sports. Minn. Att'y. Gen. Op. 1035.

234. The Commissioner of the Minnesota Department of Human Rights espoused the same position in an amicus brief to the Supreme Court of Minnesota. The brief stated that a public accommodation transgresses the MHRA "by prohibiting someone from participating in sports because of their gender identity." Brief for Comm'r of Minn. Dep't of Human Rights as Amicus Curiae at 4, *Cooper v. USA Powerlifting*, Nos. A23-0373, A23-0621 (Minn. Aug. 30, 2024), https://perma.cc/PM94-SCZK. The brief also emphasized that considerations of fairness to female athletes are misplaced, because the

MHRA has no exception for when it causes unfairness to individuals. *Id.* at 12–13.

235. Beyond that, the Policy harms all female athletes, and even girls who aspire to compete on their schools' sports teams in the future, because it denies equal athletic opportunities to girls in the state. Even girls who have not directly faced a male athlete are denied the equal opportunity to experience the benefits of competitive sports because the overall program of competitive sports opportunities does not equal that of boys.

236. By depriving girls of a female-designated category, girls are led to doubt that their efforts to excel in sports will bear fruit, because Minnesota's Policy does not protect athletic spaces that accommodate the reality of girls' physiological traits and capacities.

237. This adds to the tangible harm of lost victories and opportunities the mental burden of depriving girls of the hope for the victory and advancement that come from a level playing field.

238. Minnesota's Policy harms female athletes at the expense of male athletes by allowing male athletes into girls' sports where they have a physical advantage. Minnesota purports to provide sex-designated teams. But the Policy does not treat boys and girls equally. Under Minnesota's Policy boys always have a fair and safe playing field and are given effectively male-only teams. Girls, on the other hand, are denied a fair and safe playing field

because any boy who identifies as a girl can compete on the girls' teams. Defendants were made aware of these harms before adopting the Policy but chose to adopt it anyway and were thus deliberately indifferent to girls.

239. In recent years, the number of people, particularly adolescents, who identify as transgender has significantly increased. Hilary Cass, *The Independent Review of Gender Identity Services for Children and Young People* at 118 (2024), https://bit.ly/3GuzHQu. And the number of males competing in the girls' category has likewise grown.

240. As a result, more female athletes are losing opportunities to compete and receive recognition for their athletic achievements. Each time a male competes in the female category, the opportunities for males to compete and win are expanded at the expense of women and girls.

241. As more boys begin identifying as girls, the magnitude of harm to women and girls increases. More girls across different sports and levels of competition are displaced from competing or losing out on medals, podium spots, and opportunities to advance.

242. When girls try to speak up in support of their right to a level playing field, they are often silenced by the very officials charged with ensuring that they have equal opportunity to enjoy the benefits of competitive sports, as required by Title IX.

243.  School sports offer girls the opportunity for development and growth, but these years are limited. When girls are sidelined in their own sports, instead of receiving lessons of empowerment and strength, the girls are getting a message of discouragement: "your voice isn't welcome, your rights don't matter, and you can never practice hard enough to win."

244.  And Defendants know or should know that their policies harms girls in this way because of their sex.





247. For years now, allowing males to participate in women's sports has been a subject of public debate, with substantial focus on the issues of male physiological advantage, competitive fairness, and safety. And there are numerous instances of male athletes taking home trophies and state championships in the female category. *See* Katie Barnes, *Amid protests, Penn swimmer Lia Thomas becomes first known transgender athlete to win Division I national championship*, ESPN (Mar. 17, 2022) https://tinyurl.com/52vhrt9b; Pat Eaton-Rob, *Connecticut Transgender Policy Found to Violate Title IX*, NBC Connecticut (May 28, 2020), https://tinyurl.com/492z9pex (mentioning that two male athletes received a total of 15 state girls state medals during their time in high school); Elena Perry, *Defending state track champion, transgender athlete Verónica Garcia*

*wins second state title*, Spokesman-Review (May 31, 2025),

https://perma.cc/NR7V-4PSX (discussing how male athlete won a girls' state

championship title in the same event two years in a row).

248. In light of the widespread media coverage, Defendants—all high-

ranking public officials and public school districts—knew or should have

known of these issues or the fairness and safety concerns at the heart of this

lawsuit before the lawsuit was first filed.

249. The MSHSL's own chair of its Sports Medicine Advisory

Committee acknowledged that before Title IX, "women and girls … had been

functionally 'banned' from sports competition." He also recognized the

distinct physicality of female athletes compared to males: "With time and

research effort, it became clear that boys and girls were both equal and

different when it came to sports injury and sport related problems.…Girls

rupture their ACL knee ligaments up to eight times more frequently than

boys.…Girls have more concussions than boys playing the same sport and

sometimes it takes longer for girls to recover from concussions." He went on

to recognize the important role of Title IX in opening doors for women and

girls: "Title IX has taken the girls from the shadows and allowed full and

equal benefits of sport participation, and helped young women see their

potential in life and society." Bill Roberts, *Title IX and Sports Medicine Have*

*Grown Together*, MSHSL (Mar. 1, 2022), https://perma.cc/L7F6-CL28.

250.    Last year, President Trump issued an executive order, *Keeping Men out of Women's Sports*, Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025), reinforcing that Title IX protects girls' sports, including by requiring that competition in the female sports category is reserved for female athletes.

251.    This order reinforces the understanding of what Title IX and its implementing regulations and guidance require: if an entity is subject to Title IX, it must "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

252.    For decades, schools and athletes alike fulfilled this requirement by providing a protected female category in competitive sports. The Executive Order underscores this interpretation.

253.    The Trump administration issued another relevant executive order earlier in early 2025, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg 8615 (Jan. 20, 2025). This order confirms that sex "shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" The order also affirmed that federal agencies should interpret and apply "sex" in federal laws and regulations consistent with this definition.

254. What's more, they provide additional notice of the biological differences between males and females that make it fundamentally unfair, discriminatory, and harmful to force girls to compete against boys in girls' sports.

255. They also provide notice of what amounts to a violation of Title IX.

256. But instead of ending its discriminatory policy, the MSHSL stated that it would continue to allow male athletes who self-identify as female to participate on girls' sports teams. The MSHSL further stated that it would "continue to review the existing state laws alongside the new Presidential Executive Order and its timeline, processes for states, and requirements that are included." Madison Hunter, *MSHSL will follow MN law on transgender athletes in sports, not Pres. Trump's order*, Fox 9 (Feb. 6, 2025), https://perma.cc/2D6L-E3DG.

257. On February 12, 2025, the Department of Education initiated a Title IX investigation of the MSHSL. The Department of Education's press release describing the investigation quoted Executive Order 14201, confirming the Department of Education's intent to "affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972." 90 Fed. Reg. 9279. It also made clear that "State laws do not

override federal antidiscrimination laws, and these entities and their member schools remain subject to Title IX and its implementing regulations."

████████████████████████████████████████████

████ █████████████████████████████████████

██████████████████████.

258.   Also on February 12, 2025, the Speaker of the Minnesota House of Representatives and numerous state representatives signed a letter to the Minnesota State High School League expressing a "hope to engage in constructive dialogue to ensure MSHSL policies align with the values of the overwhelming majority of Minnesotans who support fairness and competitive integrity in high school athletics" and sharing that they were introducing a bill to try to protect girls sports. Letter from Lisa Demuth, et al. to Erich Martens, Minnesota State High School League (Feb. 12, 2025), https://perma.cc/L59G-B8JU.

259.   On February 19, 2025, the Minnesota House Education Committee heard live testimony on HF 12, the "Preserving Girls' Sports Act." Those testifying in support of the bill included Minnesota female athletes, physicians, coaches, and parents of female athletes. The testifiers made clear their concerns that denying female athletes a protected sports category would restrict opportunities for girls to fairly and safely compete and win in sports. *Preserving Girls' Sports Act: Hearing before the Minn. House Educ. Comm.,*

94th Leg (2025), https://tinyurl.com/mr5f3syf. This bill ultimately failed to pass by a single vote. Brian Basham, *Legislation to bar transgender athletes from girls sports falls short of passage in House*, Minn. House Rep. (Mar. 3, 2025), https://perma.cc/VR8Q-W97R.

260.   At the session, parents and female athletes shared the concerns and harms that were resulting from males competing on girls' sports teams. One mom shared how her daughter broke her wrist after being knocked down by a male athlete. A girls' head basketball coach and assistant athletic director shared, "My athletic experience has shown me one thing very clearly: boys and girls are different. If that wasn't true, Title IX wouldn't have been needed in the first place.… If we don't protect girls' sports now, we will be undoing the progress we fought so hard for." Brian Basham, *House education panel approves bill to ban transgender athletes from girls' sports*, Minn. Legis. (Feb. 19, 2025), https://perma.cc/AYA5-DHBZ. A first–year high school girl explained how she would be "absolutely devastated" if a male beat her in a state competition, citing the unfairness of males competing against girls due to their advantage in sports. AH District 11, Let Them Be…, *Support for Girls' Sports Fairness and Safety,* Facebook (Sept. 5, 2025), https://tinyurl.com/hxaw3t6s (last visited May 30, 2026).

261.   On February 20, 2025, the Attorney General of Minnesota issued a formal opinion stating that athletes must be allowed to compete in sports

based on gender identity. Minn. Att'y. Gen. Op. 1035. A position consistent with that of the state's Department of Human Rights in an amicus brief submitted to the Supreme Court in November of 2024. *See* Brief for Comm'r of Minn. Dep't of Human Rights as Amicus Curiae, *supra.*

262.   On February 25, 2025, Attorney General Pam Bondi sent a letter to General Ellison and Executive Director of the MSHSL, Martens. General Bondi wrote, "Let me be clear. Requiring girls to compete against boys in sports and athletic events violates Title IX of the Educational Amendments Act of 1972.… When federal and state law conflict, states and state entities are required to follow federal law[.]" Letter from Attorney General Pam Bondi to Minnesota Attorney General Keith Ellison and MSHSL Executive Director, Erich Marten (Feb. 25, 2025), https://perma.cc/38YL-68C2.

263.   On April 8, 2025, the United States Attorney General's office sent a letter to General Ellison notifying him that the United States Department of Justice had begun a Title IX compliance review of Minnesota and seeking clarification of his opinion regarding how the MHRA applies to sports. The letter stated that "allowing men and boys to compete in women and girls sports[] is contrary to Title IX," and referenced General Bondi's letter on the subject. Letter from Chad Mizelle and Harmeet K. Dhillon to Keith Ellison (April 8, 2025), https://tinyurl.com/yh2rhxc3.

264. On September 30, 2025, the Departments of Justice and Health and Human Services sent Minnesota a letter notifying them that their policy was in violation of Title IX and requesting that they take corrective action. Notice of Violation, *supra*.

265. But rather than seek to protect their female athletes, Minnesota doubled down, refusing to sign the proposed resolution agreement. The case was referred to the Department of Justice for enforcement, which could result in loss of funding to Minnesota schools. ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████

266. These numerous instances of hearing from the government and their citizens put Defendants on notice of the requirements of federal law and the harm their unlawful, discriminatory policy causes to the female athletes in their state.

267. Defendants are and have been aware that the Policy requires that a male athlete must be allowed to compete on the girls' teams if the male athlete identifies as a girl.

268. Defendants are and have been aware that the Policy changed the rules for girls' sports but not for "boys'" sports, which were already open.

269. Defendants know and have known that this removes the scheme put in place to accommodate the needs, interests, and abilities of female athletes and provide for girls-only sports.

270. And Defendants are and have been aware that no comparable measure to accommodate female athletics was put in place after adoption of the Policy.

271. Defendants are aware and have been aware that no physical limitations are placed on males who seek to compete on girls' athletic teams.

272. Defendants are likewise aware and have been aware that comparably talented and trained male athletes have significant, recorded athletic advantages over female athletes, as this is consistently illustrated across nearly all sports starting from a very early age.

273. Defendants are aware and have been aware of and required to comply with Title IX's requirement that student athletes not be denied the benefits of or discriminated against because of their sex in an educational program or activity.

274. The Defendants are and have been on notice that their actions harm female athletes, including members of FAU, and violated their rights by failing to provide equal athletic opportunity for girls, contravening the requirements of Title IX.

275. Defendants are and have been aware of the harms to identified members of FAU, Athletes 1, 2, 3, and 4, caused by the male's participation in girls high school softball.

### G. Minnesota intended to subordinate the rights of girls.

276. Defendants intentionally discriminated against girls. Various evidence makes it clear that Defendants—in adopting the Policy and rejecting the Title IX safe harbor by abandoning sex-separate teams—intended to treat girls differently, and less favorably, than boys. The adverse impact of Minnesota's removal of the protected female category has been discussed in detail above. The Policy changes the rules only as they apply to female athletes, and it harms only females. *See supra* §§ D–F.

277. Beginning in 1969, Minnesota developed a rich history of protecting girls' sports and attempting to remediate past discrimination against girls in athletics. Minnesota's decision to provide sex-separated sports teams follows Title IX and its implementing regulations—which were enacted to benefit women and girls. Then, in 2014, Minnesota swiftly removed the time-tested protection for women's and girls' sports, without any evidence of efforts to address the repeatedly raised concerns that the Policy would harm female athletes by allowing male athletes into the girls' athletic category—indeed rejecting early drafts that would have required some attempt to mitigate the effects via hormonal intervention. *See supra* §§ C; D.

278.    MSHSL scheduled a vote to remove the protected female category and open it to males who identify as females in October 2014. Only one outside organization, OutFront Minnesota, an activist organization that pushes for students to compete on sports teams that don't align with their sex, was involved in drafting the policy, which was largely kept under wraps. Indeed, a new draft was presented at the October meeting itself. Knowing that this was against the best interests of female students and would be widely opposed by parents, Child Protection League Action placed an advertisement in the Star Tribune to raise awareness. As a result, parents showed up in droves to the public hearing and within days the MSHSL received 10,000 emails expressing concerns and giving them ample notice of the harm and unfairness to girls. As a result, the MSHSL pushed the vote to December 2014. *From CPL Action: Public Alerted by Newspaper Ad – MSHSL Tables Transgender Policy*, Educ. Liberty Watch (Oct. 4, 2014), https://perma.cc/J5TG-W6R2. At the December 4, 2014 public hearing the day of the vote, a variety of testimony was given including voices pleading that female athletes retain a level playing field. The Policy, effectively unchanged from the October draft, passed unanimously with one member abstaining. Tim Post, *High school league votes to let transgender athletes pick their teams*, MPR News (Dec. 4, 2014), https://perma.cc/9AJQ-44DM?type=image. The approved version of the Policy had no requirements that any measures be

taken by male athletes desiring to compete in girls' sports to mitigate their physical advantage, though such attempted protections were on the table in earlier drafts. *Id.*

279.    Despite being fully aware of the harm to girls of allowing males into their sports, there is no evidence that Minnesota examined the biological advantages that male athletes have over female athletes, or made any effort to mitigate the known harm that would result from removing the protection that had been put in place to allow women and girls to compete fairly and safely in sports. And the process of substituting drafts at the last minute, ignoring substantial public input, and consciously disregarding concerns about harm to women was not routine.

280.    In its contemporaneous statements, the MSHSL did not address the fairness to or safety of female athletes—even though these issues were repeatedly raised by concerned citizens—or the decision not to try to mitigate male advantage. In the face of Title IX's text and regulations—pursuant to which Minnesota established sex-separated teams in order to help women and girls—Minnesota's about-face and disregard for the known harms to girls that would follow illustrates the intent to discriminate against girls and knowingly subordinate their rights to male athletes.

281.    Avoiding harm and providing equal athletic opportunity to female athletes is the reason a female category was instituted. Denying

71

females fair and safe sports competitions was a directly foreseeable result of allowing males onto girls' teams, because of the known, recorded, and long-recognized athletic advantages they possess. *See supra* § A. Minnesota knew that the Policy could only adversely affect females.

282. Against the background of the Title IX regulations that Minnesota had intentionally designed its sex-designated system to comply with and to thereby protect female athletes, the decision to deviate from the Title IX regulations and the § 106.41(b) safe harbor and, to ignore the known harm to women and girls all the while rejecting any attempt to mitigate that harm or provide a corresponding accommodation to women and girls, was intentionally discriminatory.

## Legal Allegations

### COUNT I: TITLE IX AND IMPLEMENTING REGULATIONS

283. Plaintiff realleges and incorporates by reference all of the foregoing paragraphs of this Complaint.

284. All Defendants are subject to the obligations of Title IX.

285. Defendants violated 20 U.S.C. § 1681(a) and its implementing regulations by intentionally discriminating against girls by implementing policies permitting males to participate in girls' softball.

72

286.   Implementing these policies, Defendants intentionally discriminate against girls by intentionally subordinating girls' interests to boys' interests and intentionally treating boys better than girls by allowing boys to compete on a level playing field and forcing girls to compete against male athletes with known athletic advantages, causing girls to sacrifice safety and fairness to compete in sports.

287.   Defendants' conduct was intentionally discriminatory in multiple respects:

a.   Between 1969 and 1980, Defendants intentionally created girls-only sports as a sex-based protected category, which they adopted in conformity with the Title IX regulations on that point. This was a sex-conscious and sex-based decision that intentionally distinguished between girls' sports and boys' (or open) sports.

b.   From 1980 to 2014, Defendants maintained a system of girls-only sports, including softball, as a sex-based protected category, operating parallel to a system of open-category (nominally "boys'") sports, again intentionally utilizing the framework provided by the Title IX regulations.

c. In 2014, Defendants intentionally adopted a policy admitting some males to girls' sports. This policy intentionally changed nothing about the open (nominally "boys'") category and only changed admission to the girls' category: admitting boys who identified as girls. Boys who identified as boys continued to be barred from the girls' category. The Policy violated the Title IX compliance scheme that had previously existed in Minnesota to protect girls' sports, removing girls' sports from the regulatory safe harbor and rendering them unlawfully constituted. By rejecting the § 106.41(b) safe harbor for which girls' sports previously qualified, this was a sex-based choice to allow males on exclusively female teams.

d. In 2014 and multiple times since, Defendants consciously and intentionally disregarded and chose not to act on warnings that their policy was unfair, discriminatory, and harmful to girls because of the inherent physiological differences between boys and girls, and that it would deprive girls of fair competition and competitive opportunities.

74

288.   Defendants also exhibited deliberate indifference to the heightened risk of harm, deprivation of opportunities, and inherent unfairness to female students caused by males participating in athletic competitions reserved for girls by implementing and maintaining these policies despite being apprised that the policies harm girls by excluding them from the full and equal benefits of athletic participation and by depriving them of fair and safe competition.

289.   Deliberate indifference to harms of which Defendants knew or should have known constitutes intentional discrimination under Title IX, and Defendants here knew or should have known of the physiological differences between males and females as relevant to sports and the harms of forcing girls to play against boys on many occasions over the past 50+ years and to the identified members of FAU: Athletes 1, 2, 3, and 4.

290.   Defendants' policies caused female students to be excluded from participation in, denied the benefits of, and subjected to discrimination in interscholastic athletics programs.

291.   These exclusions and denials were known to Defendants and existed in contexts within each of these defendants' control—specifically, interscholastic athletics programs.

292.   In addition to violating the plain text of § 1681, Defendants violated 34 C.F.R. § 106.41(a) and (b). Subsection (a) prohibits sex-designated

teams. Subsection (b) provides a safe harbor allowing sex-designated teams for competitive or contact sports. It also provides that if there is no team designated for the sex whose opportunities have been limited (females), they are allowed to try out for the boys' team. But this safe harbor does not apply here because "girls'" teams are not reserved exclusively for females and thus are not fully sex-designated. Nor do Defendants comply with the prohibition on sex-designation in subsection (a), as Defendants prohibit boys who identify as boys from playing girls sports.

293.    This (a)/(b) violation is based entirely on Defendants' intentional decisions as recounted above, and its deliberate indifference to warnings that these decisions would harm and were harming girls.

294.    This regulatory violation is a species of intentional discrimination. In 1980, Defendants intentionally adopted a program of girls' sports that complied with the § 106.41(b) safe harbor and recognized that creating a protected girls-only category was an appropriate way to avoid discriminating against girls and ensuring they have an equal opportunity in athletics. But in 2014, Defendants intentionally removed themselves from the safe harbor by opening up girls' sports to boys, thus destroying the justification for the protected category, while continuing to exclude some boys in violation of § 106.41(a). Every step involved decisions that intentionally discriminate based on sex. While the initial sex separation was lawful under

76

Title IX and its implementing regulations, the 2014 Policy—which deviated from the Title IX safe harbor meant to protect girls and instead harms only girls—is unlawful.

295. Defendants further violated 34 C.F.R. § 106.41(c) by failing to provide equal athletic opportunity to girls.

296. By opening up girls' sports to boys, Defendants failed to accommodate the interests and abilities of girls, or to treat them equally, and indeed removed an accommodation they had provided since the creation of the female category in 1969 without adding back any comparable accommodation.

297. This also is a species of intentional discrimination. Defendants were aware of the physiological differences between boys and girls and for many years accommodated those differences through an intentionally protected girls-only category.

298. Creating and removing that category were both intentional acts. And removing the category was an act directed only at girls' sports—not boys/open sports—knowingly harming girls by removing an accommodation that had been in place for decades.

299. This decision had a system-wide effect on girls' sports because it applied to all them.

300. It also had a significant effect on the program component of girls' softball in 2024 and 2025 in light of Doe's contributions to the team, up to and ███████████████████████████████████████████ ████████████████.

301. Defendants also violated the 1979 Policy Interpretation, the general principles of which apply to interscholastic athletics.

302. In the "Selection of Sports" section, because Defendants sponsor baseball for boys, they must sponsor an equivalent team for girls given that: (1) opportunities for girls were historically limited and (2) there is sufficient interest and ability among girls to sustain a viable team and a reasonable expectation of interscholastic competition for that team. In addition, because of their physiological differences, girls are not likely to be selected for, or to compete actively on, the baseball team, though it is technically open to them—and indeed, girls rarely make or compete actively on MSHSL baseball teams.

303. In addition, Defendants' policies fail the overall compliance factors by discriminating against girls and creating substantial disparities both overall and in softball by allowing male athletes to compete in girls' sports.

304. All of these are species of intentional discrimination because they are the products of intentional, knowing decisions to first create and then

destroy a protected girls-only category despite knowing the harm it would cause for girls.

305.    Defendants' policies discriminate against girls by depriving them of opportunities to compete safely and on a level playing field. They have resulted in fewer opportunities for girls to compete, advance, and win awards for their athletic performance. As detailed herein, they have resulted in Athlete 1 losing games and opportunities to advance to state, and Athlete 4 the opportunity to advance in, and potentially win, the state tournament. The policies have deprived these FAU members of equal opportunities to participate and advance in competitive softball and prevents girls from experiencing equal athletic opportunity, including the opportunity to achieve and be recognized for winning.

306.    By providing competitive opportunities in baseball and softball and failing to offer female athletes an equal opportunity to participate and advance in their sport based on their abilities, all Defendants have violated their Title IX obligations to extend equal treatment, benefits, and opportunities in athletic competition to girls.

307.    Such harm includes loss of the experience of fair competition; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to

college recruiters; emotional distress, pain, and other harms to be proven at trial.

308.   Accordingly, Plaintiff is entitled to the relief requested herein.

## Prayer for Relief

Plaintiff respectfully asks this Court to enter judgment against Defendants and provide the following relief:

1.   A declaration that Defendants have violated Title IX by discriminating against girls;

2.   A declaration that Title IX preempts state law to the extent such law requires allowing male students to access athletics teams and opportunities designated for females in contact sports and sports involving competitive athletic skill;

3.   A permanent injunction requiring Defendants to correct all records where FAU members (current or future) or their teams have lost to biologically male athletes or teams that included biologically male athletes, with respect to any record or recognition purporting to record game statistics, victories, rankings, or qualifications for competitions designated for girls or women, and conversely to correctly give credit, rankings, and/or titles to FAU members and their teams who would have received such credit, rankings, and/or titles but for the

participation of athletes born male and with male bodies in such competitions. This injunction would apply only to contact sports and sports involving competitive athletic skill. Requested record changes include:



Correcting the records in the following games to

Correcting the records in the following game

81



4.  An award of nominal damages;

5.  An award of Plaintiff's reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988;

6.  That this Court retain jurisdiction to enforce its orders;

7.  That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiff; and

8.  Such other relief as the Court may deem just and proper.

Respectfully submitted this 5th day of June, 2026.


By: /s/ Henry W. Frampton, IV

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rory T. Gray*
Georgia Bar No. 880715
**Alliance Defending Freedom**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (facsimile)
rgray@ADFlegal.org

Suzanne E. Beecher*
California Bar No. 329586
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, D.C.
(202) 393-8690
(202) 347-3622
sbeecher@ADFlegal.org

Renee K. Carlson
Minnesota Bar No. 0389675
Doug Wardlow
Minnesota Bar No. 0339544
**True North Legal**
525 Park Street, Suite 460
St. Paul, MN 55103
(612) 789.8811
rcarlson@truenorthlegalmn.org
dwardlow@truenorthlegalmn.org

*Admitted *Pro Hac Vice*

83

# DECLARATION UNDER PENALTY OF PERJURY

I, _Kristi Burton Brown_, a citizen of the United States and a resident of the State of _Colorado_, have reviewed the allegations of the foregoing Verified Complaint. As Chair of the Board of Directors of Female Athletes United, I have personal knowledge of the allegations that relate to the organization, its membership, and its interests. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning Female Athletes United and its membership and interests are true and correct to the best of my knowledge.

Executed this _5th_ day of _June_, 2026, at _Douglas County_, Colorado.

_Kristi Burton Brown_

84

**DECLARATION UNDER PENALTY OF PERJURY**

I, ███████████████████████████, a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this ___5th___ day of ___June___, 2026, at ███████ Minnesota.

███████████████████████

Athlete __1__

## DECLARATION UNDER PENALTY OF PERJURY

I, ████████████████████████, a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this 5th day of June, 2026, at ████████, Minnesota.

Athlete 2

## DECLARATION UNDER PENALTY OF PERJURY

I, ███████████████ , a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this __5__ day of __June__, 2026, at ███████ Minnesota.

Athlete __3__  ███████████

## DECLARATION UNDER PENALTY OF PERJURY

I, ████████████████ , a citizen of the United States and a resident of the State of Minnesota, have reviewed the allegations of the foregoing Verified Complaint. I have personal knowledge of the allegations that relate to me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements concerning me, my activities, and my observations as a participant in softball at the high-school and club level in Minnesota are true and correct to the best of my knowledge.

Executed this **5th** day of _June_, 2026, at ████████ Minnesota.

████████████████

Athlete **4**

88